06-4216-cv
Arar v. Ashcroft

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2008

<u>In Banc</u> Rehearing: December 9, 2008 Decided: November 2, 2009

Docket No. 06-4216-cv

- - - - - - - - - - - - - - - - - - - - - -x

MAHER ARAR,

> <u>Plaintiff-Appellant,</u>

> - v.-

JOHN ASHCROFT, Attorney General of the United States, LARRY D. THOMPSON, formerly Acting Deputy Attorney General, TOM RIDGE, Secretary of Homeland Security, J. SCOTT BLACKMAN, formerly Regional Director of the Regional Office of Immigration and Naturalization Services, PAULA CORRIGAN, Regional Director of Immigration and Customs Enforcement, EDWARD J. MCELROY, formerly District Director of Immigration and Naturalization Services for New York District, and now Customs Enforcement, ROBERT MUELLER, Director of the Federal Bureau of Investigation, John Doe 1-10, Federal Bureau of Investigation and/or Immigration and Naturalization Service Agents, and JAMES W. ZIGLAR, formerly Commissioner for Immigration and Naturalization Services, United States,

> <u>Defendants-Appellees.</u>

- - - - - - - - - - - - - - - - - - - - - -x

Before:         JACOBS, <u>Chief Judge</u>, McLAUGHLIN,[*] CALABRESI,[**]
                CABRANES, POOLER, SACK,[**] SOTOMAYOR,[***]
                PARKER,[**] RAGGI, WESLEY, HALL, and LIVINGSTON,
                <u>Circuit Judges</u>.  KATZMANN, <u>Circuit Judge</u>, took
                no part in the consideration or decision of
                the case.

JACOBS, C.J., filed the majority opinion in which
MCLAUGHLIN, CABRANES, RAGGI, WESLEY, HALL, and LIVINGSTON,
JJ., joined.

CALABRESI, J., filed a dissenting opinion in which POOLER,
SACK, and PARKER, JJ., joined.

POOLER, J., filed a dissenting opinion in which CALABRESI,
SACK, and PARKER, JJ., joined.

SACK, J., filed a dissenting opinion in which CALABRESI,
POOLER, and PARKER, JJ., joined.

PARKER, J., filed a dissenting opinion in which CALABRESI,
POOLER, and SACK, JJ., joined.


    Appeal from a judgment of the United States District

Court for the Eastern District of New York (Trager, <u>J.</u>)

---

[*] Senior Circuit Judge McLaughlin was a member of the initial three-judge panel that heard this appeal and is therefore eligible to participate in <u>in banc</u> rehearing.  <u>See</u> 28 U.S.C. § 46(c)(1).

[**] Senior Circuit Judges Calabresi, Sack, and Parker, who assumed senior status during the course of <u>in banc</u> proceedings, are entitled to participate pursuant to 28 U.S.C. § 46(c)(2).

[***] The Honorable Sonia Sotomayor, who was originally a member of the <u>in banc</u> panel and who participated in oral argument, was elevated to the Supreme Court on August 8, 2009.

dismissing Plaintiff-Appellant Maher Arar's complaint against John Ashcroft, the Attorney General of the United States; Tom Ridge, the Secretary of Homeland Security; Robert Mueller, the Director of the Federal Bureau of Investigation; and others. Arar v. Ashcroft, 414 F. Supp. 2d 250 (E.D.N.Y. 2006). Arar alleges that he was detained while changing planes at Kennedy Airport in New York (based on a warning from Canadian authorities that he was a member of Al Qaeda), mistreated for twelve days while in United States custody, and then removed to Syria via Jordan pursuant to an inter-governmental understanding that he would be detained and interrogated under torture by Syrian officials.

Arar's complaint alleges violations of the Torture Victim Protection Act ("TVPA") and the Fifth Amendment. The District Court dismissed the complaint. Id. at 287-88. A three-judge panel of this Court unanimously held that: (1) the District Court had personal jurisdiction over Thompson, Ashcroft, and Mueller; (2) Arar failed to state a claim under the TVPA; and (3) Arar failed to establish subject matter jurisdiction over his request for a declaratory judgment. Arar v. Ashcroft, 532 F.3d 157 (2d Cir. 2008). A

3

majority of the panel also dismissed Arar's Bivens claims, with one member of the panel dissenting. Id. After in banc rehearing, the panel opinion is vacated and the judgment of the district court is affirmed.

DAVID COLE (Maria Couri LaHood, Jules Lobel, Katherine Gallagher, on the brief), Center for Constitutional Rights, New York, NY; Joshua S. Sohn (on the brief), DLA Piper US LLP, New York, NY, for Plaintiff-Appellant.

JONATHAN F. COHN, Deputy Assistant Attorney General (Gregory G. Katsas, Assistant Attorney General; Benton J. Campbell, United States Attorney; Larry Lee Gregg, R. Joseph Sher, Dennis C. Barghaan, Assistant United States Attorneys; Mary Hampton Mason, Jeremy S. Brumbelow, U.S. Department of Justice, Civil Division, Torts Branch; Barbara L. Herwig, Robert M. Loeb, Michael Abate, U.S. Department of Justice, Civil Division, Appellate Staff, on the brief), for Defendant-Appellee John Ashcroft, the official capacity Defendants-Appellees, and the United States.

JEREMY A. LAMKEN (John J. Cassidy, Jamie S. Kilberg, Paul J. Nathanson, on the brief), Baker Botts L.L.P., Washington D.C.; Stephen L. Braga (on the brief), Ropes & Gray L.L.P.,

Washington D.C., <u>for Defendant-Appellee Larry D. Thompson</u>.

Robin L. Goldfaden, American Civil Liberties Union Foundation, Immigrants' Rights Project, San Francisco, CA, <u>for Amici Curiae American Civil Liberties Union and New York Civil Liberties Union in support of Plaintiff-Appellant</u>.

Burt Neuborne, New York, NY, <u>for Amici Curiae Norman Dorsen, Helen Hershkoff, Frank Michelman, Burt Neuborne, and David L. Shapiro, in support of Plaintiff-Appellant</u>.

Michael B. De Leeuw, Dale E. Ho, Jonathan J. Smith, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, NY, <u>for Amicus Curiae NAACP Legal Defense & Educational Fund, Inc. in support of Plaintiff-Appellant</u>.

Sidney S. Rosdeitcher, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, <u>for Amici Curiae Retired Federal Judges in support of Plaintiff-Appellant</u>.

Nancy Morawetz, New York University School of Law, New York, NY, <u>for Amici Curiae Law Professors in support of Plaintiff-Appellant</u>.

Alexander Yanos, Freshfields Bruckhaus Deringer US LLP, New York, NY, <u>for Amicus Curiae</u>

5

DENNIS JACOBS, Chief Judge:

Maher Arar appeals from a judgment of the United States District Court for the Eastern District of New York (Trager, J.) dismissing his complaint against the Attorney General of the United States, the Secretary of Homeland Security, the Director of the Federal Bureau of Investigation, and others, including senior immigration officials. Arar alleges that he was detained while changing planes at Kennedy Airport in New York (based on a warning from Canadian authorities that he was a member of Al Qaeda), mistreated for twelve days while in United States custody, and then removed to Syria via Jordan pursuant to an inter-governmental understanding that he would be detained and interrogated under torture by Syrian officials. The complaint alleges a violation of the Torture Victim Protection Act ("TVPA") and of his Fifth Amendment substantive due process rights arising from the conditions of his detention in the United States, the denial of his access to counsel and to the courts while in the United States, and his detention and torture in Syria.

The district court dismissed the complaint (with leave

6

to re-plead only as to the conditions of detention in the United States and his access to counsel and the courts during that period) and Arar timely appealed (without undertaking to amend). Arar v. Ashcroft, 414 F. Supp. 2d 250 (E.D.N.Y. 2006). A three-judge panel of this Court unanimously held that: (1) the District Court had personal jurisdiction over Thompson, Ashcroft, and Mueller; (2) Arar failed to state a claim under the TVPA; and (3) Arar failed to establish subject matter jurisdiction over his request for a declaratory judgment. Arar v. Ashcroft, 532 F.3d 157 (2d Cir. 2008). A majority of the panel also dismissed Arar's Bivens claims, with one member of the panel dissenting. Id. The Court voted to rehear the appeal in banc. We now affirm.

We have no trouble affirming the district court's conclusions that Arar sufficiently alleged personal jurisdiction over the defendants who challenged it, and that Arar lacks standing to seek declaratory relief. We do not reach issues of qualified immunity or the state secrets privilege. As to the TVPA, we agree with the unanimous position of the panel that Arar insufficiently pleaded that the alleged conduct of United States officials was done

7

under color of foreign law.  We agree with the district court that Arar insufficiently pleaded his claim regarding detention in the United States, a ruling that has been reinforced by the subsequent authority of <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  Our attention is therefore focused on whether Arar's claims for detention and torture in Syria can be asserted under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) ("<u>Bivens</u>").

To decide the <u>Bivens</u> issue, we must determine whether Arar's claims invoke <u>Bivens</u> in a new context; and, if so, whether an alternative remedial scheme was available to Arar, or whether (in the absence of affirmative action by Congress) "'special factors counsel[] hesitation.'"  <u>See</u> <u>Wilkie v. Robbins</u>, 551 U.S. 537, 550 (2007) (quoting <u>Bush v. Lucas</u>, 462 U.S. 367, 378 (1983)).  This opinion holds that "extraordinary rendition" is a context new to <u>Bivens</u> claims, but avoids any categorical ruling on alternative remedies-- because the dominant holding of this opinion is that, in the context of extraordinary rendition, hesitation is warranted by special factors.  We therefore affirm.  (The term "rendition" and its related usages are defined and discussed

in the margin.[1])

---

[1] The term "rendition" refers to the transfer of a fugitive from one state to another or from one country to another. See Black's Law Dictionary 1410 (9th ed. 2004) (defining "rendition" as "[t]he return of a fugitive from one state to the state where the fugitive is accused or was convicted of a crime"); see also Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 1.9(c) ("[I]nterstate rendition[ ] is specifically provided for in the United States Constitution. In order to implement the rendition clause, Congress enacted the Federal Rendition Act, which requires that the demanding state produce 'a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor.'" (footnotes omitted)). In the international context, "extradition" is a "distinct form of rendition" in which "one [country] surrenders a person within its territorial jurisdiction to a requesting [country] via a formal legal process, typically established by treaty between the countries." Cong. Research Serv., Renditions: Constraints Imposed by Laws on Torture 1 (2009); see also 1 Oppenheim's International Law §§ 415-16 (9th ed. 1996). Although most international renditions occur under a formal extradition treaty, renditions also occur outside the scope of extradition treaties, often as a matter of international comity. See 1 Oppenheim, supra, § 416; Cong. Research Serv., supra, at 1; see also 18 U.S.C. § 3181(b) (permitting, "in the exercise of comity, the surrender of persons, other than citizens, nationals, or permanent residents of the United States, who have committed crimes of violence against nationals of the United States in foreign countries without regard to the existence of any treaty of extradition with such foreign government"). The terms "'irregular rendition' and 'extraordinary rendition' have been used to refer to the *extrajudicial* transfer of a person from one [country] to another." Cong. Research Serv., supra, at 1; see also Black's Law Dictionary 1410 (9th ed. 2009) (defining "extraordinary rendition" as "[t]he transfer, without formal charges, trial, or court approval, of a person suspected of being a terrorist or supporter of a terrorist group to a

Our ruling does not preclude judicial review and oversight in this context.  But if a civil remedy in damages is to be created for harms suffered in the context of extraordinary rendition, it must be created by Congress,

---

foreign nation for imprisonment and interrogation on behalf of the transferring nation").  As we understand and use the term here, "extraordinary rendition" does not, by itself, imply that a subject of extraordinary rendition will be treated as Arar alleges he was treated during and after the rendition alleged in this action.

The United States Department of State records that, between 1993 and 2001, "rendition" provided the means for obtaining custody of ten suspected terrorists and "extradition" applied to another four suspects.  See U.S. Dep't of State, Patterns of Global Terrorism 2001, App. D: Extraditions and Renditions of Terrorists to the United States.  Accordingly, the rendition of suspected terrorists outside the mechanisms established by extradition treaties-- so-called extraordinary rendition--had been employed as a means of combating terrorists for nearly a decade prior to the events giving rise to this litigation.  See John B. Bellinger III, Legal Adviser, U.S. Dep't of State, Letter to the Editor, Wall St. J., July 5, 2006, at A25 (discussing the renditions of suspected terrorists Ramzi Yousef and Mir Aimal Kansi to the United States and the rendition of Illich Ramirez Sanchez, also known as "Carlos the Jackal," by French authorities from the Sudan to France, "which was subsequently upheld by the European Commission on Human Rights"), reprinted in Digest of United States Practice in International Law 162-63 (Sally J. Cummings ed., 2006); see also Remarks of Condoleezza Rice, U.S. Sec'y of State (Dec. 5, 2005) ("For decades, the United States and other countries have used 'renditions' to transport terrorist suspects from the country where they were captured to their home country or to other countries where they can be questioned, held, or brought to justice."), in Digest of United States Practice in International Law 100, 102 (Sally J. Cummings ed., 2005).

which alone has the institutional competence to set parameters, delineate safe harbors, and specify relief. If Congress chooses to legislate on this subject, then judicial review of such legislation would be available.

[lines 5-13 intentionally left blank]

Applying our understanding of Supreme Court precedent, we decline to create, on our own, a new cause of action against officers and employees of the federal government. Rather, we conclude that, when a case presents the intractable "special factors" apparent here, see supra at 36-37, it is for the Executive in the first instance to decide how to implement extraordinary rendition, and for the elected members of Congress--and not for us as judges--to decide whether an individual may seek compensation from

11

government officers and employees directly, or from the government, for a constitutional violation.  Administrations past and present have reserved the right to employ rendition, see David Johnston, U.S. Says Rendition to Continue, but with More Oversight, N.Y. Times, Aug. 24, 2009, and not withstanding prolonged public debate, Congress has not prohibited the practice, imposed limits on its use, or created a cause of action for those who allege they have suffered constitutional injury as a consequence.

**I**

Arar's complaint sets forth the following factual allegations.

Arar is a dual citizen of Syria, where he was born and raised, and of Canada, to which his family immigrated when he was 17.

While on vacation in Tunisia in September 2002, Arar was called back to work in Montreal.  His itinerary called for stops in Zurich and New York.

Arar landed at Kennedy Airport around noon on September 26.  Between planes, Arar presented his Canadian passport to an immigration official who, after checking Arar's

12

credentials, asked Arar to wait nearby. About two hours later, Arar was fingerprinted and his bags searched. Between 4 p.m. and 9 p.m., Arar was interviewed by an agent from the Federal Bureau of Investigation ("FBI"), who asked (inter alia) about his relationships with certain individuals who were suspected of terrorist ties. Arar admitted knowing at least one of them, but denied being a member of a terrorist group. Following the FBI interview, Arar was questioned by an official from the Immigration and Nationalization Service ("INS") for three more hours; he continued to deny terrorist affiliations.

Arar spent the night alone in a room at the airport. The next morning (September 27) he was questioned by FBI agents from approximately 9 a.m. until 2 p.m.; the agents asked him about Osama Bin Laden, Iraq, Palestine, and other things. That evening, Arar was given an opportunity to return voluntarily to Syria. He refused, citing a fear of torture, and asked instead to go to Canada or Switzerland. Later that evening, he was transferred to the Metropolitan Detention Center ("MDC") in Brooklyn, where he remained until October 8.

On October 1, the INS initiated removal proceedings,

and served Arar with a document stating that he was inadmissible because he belonged to a terrorist organization. Later that day, he called his mother-in-law in Ottawa--his prior requests to place calls and speak to a lawyer having been denied or ignored. His family retained a lawyer to represent him and contacted the Canadian Consulate in New York.

A Canadian consular official visited Arar on October 3. The next day, immigration officers asked Arar to designate in writing the country to which he would want to be removed. He designated Canada. On the evening of October 5, Arar met with his attorney. The following evening, a Sunday, Arar was again questioned by INS officials. The INS District Director in New York left a voicemail message on the office phone of Arar's attorney that the interview would take place, but the attorney did not receive the message in time to attend. Arar was told that she chose not to attend. In days following, the attorney was given false information about Arar's whereabouts.

On October 8, 2002, Arar learned that the INS had: (1) ordered his removal to Syria, (2) made a (required) finding that such removal would be consistent with Article 3 of the

14

Convention Against Torture ("CAT"),[2] and (3) barred him from re-entering the United States for five years. He was found inadmissible to the United States on the basis of 8 U.S.C. § 1182(a)(3)(B)(i)(V), which provides that any alien who "is a member of a terrorist organization" is inadmissible to the United States. The finding was based on Arar's association with a suspected terrorist and other (classified) information. Thereafter, Defendant J. Scott Blackman, an INS Regional Director, made a determination that Arar was clearly and unequivocally a member of Al Qaeda and inadmissible to the United States. A "Final Notice of Inadmissibility," dated October 8, and signed by Defendant Deputy Attorney General Larry Thompson, stated that Arar's removal to Syria would be consistent with the CAT, notwithstanding Arar's articulated fear of torture.

Later that day, Arar was taken to New Jersey, whence he

---

[2] Article 3 of the Convention Against Torture "prohibits any state party to the Convention from expelling, returning or extraditing any person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture, and provides that the determination of whether such grounds exist [must take] into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights." Tun v. INS, 445 F.3d 554, 566 (2d Cir. 2006) (internal quotation marks, brackets, and ellipsis omitted).

15

flew in a small jet to Washington, D.C., and then to Amman, Jordan. When he arrived in Amman on October 9, he was handed over to Jordanian authorities who treated him roughly and then delivered him to the custody of Syrian officials, who detained him at a Syrian Military Intelligence facility.

Arar was in Syria for a year, the first ten months in an underground cell six feet by three, and seven feet high. He was interrogated for twelve days on his arrival in Syria, and in that period was beaten on his palms, hips, and lower back with a two-inch-thick electric cable and with bare hands. Arar alleges that United States officials conspired to send him to Syria for the purpose of interrogation under torture, and directed the interrogations from abroad by providing Syria with Arar's dossier, dictating questions for the Syrians to ask him, and receiving intelligence learned from the interviews.

On October 20, 2002, Canadian Embassy officials inquired of Syria as to Arar's whereabouts. The next day, Syria confirmed to Canada that Arar was in its custody; that same day, interrogation ceased. Arar remained in Syria, however, receiving visits from Canadian consular officials.

On August 14, 2003, Arar defied his captors by telling

16

the Canadians that he had been tortured and was confined to a small underground cell. Five days later, after signing a confession that he had trained as a terrorist in Afghanistan, Arar was moved to various locations. On October 5, 2003, Arar was released to the custody of a Canadian embassy official in Damascus, and was flown to Ottawa the next day.

**II**

On January 22, 2004, Arar filed a four-count complaint in the Eastern District of New York seeking damages from federal officials for harms suffered as a result of his detention and confinement in the United States and his detention and interrogation in Syria. Count One of Arar's complaint seeks relief under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note (a)(1) (the "TVPA claim"). Counts Two and Three seek relief under the Fifth Amendment for Arar's alleged torture in Syria (Count Two) and his detention there (Count Three). Count Four seeks relief under the Fifth Amendment for Arar's detention in the United States prior to his removal to Syria. Arar also seeks a declaratory judgment that defendants' conduct

17

violated his "constitutional, civil, and human rights."

Defendants-Appellees moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b), challenging personal jurisdiction over Defendants Ashcroft, Thompson, and Mueller and challenging subject-matter jurisdiction as to the claims alleging confinement and torture in Syria on the ground that they arise from an order of removal and are therefore subject to the jurisdictional bar of the Immigration and Nationality Act (see infra Part VI).  It was also argued that Arar lacked standing to seek a declaratory judgment.

On February 16, 2006, the district court dismissed Counts One, Two, and Three with prejudice, and Count Four without prejudice.  Arar v. Ashcroft, 414 F. Supp. 2d 250, 287-88 (E.D.N.Y. 2006).  The district court also concluded that Arar lacked standing to bring a claim for declaratory relief.  Id. at 258-59.

Arar elected not to re-plead Count Four, and on August 17, 2006, the district court entered judgment dismissing all of Arar's claims.  Arar timely appealed.  A divided three-judge panel of this Court affirmed on June 30, 2008.  Arar v. Ashcroft, 532 F.3d 157 (2d Cir. 2008).  The Court voted

18

to rehear the case in banc, and oral argument was heard on December 9, 2008.

**III**

We review de novo the district court's decision to grant a motion to dismiss. In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007). In so doing, we accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007); see also Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009).

At the outset, we conclude (as the panel concluded unanimously) that Arar: (1) sufficiently alleged personal jurisdiction over the defendants, and (2) has no standing to seek declaratory relief; in addition, because we dismiss the action for the reasons set forth below, we need not (and do not) reach the issues of qualified immunity or the state secrets privilege.

This opinion owes a debt to the panel opinions.

19

**IV**

The TVPA creates a cause of action for damages against any "individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture."  28 U.S.C. § 1350 note (a)(1). Count One of Arar's complaint alleges that the defendants conspired with Jordanian and Syrian officials to have Arar tortured in direct violation of the TVPA.

Any allegation arising under the TVPA requires a demonstration that the defendants acted under color of foreign law, or under its authority.  Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir. 1995).  "In construing the term[] . . . 'color of law,' courts are instructed to look . . . to jurisprudence under 42 U.S.C. § 1983 . . . ."  Id. (citing H.R. Rep. No. 367, 102d Cong., 2d Sess., at 5 (1991) reprinted in 1992 U.S.C.C.A.N. 84, 87).  Under section 1983, "[t]he traditional definition of acting under color of state law requires that the defendant . . . have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  The

determination as to whether a non-state party acts under color of state law requires an intensely fact-specific judgment unaided by rigid criteria as to whether particular conduct may be fairly attributed to the state.  See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001).  A federal officer who conspires with a state officer may act under color of state law, see Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 154 (2d Cir. 2006); but since "federal officials typically act under color of *federal* law," they are rarely deemed to have acted under color of state law.  Strickland ex rel. Strickland v. Shalala, 123 F.3d 863, 866 (6th Cir. 1997) (emphasis in original).

Accordingly, to state a claim under the TVPA, Arar must adequately allege that the defendants possessed power under Syrian law, and that the offending actions (i.e., Arar's removal to Syria and subsequent torture) derived from an exercise of that power, or that defendants could not have undertaken their culpable actions absent such power.  The complaint contains no such allegation.  Arar has argued that his allegation of conspiracy cures any deficiency under the TVPA.  But the conspiracy allegation is that United States

21

officials encouraged and facilitated the exercise of power by Syrians in Syria, not that the United States officials had or exercised power or authority under Syrian law. The defendants are alleged to have acted under color of federal, not Syrian, law, and to have acted in accordance with alleged federal policies and in pursuit of the aims of the federal government in the international context. At most, it is alleged that the defendants encouraged or solicited certain conduct by foreign officials. Such conduct is insufficient to establish that the defendants were in some way clothed with the authority of Syrian law or that their conduct may otherwise be fairly attributable to Syria. See, e.g., Harbury v. Hayden, 444 F. Supp. 2d 19, 42-43 (D.D.C. 2006), aff'd on other grounds, 522 F.3d 413 (D.C. Cir. 2008). We therefore agree with the unanimous holding of the panel and affirm the District Court's dismissal of the TVPA claim.[3]

---

[3] Judge POOLER relies on a line of section 1983 cases explaining when and how private conduct can constitute state action, and then reasons by analogy to deem the defendants' conduct in this case to have arisen under foreign (Syrian) law. See Dissent of Judge Pooler at **8-9**. Under this theory, Judge POOLER would allow a person tortured abroad to sue an official of the United States government, who in the performance of her official duties, "encourage[d]," "facilitat[ed]," or "solicit[ed]" the mistreatment. Id. at

**V**

Count Four of the complaint alleges that the conditions of confinement in the United States (prior to Arar's removal to Syria), and the denial of access to courts during that detention, violated Arar's substantive due process rights under the Fifth Amendment. The District Court dismissed this claim--without prejudice--as insufficiently pleaded, and invited Arar to re-plead the claim in order to "articulate more precisely the judicial relief he was denied" and to "name those defendants that were personally involved in the alleged unconstitutional treatment." *Arar*, 414 F. Supp. 2d at 286, 287. Arar elected (in his counsel's words) to "stand on the allegations of his original complaint."

On a motion to dismiss, courts require "enough facts to

---

**10.** Notably, she cites no authority for this remarkable proposition, which would render a U.S. official an official of a foreign government when she deals with that foreign state on matters involving intelligence, military, and diplomatic affairs. At least one commentator has proposed a legislative amendment to bring the law into line with what Judge POOLER thinks it is, or should be. See Richard Henry Seamon, U.S. Torture as a Tort, 37 Rutgers L.J. 715, 802, 804 (2006) ("Under current law, U.S. officials can seldom be held civilly liable for torture . . . . Congress could amend the TVPA to extend the cause of action to the victims of torture inflicted under color of federal law.").

state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." Twombly, 550 U.S. at 555. Broad allegations of conspiracy are insufficient; the plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks omitted) (addressing conspiracy claims under 42 U.S.C. § 1985). Furthermore, a plaintiff in a Bivens action is required to allege facts indicating that the defendants were personally involved in the claimed constitutional violation. See Ellis v. Blum, 643 F.2d 68, 85 (2d Cir. 1981); see also Thomas v. Ashcroft, 470 F.3d 491, 496 (2d Cir. 2006).

Arar alleges that "Defendants"--undifferentiated-- "denied Mr. Arar effective access to consular assistance, the courts, his lawyers, and family members" in order to effectuate his removal to Syria. But he fails to specify any culpable action taken by any single defendant, and does not allege the "meeting of the minds" that a plausible

24

conspiracy claim requires. He alleges (in passive voice) that his requests to make phone calls "were ignored," and that "he was told" that he was not entitled to a lawyer, but he fails to link these denials to any defendant, named or unnamed. Given this omission, and in view of Arar's rejection of an opportunity to re-plead, we agree with the District Court and the panel majority that this Count of the complaint must be dismissed.

We express no view as to the sufficiency of the pleading otherwise, that is, whether the conduct alleged (if plausibly attributable to defendants) would violate a constitutionally protected interest.[4] To the extent that this claim may be deemed to be a <u>Bivens</u>-type action, it may raise some of the special factors considered later in this opinion.

## VI

Arar's remaining claims seek relief on the basis of torture and detention in Syria, and are cast as violations

---

[4] We need not, therefore, consider the panel's holding that Arar failed "to establish that he possessed any entitlement to a pre-removal hearing" or "to the assistance of counsel." <u>Arar</u>, 532 F.3d at 187-88.

25

of substantive due process.  At the outset, Defendants argue that the jurisdictional bar of the INA deprived the District Court of subject-matter jurisdiction over these counts because Arar's removal was conducted pursuant to a decision that was "at the discretion" of the Attorney General.

"[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.  Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."  Harisiades v. Shaughnessy, 342 U.S. 580, 588-89 (1952).  Accordingly, the INA requires an alien to seek relief only through judicial review of a removal order in the appropriate court of appeals; it entirely forecloses judicial review of decisions of the Attorney General or the Secretary of Homeland Security specified by the INA to be within the discretion of those officers.  See 8 U.S.C. § 1252.[5]

---

[5] 8 U.S.C. § 1252(b)(9) provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States

However, the application of the INA's jurisdictional bar is problematic in this case because the proceedings under the INA are alleged to have been irregular in several respects.

First, the complaint alleges that the government took the following actions that impaired Arar's timely ability to seek the judicial review normally afforded under the INA and to receive any meaningful relief: denying his requests to contact an attorney or his family; misleading his lawyer (after one was retained for him) as to his location and status, thereby frustrating any advocacy on his behalf; and serving the removal order on Arar en route to Amman, when he no longer had access to his attorney and could not make use

---

. . . shall be available only in judicial review of a final order." Subsection 1252(a)(5), in turn, states that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal." Finally, pursuant to § 1252 (a)(2)(B):

> [N]o court shall have jurisdiction to review . . .
>
> (ii) any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified . . . to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of [asylum].

27

of the review process. The complaint also alleges that the government undertook extraordinary rendition in clear violation of the protections afforded aliens by the INA, suggesting that the government itself might not have viewed the INA as the real source of its removal authority in this context. However, mere allegations of obstruction generally do not circumvent a congressionally mandated remedial scheme. Otherwise, limitations on the jurisdiction of the district courts could easily be evaded and thwarted.

Second, although the INA governs the status of aliens in transit at United States airports, and clearly has a role in such circumstances, see 8 U.S.C. § 1182(d)(4)(C), this is not a typical immigration case according to the complaint: Arar took no step to enter or stay in this country; he was changing planes to go elsewhere, repeatedly expressed his desire to return to Canada, and was ticketed to Montreal. Even though this case does not present the familiar fact pattern of an alien trying to enter or remain in the United States, our immigration laws apply with equal force to aliens who seek admission to our country and to aliens whom the government seeks to keep out of our country.

In short, it is not clear that the INA's judicial

28

review provisions govern circumstances of involuntary rendition such as those alleged here.  Indeed, rendition may take place in circumstances that in no way implicate United States immigration laws, such as when a person is detained abroad and rendered to some third country.

Finally, even if the INA's jurisdictional bar is surmounted and review not foreclosed, Arar has alleged circumstances that would have prevented him from obtaining review.  If, as he alleges, he was served with the removal order while he was already en route to Amman, the INA could have afforded him no relief then (and can afford him no affirmative relief at this time in this case).

In any event, we need not decide the vexed question of whether the INA bar defeats jurisdiction of Arar's substantive due process claims, because we conclude below that the case must be dismissed at the threshold for other reasons.


**VII**

In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), the Supreme Court "recognized for the first time an implied private action for

29

damages against federal officers alleged to have violated a citizen's constitutional rights." Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001). The plaintiff in Bivens had been subjected to an unlawful, warrantless search which resulted in his arrest. Bivens, 403 U.S. at 389-90. The Supreme Court allowed him to state a cause of action for money damages directly under the Fourth Amendment, thereby giving rise to a judicially-created remedy stemming directly from the Constitution itself. Id. at 397.

The purpose of the Bivens remedy "is to deter individual federal officers from committing constitutional violations." Malesko, 534 U.S. at 70. So a Bivens action is brought against individuals, and any damages are payable by the offending officers. Carlson v. Green, 446 U.S. 14, 21 (1980). Notwithstanding the potential breadth of claims that would serve that objective, the Supreme Court has warned that the Bivens remedy is an extraordinary thing that should rarely if ever be applied in "new contexts." See Malesko, 534 U.S. at 69 (internal quotation marks omitted); Schweiker v. Chilicky, 487 U.S. 412, 421 (1988); see also Dotson v. Griesa, 398 F.3d 156, 166 (2d Cir. 2005) ("Because a Bivens action is a judicially created remedy . . . courts

proceed cautiously in extending such implied relief . . . .").  In the 38 years since Bivens, the Supreme Court has extended it twice only: in the context of an employment discrimination claim in violation of the Due Process Clause, Davis v. Passman, 442 U.S. 228 (1979); and in the context of an Eighth Amendment violation by prison officials, Carlson, 446 U.S. 14; see also Wilkie v. Robbins, 551 U.S. 537, 550 (2007) ("[I]n most instances we have found a Bivens remedy unjustified."); Malesko, 534 U.S. at 68 ("[W]e have consistently refused to extend Bivens liability to any new context or new category of defendants.").  Since Carlson in 1980, the Supreme Court has declined to extend the Bivens remedy in any new direction at all.  Among the rejected contexts are: violations of federal employees' First Amendment rights by their employers, Bush v. Lucas, 462 U.S. 367 (1983); harms suffered incident to military service, United States v. Stanley, 483 U.S. 669 (1987); Chappell v. Wallace, 462 U.S. 296 (1983); denials of Social Security benefits, Schweiker, 487 U.S. at 412; claims against federal agencies, FDIC v. Meyer, 510 U.S. 471 (1994); claims against private corporations operating under federal contracts, Malesko, 534 U.S. 61 (2001); and claims

31

of retaliation by federal officials against private landowners, <u>Wilkie</u>, 551 U.S. at 562.

This case requires us to examine whether allowing this <u>Bivens</u> action to proceed would extend <u>Bivens</u> to a new "context," and if so, whether such an extension is advisable.

"Context" is not defined in the case law. At a sufficiently high level of generality, any claim can be analogized to some other claim for which a Bivens action is afforded, just as at a sufficiently high level of particularity, every case has points of distinction. We construe the word "context" as it is commonly used in law: to reflect a potentially recurring scenario that has similar legal and factual components.

The context of this case is international rendition, specifically, "extraordinary rendition." Extraordinary rendition is treated as a distinct phenomenon in international law. <u>See</u> <u>supra</u> note 1. Indeed, law review articles that affirmatively advocate the creation of a remedy in cases like Arar's recognize "extraordinary rendition" as the context. <u>See, e.g.,</u> Peter Johnston, Note, <u>Leaving the Invisible Universe: Why All Victims of</u>

32

*Extraordinary Rendition Need a Cause of Action Against the United States*, 16 J.L. & Pol'y 357, 363 (2007). More particularly, the context of extraordinary rendition in Arar's case is the complicity or cooperation of United States government officials in the delivery of a non-citizen to a foreign country for torture (or with the expectation that torture will take place). This is a "new context": no court has previously afforded a <u>Bivens</u> remedy for extraordinary rendition.

Once we have identified the context as "new," we must decide whether to recognize a <u>Bivens</u> remedy in that environment of fact and law. The Supreme Court tells us that this is a two-part inquiry. In order to determine whether to recognize a <u>Bivens</u> remedy in a new context, we must consider: whether there is an alternative remedial scheme available to the plaintiff; and whether "'special factors counsel[] hesitation'" in creating a <u>Bivens</u> remedy. <u>Wilkie</u>, 551 U.S. at 550 (quoting <u>Bush</u>, 462 U.S. at 378).

**VIII**

There are several possible alternative remedial schemes here. Congress has established a substantial,

comprehensive, and intricate remedial scheme in the context of immigration. The INA provides for review of final orders of removal, including review of the government's designation of a particular destination country and many (albeit not all) decisions of the Attorney General and the Secretary of Homeland Security. See 8 U.S.C. § 1252; Mendis v. Filip, 554 F.3d 335, 338 (2d Cir. 2009). Congress has supplemented this general remedial scheme with specific guidance for particular contexts by enacting (i) the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), 8 U.S.C. § 1231 note; see also 8 C.F.R. § 208.16(c); and (ii) the TVPA, which, as already discussed, provides no remedy to Arar. At the same time, Congress has expressly limited review of the removal of aliens who (like Arar) are removable for reasons related to national security. See 8 U.S.C. § 1225(c). Congress has also regularly modified the various review mechanisms to account for perceived difficulties and complications. See, e.g., REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 302; Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009-546. In light of the complexity of the remedial scheme Congress has

34

created (and frequently amended), we would ordinarily draw a strong inference that Congress intended the judiciary to stay its hand and refrain from creating a Bivens action in this context. See Wilkie, 551 U.S. at 554; Schweiker, 487 U.S. at 424-29; Bush, 462 U.S. at 388.

We recognize, however, that any reliance on the INA as an alternative remedial scheme presents difficulties for the same reasons discussed in Part VI above. Arar has alleged that he was actively prevented from seeking any meaningful review and relief through the INA processes. In the end, we need not decide whether an alternative remedial scheme was available because, "even in the absence of an alternative [remedial scheme], a Bivens remedy is a subject of judgment . . . [in which] courts must . . . pay particular heed . . . to any special factors counselling hesitation before authorizing a new kind of federal litigation." Wilkie, 551 U.S. at 550 (internal quotation marks omitted).[6] Such special factors are clearly present in the new context of

---

[6] Accordingly, we have no occasion to consider the panel's conclusion that the "review procedures set forth by the INA provide a convincing reason for us to resist recognizing a Bivens cause of action for Arar's claims." Arar, 532 F.3d at 180 (internal quotation marks and citation omitted).

this case, and they sternly counsel hesitation.

**IX**

When the Bivens cause of action was created in 1971, the Supreme Court explained that such a remedy could be afforded because that "case involve[d] no special factors counselling hesitation in the absence of affirmative action by Congress." Bivens, 403 U.S. at 396. This prudential limitation was expressly weighed by the Court in Davis, 442 U.S. at 245-46, and Carlson, 446 U.S. at 18-19, and such hesitation has defeated numerous Bivens initiatives, see, e.g., Stanley, 483 U.S. at 683-84; Chappell, 462 U.S. at 304; Wilkie, 551 U.S. at 554-55; Dotson, 398 F.3d at 166-67. Among the "special factors" that have "counsel[ed] hesitation" and thereby foreclosed a Bivens remedy are: military concerns, Stanley, 483 U.S. at 683-84; Chappell, 462 U.S. at 304; separation of powers, United States v. City of Philadelphia, 644 F.2d 187, 200 (3d Cir. 1980); the comprehensiveness of available statutory schemes, Dotson, 398 F.3d at 166; national security concerns, Beattie v. Boeing Co., 43 F.3d 559, 563 (10th Cir. 1994); and foreign policy considerations, United States v. Verdugo-Urquidez,

494 U.S. 259, 274 (1990).

Two principles emerge from this review of case law:

- "Special factors" is an embracing category, not easily defined; but it is limited in terms to factors that provoke "hesitation." While special factors should be substantial enough to justify the absence of a damages remedy for a wrong, no account is taken of countervailing factors that might counsel alacrity or activism, and none has ever been cited by the Supreme Court as a reason for affording a Bivens remedy where it would not otherwise exist.

- The only relevant threshold--that a factor "counsels hesitation"--is remarkably low. It is at the opposite end of the continuum from the unflagging duty to exercise jurisdiction. Hesitation is a pause, not a full stop, or an abstention; and to counsel is not to require. "Hesitation" is "counseled" whenever thoughtful discretion would pause even to consider.[7]

With these principles in mind, we adduce, one by one, special factors that bear upon the recognition of a Bivens remedy for rendition.

**X**

Although this action is cast in terms of a claim for

---

[7] Judge POOLER labels these two principles "dicta," see Dissent of Judge Pooler at **2**, but they are not. They are integral to the holding in this in banc case, because we do not take account of countervailing factors and because we apply the standard we announce.

37

money damages against the defendants in their individual capacities, it operates as a constitutional challenge to policies promulgated by the executive. Our federal system of checks and balances provides means to consider allegedly unconstitutional executive policy, but a private action for money damages against individual policymakers is not one of them. A Bivens action is sometimes analogized to an action pursuant to 42 U.S.C. § 1983, but it does not reach so far as to create the federal counterpart to an action under Monell v. Department of Social Services, 436 U.S. 658 (1978). Here, we need not decide categorically whether a Bivens action can lie against policymakers because in the context of extraordinary rendition, such an action would have the natural tendency to affect diplomacy, foreign policy, and the security of the nation, and that fact counsels hesitation. Our holding need be no broader.

A. Security and Foreign Policy

The Executive has practiced rendition since at least 1995. See Extraordinary Rendition in U.S. Counterterrorism Policy: The Impact on Transatlantic Relations: Joint Hearing Before the Subcomm. on International Organizations, Human

38

Rights, and Oversight and the Subcomm. on Europe of the H. Comm. on Foreign Affairs, 110th Cong. 15 (2007) (statement of Michael F. Scheuer, Former Chief, Bin Laden Unit, CIA). Arar gives "the mid-1990s" as the date for the inception of the policy under which he was sent to Syria for torture. Pl. Maher Arar's Mem. of Law in Opp'n to Defs.' Invocation of the State Secrets Privilege, Mar. 14, 2005, at 6. A suit seeking a damages remedy against senior officials who implement such a policy is in critical respects a suit against the government as to which the government has not waived sovereign immunity. Such a suit unavoidably influences government policy, probes government secrets, invades government interests, enmeshes government lawyers, and thereby elicits government funds for settlement. (Canada has already paid Arar $10 million.[8])

It is a substantial understatement to say that one must hesitate before extending <u>Bivens</u> into such a context. A suit seeking a damages remedy against senior officials who implement an extraordinary rendition policy would enmesh the

_____

[8] <u>See</u> Press Release and Announcement, Stephen Harper, Prime Minister of Can. (Jan. 26, 2007), http://pm.gc.ca/eng/media.asp?id=1510; <u>Ottawa Reaches $10M Settlement with Arar</u>, CBC News, Jan. 26, 2007, http://www.cbc.ca/canada/story/2007/01/25/arar-harper.html.

39

courts ineluctably in an assessment of the validity and rationale of that policy and its implementation in this particular case, matters that directly affect significant diplomatic and national security concerns.  It is clear from the face of the complaint that Arar explicitly targets the "policy" of extraordinary rendition; he cites the policy twice in his complaint, and submits documents and media reports concerning the practice.  His claim cannot proceed without inquiry into the perceived need for the policy, the threats to which it responds, the substance and sources of the intelligence used to formulate it, and the propriety of adopting specific responses to particular threats in light of apparent geopolitical circumstances and our relations with foreign countries.

The Supreme Court has expressly counseled that matters touching upon foreign policy and national security fall within "an area of executive action 'in which courts have long been *hesitant* to intrude'" absent congressional authorization.  Lincoln v. Vigil, 508 U.S. 182, 192 (1993) (emphasis added) (quoting Franklin v. Massachusetts, 505 U.S. 788, 819 (1992) (Stevens, J., concurring in part and concurring in the judgment)).  It "has recognized 'the

40

generally accepted view that foreign policy was the province and responsibility of the Executive. . . . Thus, unless Congress specifically has provided otherwise, courts traditionally have been *reluctant* to intrude upon the authority of the Executive in military and national security affairs." Dep't of Navy v. Egan, 484 U.S. 518, 529-30 (1988) (emphasis added) (quoting Haig v. Agee, 453 U.S. 280, 293-94 (1981)). This "hesita[tion]" and "reluctan[ce]" is counseled by:

- the constitutional separation of powers among the branches of government, see United States v. Curtiss-Wright Exp. Co., 299 U.S. 304, 320-22 (1936) (noting the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations" and discussing the difficulties presented by congressional--let alone judicial--involvement in such affairs), and

- the limited institutional competence of the judiciary, see Boumediene v. Bush, 128 S. Ct. 2229, 2276-77 (2008) ("Unlike the President and some designated Members of Congress, neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people. The law must accord the Executive substantial authority to apprehend and detain those who pose a real danger to our security."); see also Munaf v. Geren, 128 S. Ct. 2207, 2226 (2008) ("The Judiciary is not suited to [make] determinations [in the area of foreign affairs] that would . . . undermine the

41

Government's ability to speak with one voice in this area.  In contrast, the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of any ally, and what to do about it if there is." (citation omitted)).

True, courts can--with difficulty and resourcefulness--consider state secrets and even reexamine judgments made in the foreign affairs context *when they must*, that is, when there is an unflagging duty to exercise our jurisdiction. Otherwise:

> [T]he special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad.  The foreign affairs implications of suits such as this cannot be ignored--their ability to produce what the Supreme Court has called in another context "embarrassment of our government abroad" through "multifarious pronouncements by various departments on one question."  Whether or not the present litigation is motivated by considerations of geopolitics rather than personal harm, we think that as a general matter the danger of foreign citizens' using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist.

Sanchez-Espinoza v. Reagan, 770 F.2d 202, 209 (D.C. Cir. 1985) (Scalia, J.) (quoting Baker v. Carr, 369 U.S. 186, 217 (1962)).  Absent clear congressional authorization, the

42

judicial review of extraordinary rendition would offend the separation of powers and inhibit this country's foreign policy. It does not matter for our purposes whether such consequences would flow from innocent interference or from deliberate manipulation. These concerns must counsel hesitation in creating a new damages remedy that Congress has not seen fit to authorize.

B. Classified Information

The extraordinary rendition context involves exchanges among the ministries and agencies of foreign countries on diplomatic, security, and intelligence issues. The sensitivities of such classified material are "too obvious to call for enlarged discussion." Dep't of Navy, 484 U.S. at 529 (internal quotation marks omitted). Even the probing of these matters entails the risk that other countries will become less willing to cooperate with the United States in sharing intelligence resources to counter terrorism. "At its core," as the panel opinion observed, "this suit arises from the Executive Branch's alleged determination that (a) Arar was affiliated with Al Qaeda, and therefore a threat to national security, and (b) his removal to Syria was

appropriate in light of U.S. diplomatic and national security interests." <u>Arar</u>, 532 F.3d at 181. To determine the basis for Arar's alleged designation as an Al Qaeda member and his subsequent removal to Syria, the district court would have to consider what was done by the national security apparatus of at least three foreign countries, as well as that of the United States. Indeed, the Canadian government--which appears to have provided the intelligence that United States officials were acting upon when they detained Arar--paid Arar compensation for its role in the events surrounding this lawsuit, but has *also* asserted the need for Canada itself to maintain the confidentiality of certain classified materials related to Arar's claims.[9]

## C. Open Courts

Allegations of conspiracy among government agencies that must often work in secret inevitably implicate a lot of classified material that cannot be introduced into the public record. Allowing Arar's claims to proceed would very likely mean that some documents or information sought by

---

[9] <u>See</u> <u>Ottawa Trying to Hold Back Documents from Arar Inquiry</u>, CBC News, Apr. 29, 2004, http://www.cbc.ca/canada/story/2004/04/29/arar040429.html.

44

Arar would be redacted, reviewed in camera, and otherwise concealed from the public.  Concealment does not bespeak wrongdoing: in such matters, it is just as important to conceal what has not been done.  Nevertheless, these measures would excite suspicion and speculation as to the true nature and depth of the supposed conspiracy, and as to the scope and depth of judicial oversight.  Indeed, after an inquiry at oral argument as to whether classified materials relating to Arar's claims could be made available for review in camera, Arar objected to the supplementation of the record with material he could not see.  See Letter from David Cole, Counsel for Maher Arar (Dec. 23, 2008).  After pointing out that such materials are unnecessary to the adjudication of a motion on the pleadings (where the allegations of the complaint must be accepted as true), Arar protested that any materials submitted ex parte and in camera would not be subject to adversarial testing and that consideration of such documents would be "presumptively unconstitutional" since they would result in a decision "on the basis of secret information available to only one side of the dispute."

The court's reliance on information that cannot be

45

introduced into the public record is likely to be a common feature of any Bivens actions arising in the context of alleged extraordinary rendition.  This should provoke hesitation, given the strong preference in the Anglo-American legal tradition for open court proceedings, a value incorporated into modern First and Sixth Amendment law.  See U.S. Const. amend. VI (guaranteeing the right to a "*public trial*" (emphasis added)); Westmoreland v. Columbia Broad. Sys., Inc., 752 F.2d 16, 23 (2d Cir. 1984) (noting that the First Amendment secures "a right of access to civil proceedings").  The risk of limiting access, of course, is that where a proceeding "has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted." Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 571 (1980).  "[T]he appearance of justice can best be provided by allowing people to observe" proceedings.  Id. at 572. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing."  Id.  This is especially true in the courts, where the guarantee of a public trial "has always been recognized as a safeguard

46

against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." In re Oliver, 333 U.S. 257, 270 (1948).

Granted, there are circumstances in which a court may close proceedings to which a public right of access presumptively attaches. See Waller v. Georgia, 467 U.S. 39, 45 (1984); United States v. Alcantara, 396 F.3d 189, 199-200 (2d Cir. 2005); United States v. Doe, 63 F.3d 121, 127-28 (2d Cir. 1995). And the problems posed by the need to consider classified material are unavoidable in some criminal prosecutions and in other cases where we have a duty, imposed by Congress, to exercise jurisdiction. But this is not such a circumstance or such a case. The preference for open rather than clandestine court proceedings is a special factor that counsels hesitation in extending Bivens to the extraordinary rendition context.

# XI

A government report states that this case involves assurances received from other governments in connection

47

with the determination that Arar's removal to Syria would be consistent with Article 3 of the CAT. Office of Inspector General, Dep't of Homeland Sec., (Unclassified) <u>The Removal of a Canadian Citizen to Syria</u> 5, 22, 26-27 (2008).[10] This case is not unique in that respect. Cases in the context of extraordinary rendition are very likely to present serious questions relating to private diplomatic assurances from foreign countries received by federal officials, and this feature of such claims opens the door to graymail.

A. Assurances

The regulations promulgated pursuant to the FARRA explicitly authorize the removal of an alien to a foreign country following receipt from that country of sufficiently reliable assurances that the alien will not be tortured. <u>See</u> 8 C.F.R. § 208.18(c). Should we decide to extend <u>Bivens</u> into the extraordinary rendition context, resolution of these actions will require us to determine whether any such

---

[10] We take judicial notice of the existence of this unclassified report and the scope of its contents, including the limited discussion of assurances. Notice is taken only that the report alleges that assurances were received, not as to the truth of that allegation or the reliability of those assurances.

assurances were received from the country of rendition and whether the relevant defendants relied upon them in good faith in removing the alien at issue.

Any analysis of these questions would necessarily involve us in an inquiry into the work of foreign governments and several federal agencies, the nature of certain classified information, and the extent of secret diplomatic relationships. An investigation into the existence and content of such assurances would potentially embarrass our government through inadvertent or deliberate disclosure of information harmful to our own and other states.[11] Given the general allocation of authority over foreign relations to the political branches and the decidedly limited experience and knowledge of the federal judiciary regarding such matters, such an investigation would also implicate grave concerns about the separation of powers and our institutional competence. See, e.g., Kiyemba

---

[11] This risk is not necessarily abated by the undertakings of counsel. See, e.g., United States v. Sattar, 395 F. Supp. 2d 79 (S.D.N.Y. 2005) (denying attorney Lynne Stewart's motion for a judgment of acquittal following her conviction by a jury of, inter alia, conspiring to defraud the United States, conspiring to provide material support to carry out murder and kidnap in a foreign country, and making false statements).

v. Obama, 561 F.3d 509, 515 (D.C. Cir. 2009) ("[S]eparation of powers principles . . . preclude the courts from second-guessing the Executive's assessment of the likelihood a detainee will be tortured by a foreign sovereign."). These considerations strongly counsel hesitation in acknowledging a Bivens remedy in this context.

B.  Graymail

As emphasized above, Arar invokes Bivens to challenge policies promulgated and pursued by the executive branch, not simply isolated actions of individual federal employees. Such an extension of Bivens is without precedent and implicates questions of separation of powers as well as sovereign immunity.  This, by itself, counsels hesitation; there is further reason to hesitate where, as in this case, the challenged government policies are the subject of classified communications: a possibility that such suits will make the government "vulnerable to 'graymail,' i.e., individual lawsuits brought to induce the [government] to settle a case (or prevent its filing) out of fear that any effort to litigate the action would reveal classified information that may undermine ongoing covert operations,"

50

or otherwise compromise foreign policy efforts. <u>Tenet v. Doe</u>, 544 U.S. 1, 11 (2005). We cast no aspersions on Arar, or his lawyers; this dynamic inheres in any case where there is a risk that a defendant might "disclose classified information in the course of a trial." <u>United States v. Pappas</u>, 94 F.3d 795, 799 (2d Cir. 1996). This is an endemic risk in cases (however few) which involve a claim like Arar's.

The risk of graymail is itself a special factor which counsels hesitation in creating a <u>Bivens</u> remedy. There would be hesitation enough in an ordinary graymail case, <u>i.e.</u>, where the tactic is employed against the *government*, which can trade settlement cash (or the dismissal of criminal charges) for secrecy. See <u>Tenet</u>, 544 U.S. at 11; <u>Pappas</u>, 94 F.3d at 799. But the graymail risk in a <u>Bivens</u> rendition case is uniquely troublesome. The interest in protecting military, diplomatic, and intelligence secrets is located (as always) in the *government*; yet a <u>Bivens</u> claim, by definition, is never pleaded against the government. <u>See, e.g.</u>, <u>Malesko</u>, 534 U.S. at 70. So in a <u>Bivens</u> case, there is a dissociation between the holder of the non-disclosure interest (the government, which cannot be sued

51

directly under Bivens) and the person with the incentive to disclose (the defendant, who cannot waive, but will be liable for any damages assessed).  In a rendition case, the Bivens plaintiff could in effect pressure the individual defendants until the *government* cries uncle.  Thus any Bivens action involving extraordinary rendition would inevitably suck the government into the case to protect its considerable interests, and--if disclosure is ordered--to appeal, or to suffer the disclosure, or to pay.

This pressure on the government to pay a settlement has (at least) two further perverse effects.  First, a payment from the Treasury tends to obviate any payment or contribution by the individual defendants.  Yet, "[Bivens] is concerned solely with deterring the unconstitutional acts of individual officers" by extracting payment from individual wrongdoers.  Malesko, 534 U.S. at 71.  When the government elects to settle a Bivens case which is susceptible to graymail, the individual wrongdoer pays nothing and the deterrent effect is lost.  Second, the individual defendant in such a case has no incentive to resist discovery that imperils government interests; rather, discovery induces the government to settle.  So in the

52

extraordinary rendition context, there is a risk (or likelihood) that the government effectively becomes the real defendant in interest, and the named defendants become proxies that the government cannot control.  Precisely because Bivens has never been approved as a Monell-like vehicle for challenging government policies, this factor also counsels hesitation in extending a private damages action in this context.[12]

In the end, a Bivens action based on rendition is--in all but name--a claim against the government.[13]  It is not for nothing that Canada (the government, not an individual

---

[12] Judge CALABRESI does not discount the risk of graymail; he just minimizes the harm, equating it with settlement pressures that routinely inhere in section 1983 litigation.  However, "graymail" is a term of art, signifying the use of military or intelligence information as hostage for payment of money or a plea bargain.  The prospect of graymail does not induce Judge CALABRESI to pause because he sees graymail as part of the "judicial structures that *facilitate* the giving of compensation, at least to innocent victims . . . ."  See Dissent of Judge Calabresi at **15**.

[13] It is telling that, according to the Deputy Assistant Attorney General, Mr. Arar and his attorney went to the United States Congress and requested--without success--that it "clarify the ambiguity [in this area] with legislation and . . . give [Mr. Arar] reparations." Transcript of Arar In banc Oral Argument at 49.  Cf. 153 Cong. Rec. D1384-02 (Oct. 18, 2007); Matthew Jaffe, Congress Hears Testimony in Arar Torture Case, ABC News, Oct. 18, 2007, http://abcnews.go.com/Politics/story?id=3746371&page=1.

officer of it) paid Arar $10 million dollars.

## XII

In the small number of contexts in which courts have implied a Bivens remedy, it has often been easy to identify both the line between constitutional and unconstitutional conduct, and the alternative course which officers should have pursued.  The guard who beat a prisoner should not have beaten him; the agent who searched without a warrant should have gotten one; and the immigration officer who subjected an alien to multiple strip searches without cause should have left the alien in his clothes.  This distinction may or may not amount to a special factor counseling hesitation in the implication of a Bivens remedy.  But it is surely remarkable that the context of extraordinary rendition is so different, involving as it does a complex and rapidly changing legal framework beset with critical legal judgments that have not yet been made, as well as policy choices that are by no means easily reached.

Consider: should the officers here have let Arar go on his way and board his flight to Montreal?  Canada was evidently unwilling to receive him; it was, after all,

54

Canadian authorities who identified Arar as a terrorist (or did something that led their government to apologize publicly to Arar and pay him $10 million).

Should a person identified as a terrorist by his own country be allowed to board his plane and go on to his destination?  Surely, that would raise questions as to what duty is owed to the other passengers and the crew.

Or should a suspected terrorist en route to Canada have been released on the Canadian border--over which he could re-enter the United States virtually at will?  Or should he have been sent back whence his plane came, or to some third country?  Should those governments be told that Canada thinks he is a terrorist?  If so, what country would take him?

Or should the suspected terrorist have been sent to Guantanamo Bay or--if no other country would take him--kept in the United States with the prospect of release into the general population?  See Zadvydas v. Davis, 533 U.S. 678, 699-700 (2001).

None of this is to say that extraordinary rendition is or should be a favored policy choice.  At the same time, the officials required to decide these vexed issues are "subject

to the pull of competing obligations." Lombardi v. Whitman, 485 F.3d 73, 83 (2d Cir. 2007).  Many viable actions they might consider "clash with other equally important governmental responsibilities."  Pena v. DePrisco, 432 F.3d 98, 114 (2d Cir. 2005) (internal quotation marks omitted).  Given the ample reasons for pause already discussed, we need not and do not rely on this consideration in concluding that it is inappropriate to extend Bivens to this context.  Still, Congress is the appropriate branch of government to decide under what circumstances (if any) these kinds of policy decisions--which are directly related to the security of the population and the foreign affairs of the country-- should be subjected to the influence of litigation brought by aliens.

**XIII**

All of these special factors notwithstanding, we cannot ignore that, as the panel dissent put it, "there is a long history of judicial review of Executive and Legislative decisions related to the conduct of foreign relations and national security."  Arar, 532 F.3d at 213 (Sack, J., concurring in part and dissenting in part).  Where does that

56

leave us?  We recognize our limited competence, authority, and jurisdiction to make rules or set parameters to govern the practice called rendition.  By the same token, we can easily locate that competence, expertise, and responsibility elsewhere: in Congress.  Congress may be content for the Executive Branch to exercise these powers without judicial check.  But if Congress wishes to create a remedy for individuals like Arar, it can enact legislation that includes enumerated eligibility parameters, delineated safe harbors, defined review processes, and specific relief to be afforded.  Once Congress has performed this task, *then* the courts in a proper case will be able to review the statute and provide judicial oversight to the "Executive and Legislative decisions [which have been made with regard] to the conduct of foreign relations and national security."[14]

---

[14] Dissents by their nature express views that are not the law.  These dissenting opinions contain words and passages that are emotional and (in our respectful view) overwrought.  Accordingly, there is no need for extended engagement.  A brief survey will suffice.

Judge SACK's dissent deems "artificial" our characterization of the new Bivens context in this case as "entirely one of 'international rendition, specifically extraordinary rendition.'"  See Dissent of Judge Sack at **34.** We would have thought it would be common ground that the context of this appeal is extraordinary rendition.  Judge SACK, however, reconceives the context, at some points characterizing the constitutional tort as encompassing only

those events that occurred within the United States while at other points requiring that the entire narrative be considered as a seamless whole, JFK to Syria. Compare id. at **34** with id. at **36-37**. But this case is emphatically and obviously about extraordinary rendition (and its alleged abuse), as is elsewhere acknowledged in the opinions of Judge CALABRESI and Judge PARKER. See Dissent of Judge Calabresi at **15**; Dissent of Judge Parker at **2**.

As to the extraordinary rendition context, Judge SACK (joined by all dissenters) makes the following constructive (and telling) concessions: "It is difficult to deny the existence of 'special factors counseling hesitation' in this case[,]" Dissent of Judge Sack at **47**; "It . . . may be that to the extent actions against 'policymakers' can be equated with lawsuits against policies, they may not survive Iqbal[,]" id. at **49**; and, "We share what we think to be the majority's intuition that this case would likely turn largely, if not entirely, on decisions of national security and diplomacy . . . [,]" id. at **56**.

Judge CALABRESI's dissent urges that we forgo considering whether specific factors counsel hesitation under Bivens so that we could instead remand to see whether the case might eventually be dismissed as unmanageable under the state secrets privilege--which Judge CALABRESI seems equally to disapprove. See Dissent of Judge Calabresi at **13** (state secrets privilege is the subject of "significant criticism, much of it warranted"). Thus Judge CALABRESI professes hesitance to "hesitate" with respect to Bivens, as well as skepticism of the state secrets privilege. In doing so, he avoids fully endorsing either of the primary potential resolutions of this appeal, and hardly makes a choice at all. Even so, the authority cited by Judge CALABRESI, which suggests deciding whether a claim is stated before doing Bivens analysis, is inapposite. Judge CALABRESI fails to consider that application of the state secrets privilege is often performed witness-by-witness; question-by-question; page-by-page; paragraph-by-paragraph--and can take years. It is not judicial activism to hesitate before requiring such an exercise in circumstances in which a Bivens claim may not lie. In any event, the state secrets doctrine has roots in separation of powers principles, and

Id.

**CONCLUSION**

For the reasons stated above, the judgment of the District Court is affirmed. The panel opinion is hereby vacated.

---

is not itself devoid of constitutional implications. See Dep't of Navy v. Egan, 484 U.S. 518, 527 (1988) ("The authority to protect [information related to national security] falls on the President as head of the Executive Branch and as Commander in Chief."); El-Masri v. United States, 479 F.3d 296, 303 (4th Cir. 2007) ("Although the state secrets privilege was developed at common law, it performs a function of constitutional significance, because it allows the executive branch to protect information whose secrecy is necessary to its military and foreign-affairs responsibilities.").

CALABRESI, POOLER, SACK, and PARKER, Circuit Judges, dissent. Each joins fully in all the dissenting opinions, but each writes separately to emphasize particular aspects of these dissents.

Arar v. Ashcroft, No. 06-4216

Sack, Circuit Judge, joined by Judges Calabresi, Pooler, and Parker, concurring in part and dissenting in part.
----------------------------------------------------------------

The opinion of the en banc majority[1] departs from the opinion of the panel majority in two important and salutary respects.

First, the Court now explicitly acknowledges that "this is not a typical immigration case." Supra at **[24].** We would prefer that the Court concede that this is not an immigration case at all -- it is about the alleged unconstitutional treatment of an alien suspected of terrorism -- but we welcome the resulting decision not to dismiss Arar's claims as jurisdictionally barred by the Immigration and Nationality Act ("INA"), see supra at **[23],** and not to rely, in the Court's Bivens analysis, upon the INA's remedial scheme and the well nigh unlimited executive power that the INA bestows, see supra at

---

[1] Judges Straub and Sotomayor voted in the en banc poll but do not participate in deciding the case en banc because Judge Straub took senior status prior to the en banc hearing and Judge Sotomayor has been elevated to the Supreme Court. Judge Katzmann recused himself from both the poll and the en banc hearing. Senior Judge McLaughlin, as a member of the original panel, has participated in the en banc consideration. Judge Calabresi participated in the en banc hearing, but has taken senior status since the argument. The author of this opinion has also taken senior status since the hearing, but was a member of the panel that heard the appeal and therefore , like Judge McLaughlin, would have been able to have participated in the en banc hearing in any event. Judge Lynch, who joined the Court since the argument, has not participated in these proceedings.

**[31]**.  Compare Arar v. Ashcroft, 532 F.3d 157, 169-71 & n.10, 179-81 (2d Cir. 2008) ("Arar Panel Op.").

In its second departure from the panel decision, the Court declines to hold that if, as Arar alleges, government conduct "denied [him] effective access to consular assistance, the courts, his lawyers, and family members in order to effectuate his removal to Syria," Arar's constitutional rights would not have thereby been violated.  Supra at **[20]** (internal quotation marks omitted); compare Arar Panel Op., 532 F.3d at 184-89.  We agree with this approach too.  Indeed, we think both of these departures are significant enough in themselves to have rendered the unwieldy and often wasteful en banc process worthwhile here.

We disagree, however, with the majority's continued insistence that Arar cannot employ a Bivens remedy to seek compensation for his injuries at the hands of government agents. The majority reaches that conclusion by artificially dividing the complaint into a domestic claim that does not involve torture -- viz., "[Arar's] claim regarding detention in the United States," supra at **[6]** -- and a foreign claim that does -- viz., "[Arar's] claims for detention and torture in Syria," id.  The majority then dismisses the domestic claim as inadequately pleaded and the

foreign claim as one that cannot "be asserted under Bivens" in light of the opinion's "dominant holding" that "in the context of involuntary rendition, hesitation is warranted by special factors." Supra at **[6-7]**.

In our view, even treating Arar's claim for mistreatment while in United States custody and denial of access to United States counsel and United States courts as, arquendo, a claim that is entirely isolated from the remainder of Arar's allegations, it was adequately pleaded in his highly detailed complaint.

As we will explain, however, the complaint's allegations cannot properly be divided into claims for mistreatment in the United States and "claims for detention and torture in Syria." Arar's complaint of mistreatment sweeps more broadly than that, encompassing a chain of events that began with his interception and detention at New York's John F. Kennedy Airport ("JFK") and continued with his being sent abroad in shackles by government agents with the knowledge that he would likely be tortured as a result. Viewed in this light, we conclude that Arar's allegations do not present a "new context" for a Bivens action.

And even were it a new context, we disagree with what appears to be the en banc majority's test for whether a new Bivens action should be made available: the existence vel non of "special factors counselling hesitation." First, we think heeding "special factors" relating to secrecy and security is a form of double counting inasmuch as those interests are fully protected by the state-secrets privilege. Second, in our view the applicable test is not whether "special factors" exist, but whether after "paying particular heed to" them, a Bivens remedy should be recognized with respect to at least some allegations in the complaint. Applying that test, we think a Bivens remedy is available.

We hasten to add that under the proper formulation of the test, we might well agree with the en banc majority that a Bivens action is not available in the context of an alien's "claims for detention and torture in Syria." But, as we will explain, Arar's allegations are not so limited.

Our overriding concern, however, is with the majority's apparent determination to go to whatever length necessary to reach what it calls its "dominant holding": that a Bivens remedy is unavailable. Such a holding is unnecessary inasmuch as the government assures us that this case could likely be resolved

-4-

quickly and expeditiously in the district court by application of the state-secrets privilege.

What is at stake on this appeal is not whether Arar will, through this litigation, obtain compensation for the injury he suffered as a result of the malfeasance of employees of the United States. In light of the many hurdles he would have to surmount,[2] he would be extremely unlikely to do so. Rather, the question for the Court is, and has from the outset been, the manner by which that likely result will (or will not) be reached. We fear that the majority is so bound and determined to declare categorically that there is no <u>Bivens</u> action in the present "context," that it unnecessarily makes dubious law.

For those reasons, we respectfully dissent.[3]

I. Arar's Allegations

---

[2] <u>See, e.g.,</u> <u>Arar</u> Panel Op., 532 F.3d at 193 <u>et seq.</u> (Sack, J., concurring in part and dissenting in part) ("<u>Arar</u> partial panel dissent").

[3] We do not dissent from the majority's conclusions as to personal jurisdiction. The author of this opinion, as a member of the panel that originally heard this appeal, concurred in the panel opinion's conclusion that relief under the Torture Victim Protection Act is unavailable to Arar. Having reviewed the arguments to the contrary stated in Judge Pooler's partial dissent, <u>infra</u>, for the reasons stated in it, he now agrees that the relief under the Act is available to Arar. Inasmuch as the en banc Court now holds that it is not available, however, this opinion accepts its unavailability as a matter of law for the purposes of the <u>Bivens</u> analysis that follows.

The majority's recitation of the facts, see supra **[8-13]**, is generally accurate, but anodyne.  A complete assessment of the majority opinion and the implications of the Court's decision is not possible without a fuller account of the troubling allegations contained in Arar's complaint.

"Because this is an appeal from a dismissal of a complaint under Fed. R. Civ. P. 12(b)(6), we view the allegations of the complaint in the light most favorable to appellant." Paycom Billing Servs. v. MasterCard Int'l, Inc., 467 F.3d 283, 285 (2d Cir. 2006).  The district court's opinion carefully and fully sets forth Arar's allegations.  See Arar v. Ashcroft, 414 F. Supp. 2d 250, 252-57 (E.D.N.Y. 2006).  We adhere to that account nearly verbatim.[4]

A.  Arar's Apprehension, Detention, and Forcible Transportation to Syria

Arar, who is in his thirties, is a native of Syria.  He immigrated to Canada with his family when he was a teenager.  He is a dual citizen of Syria and Canada.  He resides in Ottawa. (Arar, 414 F. Supp. 2d at 252.)

---

[4] Citations to the district court opinion appear in parentheses.  The footnotes and subheadings are ours.

In September 2002, while vacationing with his family in Tunisia, he was called back to work by his employer[5] to consult with a prospective client. He purchased a return ticket to Montreal with stops[6] in Zurich and New York. He left Tunisia on September 25, 2002. (Id.)

On September 26, 2002, Arar arrived from Switzerland at JFK to catch a connecting flight to Montreal. Upon presenting his passport to an immigration inspector, he was identified as "the subject of a . . . lookout as being a member of a known terrorist organization." Compl. Ex. D (Decision of J. Scott Blackman, Regional Director) at 2. He was interrogated by various officials for approximately eight hours.[7] The officials asked Arar if he had contacts with terrorist groups, which he categorically denied. Arar was then transported to another site at JFK, where he was placed in solitary confinement. He alleges that he was transported in chains and shackles and was left in a

---

[5] Arar was employed by a privately held Massachusetts-based developer and supplier of software for technical computing. See Compl. ¶ 12.

[6] That is, changes of plane.

[7] According to the complaint, on that day, Arar was questioned first by an FBI agent for five hours, Compl. ¶ 29, then by an immigration officer for three hours, id. ¶ 31.

-7-

room with no bed and with lights on throughout the night. (Arar, 414 F. Supp. 2d at 253.)

The following day, starting at approximately 9:00 a.m., two FBI agents interrogated Arar for about five hours, asking him questions about Osama bin Laden, Iraq, and Palestine. Arar alleges that the agents yelled and swore at him throughout the interrogation. They ignored his repeated requests to make a telephone call and see a lawyer. At 2:00 p.m. that day, Arar was taken back to his cell, chained and shackled, and provided a cold McDonald's meal -- his first food in nearly two days. (Id.)

That evening, Arar was given an opportunity to voluntarily return to Syria, but refused, citing a fear of being tortured if returned there and insisting that he be sent to Canada or returned to Switzerland. An immigration officer told Arar that the United States had a "special interest" in his case and then asked him to sign a form, the contents of which he was not allowed to read. That evening, Arar was transferred, in chains and shackles, to the Metropolitan Detention Center ("MDC") in Brooklyn, New York,[8] where he was strip-searched and placed in

---

[8] This is the same federal prison in which, less than a year earlier, Javaid Iqbal was allegedly mistreated. Iqbal, a Muslim inmate accused of conspiracy to defraud the United States and fraud with identification and held post-9/11 in the MDC, allegedly suffered "unconstitutional actions against him in

solitary confinement.  During his initial three days at MDC, Arar's continued requests to meet with a lawyer and make telephone calls were refused.  (Id.)

On October 1, 2002,[9] the Immigration and Naturalization Service ("INS") initiated removal proceedings against Arar, who was charged with being temporarily inadmissible because of his membership in al-Qaeda, a group designated by the Secretary of State as a foreign terrorist organization.  Upon being given permission to make one telephone call, Arar called his mother-in-law in Ottawa, Canada.  (Id.)

Upon learning of Arar's whereabouts, his family contacted the Office for Consular Affairs ("Canadian

---

connection with his confinement under harsh conditions . . . after separation from the general prison population."  Iqbal v. Hasty, 490 F.3d 143, 147, 148 n.1 (2d Cir. 2007).  We held, with respect to Iqbal's subsequent Bivens action, that such treatment was not protected, as a matter of law, by the doctrine of qualified immunity.  Id. at 177-78.  The Supreme Court subsequently reversed that judgment and remanded, holding that the complaint was insufficiently pleaded as to two high-ranking official defendants.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1952 (2009).  On September 29, 2009, the remaining parties in Iqbal filed a document in this Court stipulating that the appeal was to be "withdrawn from active consideration before the Court . . . because a settlement has been reached in principle between Javaid Iqbal and defendant United States."  Iqbal v. Hasty, No. 05-5768-cv (2d Cir. Sept. 30, 2009), "Stipulation Withdrawing Appeal from Active Consideration" dated September 29, 2009.

[9] I.e., five days after Arar's arrival in the United States.

-9-

Consulate")[10] and retained an attorney, Amal Oummih, to represent him. The Canadian Consulate had not been notified of Arar's detention. On October 3, 2002, Arar received a visit from Maureen Girvan from the Canadian Consulate, who, when presented with the document noting Arar's inadmissibility to the United States, assured Arar that removal to Syria was not an option. On October 4, 2002, Arar designated Canada as the country to which he wished to be removed. (Id.)

On October 5, 2002, Arar had his only meeting with counsel. The following day, he was taken in chains and shackles to a room where approximately seven INS officials questioned him about his reasons for opposing removal to Syria. His attorney was not provided advance notice of the interrogation, and Arar further alleges that U.S. officials misled him into thinking his attorney had chosen not to attend. During the interrogation, Arar continued to express his fear of being tortured if returned to Syria. At the conclusion of the six-hour interrogation, Arar was informed that the officials were discussing his case with "Washington, D.C." Arar was asked to sign a document that

[10] The consulate is in New York City.

appeared to be a transcript. He refused to sign the form. (Id. at 253-54.)

The following day, October 7, 2002, attorney Oummih received two telephone calls informing her that Arar had been taken for processing to an INS office at Varick Street in Manhattan, that he would eventually be placed in a detention facility in New Jersey, and that she should call back the following morning for Arar's exact whereabouts. However, Arar alleges that he never left the MDC and that the contents of both of these phone calls to his counsel were false and misleading. (Id. at 254.)

That same day, October 7, 2002, the INS Regional Director, J. Scott Blackman, determined from classified and unclassified information that Arar is "clearly and unequivocally" a member of al-Qaeda and, therefore, "clearly and unequivocally inadmissible to the United States" under 8 U.S.C. § 1182(a)(3)(B)(i)(V). See Compl. Ex. D at 1, 3, 5. Based on that finding, Blackman concluded "that there are reasonable grounds to believe that [Arar] is a danger to the security of the United States." Id. at 6 (brackets in original). (Arar, 414 F. Supp. 2d at 254.)

At approximately 4:00 a.m. on October 8, 2002, Arar learned that, based on classified information, INS regional director Blackman had ordered that Arar be sent to Syria and that his removal there was consistent with Article Three of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). Arar pleaded for reconsideration but was told by INS officials that the agency was not governed by the "Geneva Conventions" and that Arar was barred from reentering the country for a period of five years and would be admissible only with the permission of the Attorney General. (Id.)

Later that day, Arar was taken in chains and shackles to a New Jersey airfield, where he boarded a small jet airplane bound for Washington, D.C. From there, he was flown to Amman, Jordan, arriving there on October 9, 2002. He was then handed over to Jordanian authorities, who delivered him to the Syrians later that day. At this time, U.S. officials had not informed either Canadian Consulate official Girvan or attorney Oummih that Arar had been removed to Syria. Arar alleges that Syrian officials refused to accept Arar directly from the United States. (Id.)

Arar's Final Notice of Inadmissability ("Final Notice") ordered him removed without further inquiry before an immigration judge. See Compl. Ex. D. According to the Final Notice: "The Commissioner of the Immigration and Naturalization Service has determined that your removal to Syria would be consistent with [CAT]." Id. (brackets in original). The Final Notice was dated October 8, 2002, and was signed by Deputy Attorney General Larry Thompson. After oral argument in the district court on the defendants' motions to dismiss, in a letter dated August 18, 2005, counsel for Arar said that Arar had received the Final Notice within hours of boarding the aircraft taking him to Jordan. (Arar, 414 F. Supp. 2d at 254.)

B.  Arar's Detention in Syria

During his ten-month period of detention in Syria, Arar alleges, he was placed in a "grave" cell measuring six feet long, seven feet high, and three feet wide. The cell was located within the Palestine Branch of the Syrian Military Intelligence ("Palestine Branch"). The cell was damp and cold, contained very little light, and was infested with rats, which would enter the cell through a small aperture in the ceiling. Cats would urinate on Arar through the aperture, and sanitary facilities were nonexistent. Arar was allowed to bathe himself in cold water

-13-

once per week. He was prohibited from exercising and was provided barely edible food. Arar lost forty pounds during his ten-month period of detention in Syria. (Id.)

During his first twelve days in Syrian detention, Arar was interrogated for eighteen hours per day and was physically and psychologically tortured. He was beaten on his palms, hips, and lower back with a two-inch-thick electric cable. His captors also used their fists to beat him on his stomach, his face, and the back of his neck. He was subjected to excruciating pain and pleaded with his captors to stop, but they would not. He was placed in a room where he could hear the screams of other detainees being tortured and was told that he, too, would be placed in a spine-breaking "chair," hung upside down in a "tire" for beatings, and subjected to electric shocks. To lessen his exposure to the torture, Arar falsely confessed, among other things, to having trained with terrorists in Afghanistan, even though he had never been to Afghanistan and had never been involved in terrorist activity. (Id. at 255.)

Arar alleges that his interrogation in Syria was coordinated and planned by U.S. officials, who sent the Syrians a dossier containing specific questions. As support for this allegation, Arar notes that the interrogations in the United

-14-

States and Syria contained identical questions, including a specific question about his relationship with a particular individual wanted for terrorism.  In return, Arar alleges, the Syrian officials supplied U.S. officials with all information extracted from Arar; Arar cites a statement by one Syrian official who has publicly stated that the Syrian government shared information with the United States that it extracted from him.  See Compl. Ex. E (January 21, 2004 transcript of CBS's Sixty Minutes II: "His Year In Hell").  (Id.)

C. Arar's Contact with the Canadian Government
   While Detained in Syria

The Canadian Embassy contacted the Syrian government about Arar on October 20, 2002, and the following day, Syrian officials confirmed that they were detaining him.  At this point, the Syrian officials ceased interrogating and torturing Arar. (Id.)

Canadian officials visited Arar at the Palestine Branch five times during his ten-month detention.  Prior to each visit, Arar was warned not to disclose that he was being mistreated.  He complied but eventually broke down during the fifth visit, telling the Canadian consular official that he was being tortured and kept in a grave.  (Id.)

Five days later, Arar was brought to a Syrian investigation branch, where he was forced to sign a confession stating that he had participated in terrorist training in Afghanistan even though, Arar states, he has never been to Afghanistan or participated in any terrorist activity. Arar was then taken to an overcrowded Syrian prison, where he remained for six weeks. (Id.)

On September 28, 2003, Arar was transferred back to the Palestine Branch, where he was held for one week. During this week, he heard other detainees screaming in pain and begging for their torture to end. (Id.)

On October 5, 2003, Syria, without filing any charges against Arar, released him into the custody of Canadian Embassy officials in Damascus. He was flown to Ottawa the following day and reunited with his family. (Id.)

Arar contends that he is not a member of any terrorist organization, including al-Qaeda, and has never knowingly associated himself with terrorists, terrorist organizations, or terrorist activity. Arar claims that the individual about whom he was questioned was a casual acquaintance whom Arar had last seen in October 2001. He believes that he was removed to Syria for interrogation under torture because of his casual

-16-

acquaintance with this individual and others believed to be involved in terrorist activity.  But Arar contends "on information and belief" that there has never been, nor is there now, any reasonable suspicion that he was involved in such activity.  Compl. ¶ 2.  (Arar, 414 F. Supp. 2d at 255-56 (footnote omitted).)

Arar alleges that he continues to suffer adverse effects from his ordeal in Syria.  He claims that he has trouble relating to his wife and children, suffers from nightmares, is frequently branded a terrorist, and is having trouble finding employment due to his reputation and inability to travel in the United States.  (Id. at 256.)

D.  U.S. Policy Relating to Interrogation
    of Detainees by Foreign Governments

The complaint alleges on information and belief that Arar was removed to Syria under a covert U.S. policy of "extraordinary rendition," according to which individuals are sent to foreign countries to undergo methods of interrogation not permitted in the United States.  The extraordinary rendition policy involves the removal of "non-U.S. citizens detained in this country and elsewhere and suspected -- reasonably or unreasonably -- of terrorist activity to countries, including

-17-

Syria, where interrogations under torture are routine."  Compl. ¶ 24.  Arar alleges on information and belief that the United States sends individuals "to countries like Syria precisely because those countries can and do use methods of interrogation to obtain information from detainees that would not be morally acceptable or legal in the United States and other democracies." Id.  The complaint further alleges that federal officials involved with extraordinary rendition "have facilitated such human rights abuses, exchanging dossiers with intelligence officials in the countries to which non-U.S. citizens are removed."  Id.  The complaint also alleges that the United States involves Syria in its extraordinary rendition program to extract counter-terrorism information.  (Arar, 414 F. Supp. 2d at 256.)

This extraordinary rendition program is, Arar alleges, not part of any official or declared U.S. public policy; nevertheless, it has received extensive attention in the press, where unnamed U.S. officials and certain foreign officials have admitted to the existence of such a policy.  Arar details a number of articles in the mainstream press recounting both the incidents of this particular case and the extraordinary rendition program more broadly.  These articles are attached as Exhibit C of his complaint.  (Id. at 256-57.)

Arar alleges that the defendants directed the interrogations in Syria by providing information about Arar to Syrian officials and receiving reports on Arar's responses. Consequently, the defendants conspired with, and/or aided and abetted, Syrian officials in arbitrarily detaining, interrogating, and torturing Arar. Arar argues in the alternative that, at a minimum, the defendants knew or at least should have known that there was a substantial likelihood that he would be tortured upon his removal to Syria. (Id. at 257.)

E. Syria's Human Rights Record

Arar's claim that he faced a likelihood of torture in Syria is supported by U.S. State Department reports on Syria's human rights practices. See, e.g., Bureau of Democracy, Human Rights, and Labor, United States Department of State, 2004 Country Reports on Human Rights Practices (Released February 28, 2005) ("2004 Report"). According to the State Department, Syria's "human rights record remained poor, and the Government continued to commit numerous, serious abuses . . . includ[ing] the use of torture in detention, which at times resulted in death." Id. at 1. Although the Syrian constitution officially prohibits such practices, "there was credible evidence that security forces continued to use torture frequently." Id. at 2.

-19-

The 2004 Report cites "numerous cases of security forces using torture on prisoners in custody."  Id.  Similar references throughout the 2004 Report, as well as State Department reports from prior years, are legion.  See, e.g., Compl. Ex. A (2002 State Department Human Rights Report on Syria).  (Arar, 414 F. Supp. 2d at 257.)[11]

F.  The Canadian Government Inquiry

On September 18, 2006, a Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar ("Arar Commission"), established by the government of Canada to investigate the Arar affair, issued a three-volume report.  See Arar Commission, Report of the Events Relating to Maher Arar (2006) ("Commission Report").[12]  A press release issued by the Commission summarized: **"On Maher Arar** the Commissioner [Dennis O'Connor] comes to one important conclusion:  'I am able to say categorically that there is no evidence to indicate that Mr. Arar

---

[11]  The district court's description of the facts as alleged in the complaint ends here.

[12]  On October 23, 2007, this Court granted Arar's motion to take judicial notice of the Report insofar as its existence and the scope of its contents were concerned, but denied the motion insofar as it may have sought judicial notice of the facts asserted in the report.  But cf. supra at **[4-5]** (employing the report as the source for facts relating to Canadian involvement in the Arar incident).

has committed any offence or that his activities constitute a threat to the security of Canada.'" Arar Commission, Press Release, Arar Commission Releases Its Findings on the Handling of the Maher Arar Case (Sept. 18, 2006) (boldface in original), available at http://www.ararcommission.ca/eng/Release Final_Sept 18.pdf (copy on file with the Clerk of Court). On January 26, 2007, the Office of the Prime Minister of Canada issued the following announcement:

Prime Minister Stephen Harper today released the letter of apology he has sent to Maher Arar and his family for any role Canadian officials may have played in what happened to Mr. Arar, Monia Mazigh and their family in 2002 and 2003.

"Although the events leading up to this terrible ordeal happened under the previous government, our Government will do everything in its power to ensure that the issues raised by Commissioner O'Connor are addressed," said the Prime Minister. "I sincerely hope that these actions will help Mr. Arar and his family begin a new and hopeful chapter in their lives."

Canada's New Government has accepted all 23 recommendations made in Commissioner O'Connor's first report, and has already begun acting upon them. The Government has sent letters to both the Syrian and the U.S. governments formally objecting to the treatment of Mr. Arar. Ministers Day and MacKay have also expressed Canada's concerns on this important issue to their American counterparts. Finally, Canada has removed

-21-

Mr. Arar from Canadian lookout lists, and requested that the United States amend its own records accordingly.

The Prime Minister also announced that Canada's New Government has successfully completed the mediation process with Mr. Arar, fulfilling another one of Commissioner O'Connor's recommendations. This settlement, mutually agreed upon by all parties, ensures that Mr. Arar and his family will obtain fair compensation, in the amount of $10.5 million, plus legal costs, for the ordeal they have suffered.

Office of the Prime Minister, Press Release, Prime Minister Releases Letter of Apology to Maher Arar and His Family and Announces Completion of Mediation Process (Jan. 26, 2007), available at http://pm.gc.ca/eng/media.asp?id=1509 (last visited July 15, 2009); see also Margaret L. Satterthwaite, Rendered Meaningless: Extraordinary Rendition and the Rule of Law, 75 Geo. Wash. L. Rev. 1333, 1339-40 (2007).

II. The Dismissal of the Fourth Claim for Relief

The fulcrum of the en banc majority's analysis is its conclusion that this appeal requires us to decide whether "to devise a new Bivens damages action" under Wilkie v. Robbins, 127 S. Ct. 2588, 2597 (2007). See supra at **[6]**. But the majority can characterize Arar's action as "new" only by isolating and eliminating the domestic aspects of the case. It does so in part

by affirming the district court's dismissal of Arar's "Fourth Claim for Relief, (Fifth Amendment: Substantive Due Process -- Domestic Detention)" on the ground that the claim was insufficiently pleaded. See supra at **[19-21]**. We think that ruling to be incorrect.

With respect to the conditions of confinement aspect of this claim, the district court concluded that Arar was entitled to Fifth Amendment substantive due process protection and that his rights in that respect could have been violated by "the deprivations Arar alleges with respect to his treatment while in U.S. custody." Arar, 414 F. Supp. 2d at 286. We agree, and the majority does not decide otherwise. Supra at **[21]**. With respect to the access to counsel and the courts aspect of the claim, the district court concluded that Arar would be able to state a claim for interference "with his access to courts in part by [government officials] lying to his counsel," if he could "identify 'a separate and distinct right to seek judicial relief for some wrong.'" Arar, 414 F. Supp. 2d at 285 (quoting Christopher v. Harbury, 536 U.S. 403, 414-15 (2002)). We agree here, too, and the majority does not decide otherwise.

But the district court nonetheless dismissed the Fourth Claim for Relief without prejudice. On pain of forfeiture of the

-23-

claims, it required Arar (1) with respect to the mistreatment claim, to "name those defendants that were personally involved in the alleged unconstitutional treatment," and, (2) with respect to the denial of access claim, to replead "without regard to any [underlying] rendition claim," in light of the court's conclusion that no <u>Bivens</u> action was available with respect to such a claim, and, because it was unclear to what underlying relief Arar was denied access, "identify[ing] the specific injury he was prevented from grieving." <u>Arar</u>, 414 F. Supp. 2d at 287-88. Arar declined to replead,[13] rendering the dismissal final.

---

[13] Following the district court's dismissal of the fourth claim without prejudice and dismissal of the first three claims with prejudice, Arar moved for certification of a final judgment on the first three claims to enable him to appeal them immediately. <u>See</u> <u>Arar v. Ashcroft</u>, No. CV-04-0249 (DGT), 2006 WL 1875375, 2006 U.S. Dist. LEXIS 45550 (E.D.N.Y. July 5, 2006). The district court denied the motion. <u>See</u> <u>id.</u> Arar then declined to replead the fourth claim, apparently in order to obtain this Court's early review of the dismissal of the first three claims, <u>cf.</u> <u>id.</u>

The majority affirms the dismissal of the fourth claim partly "in view of Arar's rejection of an opportunity to re-plead." <u>Supra</u> at **[21]**. While we do not read that as a suggestion that this claim has been waived on appeal, we note that any such suggestion would be incorrect. We may review the entire judgment. <u>See, e.g.</u>, <u>Kittay v. Kornstein,</u> 230 F.3d 531, 541 n.8 (2d Cir. 2000) ("[A] disclaimer of intent to amend the complaint renders the District Court's judgment final and allows review of the dismissal in this Court."); <u>Festa v. Local 3 Int'l Brotherhood of Elec. Workers</u>, 905 F.2d 35, 36-37 (2d Cir. 1990) (per curiam); <u>Conn. Nat'l Bank v. Fluor Corp.</u>, 808 F.2d 957,

-24-

A.   Specification of Defendants' Acts and Conspiracy Allegations

The majority affirms the dismissal of the Fourth Claim for Relief on the ground that Arar's complaint does not "specify any culpable action taken by any single defendant" and fails to allege a conspiracy.  Supra at **[21]**.  We disagree with each of these rationales.

Arar should not have been required to "name those defendants [who] were personally involved in the alleged unconstitutional treatment."  Arar, 414 F. Supp. 2d at 287.  In actions pursuant to 42 U.S.C. § 1983, which are "analog[s]" of the less-common Bivens action, Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009) (citation omitted), we allow plaintiffs to "maintain[] supervisory personnel as defendants . . . until [they have] been afforded an opportunity through at least brief discovery to identify the subordinate officials who have personal liability."  Davis v. Kelly, 160 F.3d 917, 921 (2d Cir. 1998) (citing Second Circuit authority).

> Similarly, courts have rejected the dismissal of suits against unnamed defendants described by roles . . . until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials.  Once the supervisory officer has inquired within

960-61 (2d Cir. 1987).

-25-

the institution and identified the actual decision-makers of the challenged action, those officials may then submit affidavits based on their personal knowledge of the circumstances.

Id. (citations omitted). It should not be forgotten that the full name of the Bivens case itself is Bivens v. Six **Unknown Named Agents** of Fed. Bureau of Narcotics, 403 U.S. 388 (1971) (emphasis added).[14]

To be sure, the Supreme Court has recently set a strict pleading standard for supervisory liability claims under Bivens against a former Attorney General of the United States and the Director of the FBI." See Iqbal, supra. We do not think, however, that the Court has thereby permitted governmental actors who are unnamed in a complaint automatically to escape personal civil rights liability. A plaintiff must, after all, have some

---

[14] The Supreme Court explained: "The agents were not named in petitioner's complaint, and the District Court ordered that the complaint be served upon "those federal agents who it is indicated by the records of the United States Attorney participated in the November 25, 1965, arrest of the [petitioner]." App. 3. Five agents were ultimately served." Id. at 390 n.2; see also Bivens, Brief for Respondent at *2 n.1, 1970 WL 116900 ("The apparent contradiction in the title of this case -- "Unknown Named" -- arises from the fact that after petitioner filed his complaint, the United States Attorney supplied the clerk of the court with the agents' names. However, as the summonses and their returns indicate, only five agents are apparently involved (App. 5-24), rather than six as stated in the case title.")

way to identify a defendant who anonymously violates his civil rights. We doubt that <u>Iqbal</u> requires a plaintiff to obtain his abusers' business cards in order to state a civil rights claim. Put conversely, we do not think that <u>Iqbal</u> implies that federal government miscreants may avoid <u>Bivens</u> liability altogether through the simple expedient of wearing hoods while inflicting injury. Some manner of proceeding must be made available for the reasons we recognized in <u>Davis</u>.

Whether or not there is a mechanism available to identify the "Doe" defendants, moreover, Arar's complaint <u>does</u> sufficiently name some individual defendants who personally took part in the alleged violation of his civil rights. The role of defendant J. Scott Blackman, formerly Director of the Regional Office of INS, for example, is, as reflected in the district court's explication of the facts, <u>see</u> <u>Arar</u>, 414 F. Supp. 2d at 252-54, set forth in reasonable detail in the complaint.[15] So are

_____

[15] The complaint alleges, <u>inter alia</u>:

Early on October 8, 2002, at about 4 a.m., Mr. Arar was taken in chains and shackles to a room where two INS officials told him that, based on Mr. Arar's casual acquaintance with certain named individuals, including Mr. Almalki as well as classified information, Defendant Blackman, Regional Director for the Eastern Region of Immigration and Naturalization Services, had decided to

-27-

at least some of the acts of the defendant Edward J. McElroy, District Director of the INS.[16]

The majority also asserts that Arar does no more than "allege[] (in passive voice) that his requests to make phone calls 'were ignored,' and that 'he was told' that he was not entitled to a lawyer." Supra at **[21]**. But as indicated above, such an identification of the unnamed defendants by their "roles" should be sufficient to enable a plaintiff to survive a motion to dismiss, and subsequently to use discovery to identify them. And while the majority is correct that the complaint does not utter

---

remove Mr. Arar to Syria. Without elaboration, Defendant Blackman also stipulated that Mr. Arar's removal would be consistent with Article 3 of CAT. . . . (A copy of Defendant Blackman's decision is attached as Exhibit D [to the complaint]).

Compl. ¶ 47.

[16] The complaint alleges, inter alia:

The only notice given [Arar's counsel prior to his interrogation late on the evening of Sunday, October 6, 2002] was a message left by Defendant McElroy, District Director for Immigration and Naturalization Services for New York City, on [counsel's] voice mail at work that same [Sunday] evening. [She] did not retrieve the message until she arrived at work the next day, Monday morning, October 7, 2002 -- long after Mr. Arar's interrogation had ended.

Compl. ¶ 43.

-28-

the talismanic words "meeting of the minds" to invoke an agreement among the defendants, see supra at **[21]**, it is plain that the logistically complex concerted action allegedly taken to detain Arar and then transport him abroad implies an alleged agreement by government actors within the United States to act in concert.

B.  Dismissal of Claims of Denial of Access to Courts and Counsel

With respect to the dismissal of Arar's claim for "interfere[nce] with his access to lawyers and the courts" while he was incarcerated by United States officials, Compl. ¶ 93, we think the district court erred here, too.  An access to courts claim requires the pleading of (1) a "nonfrivolous, arguable underlying claim" that has been frustrated by the defendants' actions, and (2) a continued inability to obtain the relief sought by the underlying claim.  Christopher, 536 U.S. at 415-16 (internal quotation marks omitted).  The district court decided that Arar failed to plead with sufficient "precis[ion]" the existence of a sought-for underlying claim for relief, Arar, 414 F. Supp. 2d at 286, which means it decided that, for purposes of Federal Rule of Civil Procedure 8,[17] the defendants were not put

---

[17]  That rule provides:

Claim for Relief.  A pleading that states a

-29-

on notice of the existence of such a claim.  See Christopher, 536 U.S. at 416 ("Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations . . . sufficient to give fair notice to a defendant.").

But taking the allegations in the complaint as true, as we must, the complaint clearly implies the existence of an underlying claim for relief under CAT.  The defendants can hardly argue that under Arar's assertions, which we take to be true, they lacked notice of such a claim, since the complaint says that it was they who first notified Arar about it:  Arar alleges that on October 8, 2002, "two INS officials told him that . . . Defendant Blackman . . . had decided to remove [him] to Syria," and "Defendant Blackman also stipulated that [such action] would be consistent with Article 3 of CAT."  Compl. ¶ 47.  Indeed, the

claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a).

-30-

complaint alleges that Arar asked defendants for reconsideration of that decision -- i.e., relief from it -- in light of the prospect of torture in Syria, but the officials said that "the INS is not governed by the 'Geneva Conventions.'" Id.

Insofar as the district court's requirement that Arar "articulate more precisely the judicial relief he was denied," Arar, 414 F. Supp. 2d at 286, related to its holding that "Bivens did not extend a remedy to Arar for his deportation to Syria," id., we disagree for the reasons set forth below. Insofar as the district court thought Arar's underlying CAT claim would have been frivolous, it was mistaken. Cf. Ramsameachire v. Ashcroft, 357 F.3d 169, 184 (2d Cir. 2004) (pursuant to the CAT, the United States may not remove an alien to a country if "'it is more likely than not that he or she would be tortured if removed to [that country]'" (quoting 8 C.F.R. § 208.16(c)(2))).

Nor was CAT the only relief Arar was denied. As the government pointed out at oral argument, "th[e] decision [in Michael v. INS, 48 F.3d 657 (2d Cir. 1995),] shows that in extraordinary cases, and no one can dispute that this is an extraordinary case, the plaintiff could have filed a habeas

[petition] and sought a stay pursuant to the All Writs Act." Tr. at 82 (Cohn).[18]

Contrary to the district court's ruling, then, Arar's complaint put the defendants on notice of claims seeking relief to bar his removal that were frustrated by the defendants' actions. Whatever the ultimate merits of those claims, they would not have been "frivolous." And absent a remedy for the rendition and torture themselves -- the district court, and the majority, of course, conclude there is none -- no contemporaneous legal relief is now possible except through the access to courts and counsel claim. See generally Br. of Amici Norman Dorsen et al. at 12-14. The Fourth Claim for Relief therefore states a sufficient due process access claim.

C. Sufficient Pleading under Iqbal

More generally, we think the district court's extended recitation of the allegations in the complaint makes clear that the facts of Arar's mistreatment while within the United States

---

[18] In response to a question by the Chief Judge as to what cognizable allegations might be made in such a habeas petition, the government said, "Your Honor, I'm not going to speak for what a judge might or might not have said, but in his habeas position and his petition for a stay he could say, look, things are moving quickly, I'm afraid they're going to send me to Syria, don't let that happen." Tr. 84; see also id. at 85.

-32-

-- including the alleged denial of his access to courts and counsel and his alleged mistreatment while in federal detention in the United States -- were pleaded meticulously and in copious detail. The assertion of relevant places, times, and events -- and names when known -- is lengthy and specific. Even measured in light of Supreme Court case law post-dating the district court's dismissal of the fourth claim, which instituted a more stringent standard of review for pleadings, the complaint here passes muster. It does not "offer[] 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" Iqbal, 129 S. Ct. at 1949 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Nor does it "tender[] 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557). Its allegations of a constitutional violation are "'plausible on [their] face.'" Id. (quoting Twombly, 550 U.S. at 555). And, as we have explained, Arar has pled "factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556). We would therefore vacate the district court's dismissal of the Fourth Claim for Relief.

III. The Majority's Interpretation of the Second and Third Claims for Relief

Having thus decided, mistakenly we think, that Arar's Fourth Claim for Relief has failed, our colleagues leap to the conclusion that what remains -- the allegations contained in what Arar's complaint styles as the Second and Third Claims for Relief -- relates only to the legal implications of the international and foreign elements of the defendants' behavior. See supra at **[21]** ("Arar's remaining claims seek relief on the basis of torture and detention in Syria . . . ."). Even were we to agree with the majority's view that the Fourth Claim for Relief warranted dismissal, we would still not concur in its crabbed interpretation of Arar's complaint in light of the facts alleged in it.

"[W]e may not affirm the dismissal of [a] complaint because [it has] proceeded under the wrong theory 'so long as [it has] alleged facts sufficient to support a meritorious legal claim.'" Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 89 (2d Cir. 2000) (plurality opinion of Pooler, J.) (quoting Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir. 1997)), cert. denied, 534 U.S. 888 (2001). "'Factual allegations alone are what matter[].'" Northrop, 134 F.3d at 46 (quoting Albert v. Carovano, 851 F.2d 561, 571 n.3 (2d Cir. 1988) (en

-34-

banc)); see also Newman v. Silver, 713 F.2d 14, 15 n.1 (2d Cir. 1983) ("[T]he nature of federal pleading . . . is by statement of claim, not by legal theories.").[19]  And we are required to read those factual allegations as a whole.  See Shapiro v. Cantor, 123 F.3d 717, 721 (2d Cir. 1997); see also Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1252 n.11 (11th Cir. 2005) (per curiam), cert. denied, 127 S. Ct. 596 (2006); Goldwasser v. Ameritech Corp., 222 F.3d 390, 401 (7th Cir. 2000).

Although Arar pled in his Fourth Claim for Relief what he denominated as a separate "Claim" on the subject of "Domestic Detention," including allegations about unconstitutional conditions of confinement and denial of access to courts and counsel, the complaint as a whole makes broader allegations of mistreatment while within the borders of the United States. According to the complaint:  (1) Arar was apprehended by government agents as he sought to change planes at JFK; (2) he was not seeking to enter the United States; (3) his detention was

---

[19]  The Federal Rules of Civil Procedure instruct that "[p]leadings must be construed so as to do justice."  Fed. R. Civ. P. 8(e).  Wright and Miller's treatise counsels that "[t]his provision is not simply a precatory statement but reflects one of the basic philosophies of practice under the federal rules."  5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004).  "One of the most important objectives of the federal rules is that lawsuits should be determined on their merits and according to the dictates of justice, rather than in terms of whether or not the averments in the paper pleadings have been artfully drawn."  Id.

for the purpose of obtaining information from him about terrorism and his alleged links with terrorists and terrorist organizations; (4) he was interrogated harshly on that topic -- mostly by FBI agents -- for many hours over a period of two days; (5) during that period, he was held incommunicado and was mistreated by, among other things, being deprived of food and water for a substantial portion of his time in custody; (6) he was then taken from JFK to the MDC in Brooklyn, where he continued to be held incommunicado and in solitary confinement for another three days; (7) while at the MDC, INS agents sought unsuccessfully to have him agree to be removed to Syria because they and other U.S. government agents intended that he would be questioned there along similar lines, but under torture; (8) U.S. officials thwarted his ability to consult with counsel or access the courts; and (9) thirteen days after Arar had been intercepted and incarcerated at the airport, defendants sent him against his will to Syria, where they allegedly intended that he be questioned under torture and while enduring brutal and inhumane conditions of captivity. This was, as alleged, all part of a single course of action conceived of and executed by the defendants in the United States in order to try to make Arar "talk."

It may not have been best for Arar to file a complaint that structures his claims for relief so as to charge knowing or reckless subjection to torture, coercive interrogation, and arbitrary detention in Syria (the second and third claims) separately from charges of cruel and inhuman conditions of confinement and "interfere[nce] with access to lawyers and the courts" while in the United States (the fourth claim).  But such division of theories is of no legal consequence.  "'Factual allegations alone are what matter[].'"  Northrop, 134 F.3d at 46 (quoting Albert, 851 F.2d at 571 n.3).  The assessment of Arar's complaint must, then, take into account the entire arc of factual allegations that it contains -- his interception and arrest; his interrogation, principally by FBI agents, about his putative ties to terrorists; his detention and mistreatment at JFK in Queens and the MDC in Brooklyn; the deliberate misleading of both his lawyer and the Canadian Consulate; and his transport to Washington, D.C. and forced transfer to Syrian authorities for further detention and questioning under torture.  Such attention to the complaint's factual allegations, rather than its legal theories, makes perfectly clear that the remaining claims upon which Arar seeks relief are not limited to his "detention or torture in Syria," supra at **[6]**, but include allegations of

violations of his due process rights in the United States.  The scope of those claims is relevant in analyzing whether a <u>Bivens</u> remedy is available.

IV. The "Context" in Which a <u>Bivens</u> Remedy Is Sought

The majority's artificial interpretation of the complaint permits it to characterize the "context" of Arar's <u>Bivens</u> action as entirely one of "international rendition, specifically, 'extraordinary rendition.'"  <u>Supra</u> at **[32]**; <u>see also</u> <u>id.</u> ("Extraordinary rendition is treated as a distinct phenomenon in international law.").  This permits the majority to focus on the part of the complaint that presents a "new context" for <u>Bivens</u> purposes.  But when the complaint is considered in light of all of Arar's allegations, his due process claim for relief from his apprehension, detention, interrogation, and denial of access to counsel and courts in the United States, as well as his expulsion to Syria for further interrogation likely under torture, is not at all "new."

A.  <u>Bivens and Its Progeny</u>

In <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971), the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's

constitutional rights." Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001). Bivens permitted "a victim of a Fourth Amendment violation by federal officers [to] bring suit for money damages against the officers in federal court." Id. The Supreme Court has been reluctant, as the majority correctly observes, to "extend" Bivens liability further. See, e.g., Wilkie, 127 S. Ct. at 2597. The Court has done so only twice -- in the contexts of "an implied damages remedy under the Due Process Clause of the Fifth Amendment" in Davis v. Passman, 442 U.S. 228 (1979), and under "the Cruel and Unusual Punishments Clause of the Eighth Amendment" in Carlson v. Green, 446 U.S. 14 (1980). Malesko, 534 U.S. at 67; see also Wilkie, 127 S. Ct. at 2597-98. But we must ask whether we should "devise a new Bivens damages action," Wilkie, 127 S. Ct. at 2597, only if the asserted action is, indeed, new. And a new Bivens action is not being sought unless the plaintiff is asking the court to "extend Bivens liability to a[] new context or new category of defendants." Malesko, 534 U.S. at 68.

B.   The New Category of Defendants Test

The majority does not suggest that Arar's Bivens claim fails because it is against a new category of defendants. The Bivens remedy was devised to supply relief for constitutional

-39-

torts by federal agents and officials.  See Malesko, 534 U.S. at 70.

C.  The New Context Test

The questions, then, are whether we are facing a "new context," or considering recognizing "a new Bivens damages action," questions that are complicated by the fact that the meaning that the Supreme Court has ascribed to those terms is less than clear.  Compare Malesko, 534 U.S. at 67 (noting that Bivens was extended to "a new right of action" in Davis v. Passman, in which the Court "recognized an implied damages remedy under the Due Process Clause of the Fifth Amendment" (emphasis added)), with id. at 68 (describing Schweiker v. Chilicky, 487 U.S. 412 (1988), as presenting a "new context[]" in which the plaintiffs sought damages under the Due Process Clause for errors made by federal officials "in the[] handling of [their] Social Security applications" (emphasis added)).

If the alleged facts of Arar's complaint were limited to his claim of "extraordinary rendition" to, and torture in, Syria -- that is, limited to his allegations that he was transported by the United States government to Syria via Jordan pursuant to a conspiracy or other arrangement among the countries or their agents and mistreated in Syria as a result -- as the

-40-

majority would have it, then we might well agree that we are dealing with a "new context."  But, as we have explained, the complaint is not so limited.  Incarceration in the United States without cause, mistreatment while so incarcerated, denial of access to counsel and the courts while so incarcerated, and the facilitation of torture by others, considered as possible violations of a plaintiff's procedural and substantive due process rights, are hardly novel claims, nor do they present us with a "new context" in any legally significant sense.[20]

We have recognized implied Bivens rights of action pursuant to the Due Process Clause, so Arar's claims for relief are not new actions under Bivens in that sense.  A deprivation of

---

[20]  In one sense, every case presents a new context, in that it presents a new set of facts to which we are expected to apply established law.  But a new set of facts is not ipso facto a "new context."  We do not decide, based on the difference in factual setting alone, whether or not it is a good idea to allow a plaintiff to avail him or herself of a well-established remedy such as that afforded by Bivens.  This is illustrated by cases involving legal contexts where Bivens is well-established, in which courts do not conduct a fresh assessment as to whether a Bivens action is available based on the facts of each case.  See, e.g., Groh v. Ramirez, 540 U.S. 551 (2004) (Bivens action for Fourth Amendment violation); McCarthy v. Madigan, 503 U.S. 140 (1992) (Bivens action for Eighth Amendment violation), superseded by statute on other grounds as stated in Booth v. Churner, 532 U.S. 731 (2001); Castro v. United States, 34 F.3d 106 (2d Cir. 1994) (Fourth Amendment); Armstrong v. Sears, 33 F.3d 182 (2d Cir. 1994) (same); Anderson v. Branen, 17 F.3d 552 (2d Cir. 1994) (same); see also Hallock v. Bonner, 387 F.3d 147 (2d Cir. 2004) (same), rev'd on other grounds, sub nom Will v. Hallock, 546 U.S. 345 (2006).

-41-

procedural due process rights can give rise to a <u>Bivens</u> claim under our case law.  See, e.g., <u>Tellier v. Fields</u>, 280 F.3d 69, 80-83 (2d Cir. 2000).  And while we do not appear to have squarely considered whether a <u>Bivens</u> action may lie for alleged violations of substantive due process rights, our cases imply that it can be.  In <u>Iqbal v. Hasty</u>, 490 F.3d 143 (2d Cir. 2007), <u>rev'd in part on other grounds sub nom Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009), for example, we considered a <u>Bivens</u> action brought on, <u>inter alia</u>, a Fifth Amendment substantive due process theory.  The plaintiff alleged physical mistreatment and humiliation, as a Muslim prisoner, by federal prison officials, while he was detained at the MDC.  After concluding, on interlocutory appeal, that the defendants were not entitled to qualified immunity, we returned the matter to the district court for further proceedings.  We did not so much as hint either that a <u>Bivens</u> remedy was unavailable or that its availability would

constitute an unwarranted extension of the <u>Bivens</u> doctrine.[21]
<u>Iqbal</u>, 490 F.3d at 177-78.

In other cases we have apparently assumed <u>Bivens</u> remedies were available for substantive due process claims. <u>See</u> <u>Thomas v. Ashcroft</u>, 470 F.3d 491, 497 (2d Cir. 2006) (reversing district court's dismissal of <u>Bivens</u> action for violation of plaintiff's Fifth Amendment substantive due process rights while detained at the MDC); <u>Cuoco v. Moritsugu</u>, 222 F.3d 99 (2d Cir. 2000) (dismissing, on qualified immunity grounds, plaintiff's <u>Bivens</u> claim for, <u>inter alia</u>, substantive due process violations, without questioning whether a cause of action was available); <u>Li v. Canarozzi</u>, 142 F.3d 83 (2d Cir. 1998) (affirming judgment following jury verdict for defendants in <u>Bivens</u> action based on allegations of physical assault by guards at the federal Metropolitan Correctional Center in New York City, although not explicitly on substantive due process grounds); <u>Ayeni v. Mottola</u>, 35 F.3d 680, 691 (2d Cir. 1994) (apparently assuming that <u>Bivens</u> remedy was available for substantive due process claim, but

---

[21] Shortly after we decided <u>Iqbal</u>, the Supreme Court made clear that by appealing from the district court's denial of qualified immunity, the defendants placed within our jurisdiction the question of "the recognition of the entire cause of action." <u>Wilkie</u>, 127 S. Ct. at 2597 n.4. The district court in <u>Iqbal</u> had specifically rejected the defendants' argument that a <u>Bivens</u> action was unavailable. <u>See</u> <u>Elmaghraby v. Ashcroft</u>, No. 04 CV 01809 JG SMG, 2005 WL 2375202, at *14, 2005 U.S. Dist. LEXIS 21434, at *44-*45 (E.D.N.Y. Sept. 27, 2005). Thus, had we thought that no <u>Bivens</u> action was available, we had the power to resolve Iqbal's claims on that basis.

deciding that it could not be pursued because the claim in issue was covered by the more particular provisions of the Fourth Amendment, for which a Bivens action was permitted), abrogated on qualified immunity grounds, Wilson v. Layne, 526 U.S. 603 (1999).

Indeed, even the most "international" of Arar's domestic allegations -- that the defendants, acting within the United States, sent Arar to Syria with the intent that he be tortured -- present no new context for Bivens purposes. Principles of substantive due process apply to a narrow band of extreme misbehavior by government agents acting under color of law: mistreatment that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lombardi v. Whitman, 485 F.3d 73, 79 (2d Cir. 2007) (internal quotation marks omitted). Sending Arar from the United States with the intent or understanding that he will be tortured in Syria easily exceeds the level of outrageousness needed to make out a substantive due process claim.

Although the "shocks the conscience" test is undeniably "vague," see Estate of Smith v. Marasco, 430 F.3d 140, 156 (3d Cir. 2005); Schaefer v. Goch, 153 F.3d 793, 798 (7th Cir. 1998), "[n]o one doubts that under Supreme Court precedent, interrogation by torture" meets that test, Harbury v. Deutch, 233

-44-

F.3d 596, 602 (D.C. Cir. 2000), rev'd on other grounds sub nom Christopher v. Harbury, 536 U.S. 403 (2002);[22] see also Rochin v. California, 342 U.S. 165, 172 (1952) (holding that the forcible pumping of a suspect's stomach to obtain evidence to be used against him was "too close to the rack and the screw to permit of constitutional differentiation"); Palko v. Connecticut, 302 U.S. 319, 326 (1937) (noting that the Due Process Clause must at least "give protection against torture, physical or mental"), overruled on other grounds, Benton v. Maryland, 395 U.S. 784 (1969); Brown v. Mississippi, 297 U.S. 278, 285-86 (1936) ("Because a state may dispense with a jury trial, it does not follow that it may substitute trial by ordeal.  The rack and torture chamber may not be substituted for the witness stand.").[23]

---

[22]  The D.C. Circuit in Harbury concluded that the interrogation in question did not violate the Constitution because it occurred entirely abroad.  See Harbury, 233 F.3d at 602-04 (relying upon United States v. Verdugo-Urquidez, 494 U.S. 259 (1990)).

[23]  The full quotation is:

> [T]he freedom of the state in establishing
> its policy is the freedom of constitutional
> government and is limited by the requirement
> of due process of law. Because a State may
> dispense with a jury trial, it does not
> follow that it may substitute trial by
> ordeal.  The rack and torture chamber may not
> be substituted for the witness stand.
> Because a state may dispense with a jury
> trial, it does not follow that it may
> substitute trial by ordeal.  The rack and

-45-

To be sure, Arar alleges not that the defendants themselves tortured him; he says that they "outsourced" it.[24] But we do not think that the question whether the defendants violated Arar's substantive due process rights turns on whom they selected to do the torturing,[25] or that such "outsourcing" somehow changes the essential character of the acts within the United States to which Arar seeks to hold the defendants accountable.

We think that Arar states a substantive due process claim under either of two theories of substantive due process liability: "special relationship liability" or "state-created-danger liability," Benzman v. Whitman, 523 F.3d 119, 127 (2d Cir. 2008) (internal quotation marks omitted).

---

torture chamber may not be substituted for the witness stand.

Brown, 297 U.S. at 285-86.

[24] "[R]endition -- the market approach -- outsources our crimes, which puts us at the mercy of anyone who can expose us, makes us dependent on some of the world's most unsavory actors, and abandons accountability.  It is an approach we associate with crime families, not with great nations."  Philip Bobbitt, Terror and Consent: The Wars for the Twenty-First Century 388 (2008). "[O]ne could get the worst of both worlds: national responsibility for acts as to which the agents we have empowered are unaccountable."  Id. at 387.

[25] "I do not think that whether the defendants violated Arar's Fifth Amendment rights turns on whom they selected to do the torturing: themselves, a Syrian Intelligence officer, a warlord in Somalia, a drug cartel in Colombia, a military contractor in Baghdad or Boston, a Mafia family in New Jersey, or a Crip set in South Los Angeles."  Arar partial panel dissent at 205.

-46-

Under the latter doctrine, the defendants can be held liable for "tak[ing] an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm)." Lombardi, 485 F.3d at 80. Under the former, Arar was owed "an affirmative duty" by the defendants to protect him from harm by Syrian agents in light of the fact that the government took him "into its custody and h[eld] him there against his will." Matican v. City of New York, 524 F.3d 151, 155-56 (2d Cir.) (citations, internal quotation marks, and footnotes omitted), cert. denied, 129 S. Ct. 636 (2008).

In sum, we do not view the current action as presenting a "new context" in any relevant sense. We therefore do not think we must decide whether "to devise a new Bivens damages action." Wilkie, 127 S. Ct. at 2597, here.

V. Devising a New Bivens Damages Action

Even apart from our disagreement with the majority that Arar's claims present a new context in which to extend Bivens liability, we are puzzled by the majority's analysis as to whether to do so. Having decided that the issue for our consideration is whether a Bivens action should be permitted in what it has concluded is a new context, the majority engages in a two-part inquiry: "whether there is an alternative remedial

scheme available to the plaintiff; and whether 'special factors counsel[] hesitation' in creating a Bivens remedy." Supra at [33] (quoting Wilkie, 127 S. Ct. at 2598).

Our colleagues wisely decline to decide the first issue, whether an alternative remedial scheme is available, partly because they conclude that this is not an immigration case (or, at least, not a "typical" one), see supra at [28], and partly because "Arar has alleged that he was actively prevented from seeking any meaningful review and relief through the INA processes," supra at [35]; see also supra at [27]. This is significant inasmuch as the Supreme Court has observed that it has recognized "new" Bivens actions precisely, inter alia, "to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by an individual officer's unconstitutional conduct." Malesko, 534 U.S. at 70 (emphasis omitted).

The majority moves on to the second prong of the test, concluding that "special factors are clearly present in the new context of this case, and they sternly counsel hesitation." Supra at [35-36]. We think it unfortunate that the majority concludes that Arar should be afforded no Bivens right of action in light of such "special factors." We quarrel not only with

-48-

their conclusion, but also the majority's apparent treatment of the existence vel non of "special factors counseling hesitation" as the determinative legal standard for whether an extension of Bivens is warranted. Setting aside for the moment our view that many of the "special factors" cited by the majority are not properly considered to be such, we think it mistaken to preclude Bivens relief solely in light of a citation or compilation of one or more purported examples of such "special factors."

A. "Special Factors" As a Standard

The majority is not altogether clear in conveying its understanding of the legal significance of a finding that "special factors counseling hesitation," "sternly" or otherwise, are present. The majority acknowledges that "[h]esitation is a pause, not a full stop, or an abstention; and to counsel is not to require," supra at **[37]**, but it also states that countervailing factors are not considered, and that no such factors have "ever been cited by the Supreme Court as a reason for affording a Bivens remedy where it would not otherwise exist," id. What we are left with is an implication that the presence of "special factors counseling hesitation" in fact does require a "full stop, or an abstention." We disagree. It seems

to us that the existence of such "special factors" alone does not compel a conclusion that a Bivens action is unavailable.

When the words "special factors counseling hesitation" were first uttered by the Supreme Court, in Bivens itself, the Court asserted that there is a general rule "that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." Bivens, 403 U.S. at 396 (internal quotation marks omitted). The Court then said: "The present case involves no special factors counseling hesitation in the absence of affirmative action by Congress," citing cases in which the general rule had not been applied.[26] Id. The Bivens Court's observation that there was no cause for hesitation, and its simultaneous recognition in the case before it of a private right of action did not imply, however -- as the majority seems to -- that if there had been reason to hesitate,

---

[26] The Court referred by way of example to its previous decisions in United States v. Standard Oil Co., 332 U.S. 301, 311 (1947), in which it had concluded that the government had no implied right of action against a company that had allegedly injured a soldier because it trenched upon "federal fiscal policy" particularly delegated to Congress, and Wheeldin v. Wheeler, 373 U.S. 647 (1963), in which the Court found no private right of action under federal law where the defendant's acts were not asserted to violate the plaintiff's constitutional rights and were governed by state law.

then the Court, _ipso facto_, would _not_ have recognized a right of action.[27]

The Supreme Court has not told us that "special factors counseling hesitation" are to be understood to prohibit a private right of action. In _Wilkie_, for example, the Court noted that deciding "whether to recognize a _Bivens_ remedy may require two steps," the second of which asks that the court "pay[] particular heed . . . to any special factors counselling hesitation," _id._, 127 S. Ct. at 2598 (emphasis added). And the Court, in _Bush v. Lucas_, 462 U.S. 367 (1983), relied upon by the _Wilkie_ Court in this regard, similarly observed that "[i]n the absence of . . . a congressional directive [that a right of action lies], the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, _paying particular heed_, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation." _Id._ at 378 (emphasis added).

---

[27] This appears to reflect a classic logical fallacy, "denial of the antecedent," which mistakes a necessary condition for a sufficient one. E.M. Adams, _The Fundamentals of General Logic_ 164 ("The truth of the premises does not require the truth of the conclusion. This means that denying the antecedent is an invalid form of the simple conditional argument.").

"[H]eed" means "[c]lose attention" or "notice." American Heritage Dictionary of the English Language 813 (4th ed. 2000). To "pay heed," then, means "to notice," it does not mean "to be governed by." The majority tells us that "'[h]esitation' is 'counseled' whenever thoughtful discretion would pause even to consider." Supra at **[37].** If the existence of "special factors counseling hesitation" were determinative of the existence of a right of action, the bar to declining to allow a new Bivens claim would be less than "remarkably low." Id. It would be chimerical.

It is difficult to deny the existence of "special factors counseling hesitation" in this case. We have been "hesitating" -- in order to deliberate in light of those factors -- for nearly two years. While the time we have taken to consider "special factors" strongly indicates that they counsel hesitation, it cannot follow that having hesitated, we must therefore halt, and dismiss the Bivens complaint.[28]

---

[28] Such a test would be reminiscent of Leo Tolstoy's brother's perhaps apocryphal challenge to Tolstoy to stand in a corner and not think of a white bear. See, e.g., Aylmer Maude, The Life of Tolstoy: First Fifty Years (Dodd, Mead and Co. 1910) 19 ("[T]here was also a certain Fanfarónof Hill, up which [my brother] said he could lead us, if only we would fulfil all the appointed conditions. These were: first, to stand in a corner and not think of a white bear. I remember how I used to get into a corner and try (but could not possibly manage) not to think of

## B. The Special Factors Identified by the Majority

The "special factors" cited by the majority fall into one of two general categories: those involving security, secrecy, and confidentiality, and those involving other policy considerations. We turn to the latter category first, briefly summarizing each factor as the majority describes it and then setting forth our view of the factor's weight.

### 1. Factors not involving secrecy or security.

- This action asks for damages, but it functionally "operates as a constitutional challenge to the policies promulgated by the executive." Supra at **[38]**. We should hesitate to allow such an action to proceed because to do so would tacitly "decide," id., that Bivens can subject federal officers to the kind of enterprise liability that was established for actions under 42 U.S.C. § 1983 by Monell v. Department of Social Services, 436 U.S. 658 (1978), but has not been established for Bivens actions.

This paraphrase sets forth the strongest argument ("factor"), we think, for denying a Bivens remedy to Arar. After Iqbal, it would be difficult to argue that Arar's complaint can survive as against defendants who are alleged to have been supervisors with, at most, "knowledge" of Arar's mistreatment. See Iqbal, 129 S. Ct. at 1949; see also id. at 1955 (Souter, J.,

---

a white bear.").

-53-

dissenting). And to the extent that the United States remains a defendant, perhaps it should be dismissed for want of possible liability under Bivens too. But that does not dispose of the case against the lower-level defendants, such as Blackman, McElroy, and the Doe defendants, who are alleged to have personally undertaken purposeful unconstitutional actions against Arar.

It also may be that to the extent actions against "policymakers" can be equated with lawsuits against policies, they may not survive Iqbal either. But while those championing Arar's case may in fact wish to challenge extraordinary rendition policy writ large, the relief Arar himself seeks is principally compensation for an unconstitutional implementation of that policy. That is what Bivens actions are for.

- Actions for damages against federal officers "who implement" rendition "policy" implicate sovereign immunity concerns, by "influenc[ing] government policy, prob[ing] government secrets, invad[ing] government interests, enmesh[ing] government lawyers, and . . . elicit[ing] government funds for settlement." Supra at **[39]**.

- Recognizing a Bivens action for Arar would entail a judicial "assessment of the validity and rationale" of rendition, which "directly affect[s] significant diplomatic and national security concerns." Supra at **[40]**. The concern here is in part one of separation of powers, see supra at **[41]**, and in part one of

-54-

institutional incompetence, see supra at **[41]**.

Aside from diplomatic and national security considerations, which we address below, this consideration applies to all civil rights actions. Bivens by its nature implicates "government interests," enmeshes government lawyers, and elicits government funds for settlement. Bivens by its nature authorizes courts to invalidate exercises in executive power. A Bivens action, like any other civil rights action, is an attempt to hold members of the executive accountable for their allegedly unconstitutional acts, through the courts. If these "special factors" were persuasive grounds on which to deny Bivens actions, they would not only not be permitted in new contexts, they would not be permitted at all.

Similarly, insofar as this Bivens action may influence executive policy, we doubt that that should be a factor "counseling hesitation" either. Civil rights actions influence policy: They make it more costly for executive officers to violate the Constitution. That is their point. See Wyatt v. Cole, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.").

-55-

Finally, the majority suggests that "[i]n the small number of contexts in which courts have implied a Bivens remedy, it has often been easy to identify both the line between constitutional and unconstitutional conduct, and the alternative course which officers should have pursued," a "distinction [the majority says] may or may not amount to a special factor counseling hesitation in the implication of a Bivens remedy." Supra at **[54].** It should be noted to the contrary that in the two Supreme Court decisions that did "extend" a Bivens remedy in a "new context," such identification was anything but "easy." Carlson v. Green, 446 U.S. 14 (1980), involved the line between constitutional and unconstitutional medical treatment and medical facilities in prisons, whose management the Supreme Court has found "peculiarly within the province and professional expertise of corrections officials" -- and thus outside of the competence of judges -- and instructed courts to "ordinarily defer to [prison officials'] expert judgment," Pell v. Procunier, 417 U.S. 817, 827 (1974). And Davis v. Passman, 442 U.S. 228 (1979), addressed the line between constitutional and unconstitutional discrimination in public employment, which the Court later observed raises issues requiring "decisions [that] are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify," Engquist v. Or. Dep't of Agric., 128 S.Ct. 2146, 2154 (2008).

The factors relied upon by the majority that do not relate to secrecy or security therefore do not appear to us to counsel strongly against recognition of a Bivens remedy here.

2. Factors involving secrecy or security. The other "special factors" cited by the majority focus our attention on the ability of the executive to conduct the business of diplomacy and government in secret as necessary and to protect public and private security. It is beyond dispute that the judiciary must protect that concern. See, e.g., Doe v. CIA, 576 F.3d 95 (2d Cir. 2009). But inasmuch as there are established procedures for doing just that, we think treating that need as giving rise to "special factors counseling hesitation" is an unfortunate form of double counting. The problem can be, should be, and customarily is, dealt with case by case by employing the established procedures of the state-secrets doctrine, see id.; see also section VI, below, rather than by barring all such plaintiffs at the courtroom door without further inquiry.

C. Factors Weighing in Favor of a Bivens Action

At least some factors weigh in favor of permitting a Bivens action in this case. We assume, as we are required to, that Arar suffered a grievous infringement of his constitutional rights by one or more of the defendants, from his interception

-57-

and detention while changing planes at an international airport to the time two weeks later when he was sent off in the expectation -- perhaps the intent and expectation -- that he would be tortured, all in order to obtain information from him. Breach of a constitutional or legal duty would appear to counsel in favor of some sort of opportunity for the victim to obtain a remedy for it. Justice Harlan's landmark concurrence in Bivens explains:

> The[ government's] arguments for a more stringent test to govern the grant of damages in constitutional cases [than that governing a grant of equitable relief] seem to be adequately answered by the point that the judiciary has a particular responsibility to assure the vindication of constitutional interests . . . . To be sure, "it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." But it must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities; at the very least, it strikes me as no more appropriate to await express congressional authorization of traditional judicial relief with regard to [the plaintiff's constitutional] legal interests than with respect to interests protected by federal statutes.

Bivens, 403 U.S. at 407 (Harlan, J., concurring) (citation and footnote omitted).

And more generally, Bivens should be available to vindicate Fifth Amendment substantive due process rights such as those asserted here. As Judge Posner wrote for the Seventh Circuit with respect to a Bivens action:

> [I]f ever there were a strong case for "substantive due process," it would be a case in which a person who had been arrested but not charged or convicted was brutalized while in custody. If the wanton or malicious infliction of severe pain or suffering upon a person being arrested violates the Fourth Amendment -- as no one doubts -- and if the wanton or malicious infliction of severe pain or suffering upon a prison inmate violates the Eighth Amendment -- as no one doubts -- it would be surprising if the wanton or malicious infliction of severe pain or suffering upon a person confined following his arrest but not yet charged or convicted were thought consistent with due process.

Wilkins v. May, 872 F.2d 190, 194 (7th Cir. 1989), cert. denied, 493 U.S. 1026 (1990);[29] accord Magluta v. Samples, 375 F.3d 1269 (11th Cir. 2004) (reversing district court's dismissal of pretrial detainee's Bivens action alleging unconstitutional conditions of confinement at federal penitentiary in violation of the Due Process Clause of the Fifth Amendment); Cale v. Johnson, 861 F.2d 943, 946-47 (6th Cir. 1988) (concluding that "federal

_____

[29] Although there is some disagreement in the Circuits regarding precisely when, following arrest, abuse of detained persons is to be analyzed under principles of substantive due process, we think Judge Posner's comment as to why those principles must apply at some point is insightful and remains valid.

courts have the jurisdictional authority to entertain a <u>Bivens</u> action brought by a federal prisoner, alleging violations of his right to substantive due process"), <u>abrogated on other grounds</u>, <u>Thaddeus-X v. Blatter</u>, 175 F.3d 378, 387-88 (6th Cir. 1999); <u>see also</u> <u>Sell v. United States</u>, 539 U.S. 166, 193 (2003) (Scalia, J., dissenting) (observing that "a [Bivens] action . . . is available to federal pretrial detainees challenging the conditions of their confinement"  (citing <u>Lyons v. U.S. Marshals</u>, 840 F.2d 202 (3d Cir. 1988)).[30]

A federal inmate serving a prison sentence can employ <u>Bivens</u> to seek damages resulting from mistreatment by prison officials.  <u>Carlson v. Green</u>, 446 U.S. 14 (1980).  It would be odd if a federal detainee not charged with or convicted of any offense could not bring an analogous claim.[31]

---

[30]  While cases permitting pretrial detainees to bring <u>Bivens</u> actions for violations of their substantive due process rights support the <u>availability</u> of a <u>Bivens</u> action here, Arar's substantive due process claim should not be evaluated under the <u>standard</u> for assessing the claims of persons who, unlike Arar, were detained pretrial rather than for the purpose of interrogation.

[31]  We have not been asked by the parties to examine the possibility that Arar has pled facts sufficient to raise a claim under theories other than substantive due process -- such as under the Fourth Amendment, the self-incrimination clause of the Fifth Amendment, or even the Eighth Amendment.  Because this is an appeal from a dismissal on the <u>facts</u> pleaded in the complaint under Rule 12(b)(6), we think that even if this Court were to consider such an alternate theory and conclude that it was valid, the case would be subject to remand to the district court for

Finally, a factor counseling recognition of a Bivens action is that Arar has no other remedy for the alleged harms the defendant officers inflicted on him. Cf. Malesko, 534 U.S. at 70 ("In 30 years of Bivens jurisprudence we have extended its holding only twice, to provide an otherwise nonexistent cause of action against individual officers alleged to have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by an individual officer's unconstitutional conduct.").

## VI.  The State-Secrets Privilege

### A.  Resolution on State-Secrets Grounds

If we have not been fully persuasive in arguing that a Bivens remedy should not be denied in this case, we hope we have made it abundantly clear that the question is a complex and difficult one.  And that underlies our principal cause for dissent.  We think it improper for the Court to take the twisting road to a categorical conclusion that no plaintiff has a private right of action in these circumstances and circumstances like them, when, by a brief order, we could take steps that would likely permit the case to be resolved on its particular facts without new and strained declarations of law.

---

further proceedings on that theory.

The majority makes a thinly veiled reference to the recognition of a _Bivens_ action as "alacrity or activism." _Supra_, at **[37]**. The irony of its making that assertion while reaching out unnecessarily to decide a difficult issue related to separation of powers principles should not be lost. Activism in the defense of "liberty," we gather, is no vice.

"The state secrets privilege is a common law evidentiary rule that allows the government to withhold information from discovery when disclosure would be inimical to national security." _Zuckerbraun v. Gen. Dynamics Corp._, 935 F.2d 544, 546 (2d Cir. 1991). "In some cases, the effect of an invocation of the privilege may be so drastic as to require dismissal," as when a "proper assertion of the privilege precludes access to evidence necessary for the plaintiff to state a prima facie claim." _Id._ at 547. We share what we think to be the majority's intuition that this case would likely turn largely, if not entirely, on decisions of national security and diplomacy that the executive branch has already assured us it has good reason to keep out of public view.

Indeed, the government, while arguing before us _en banc_ seeking affirmance on the _Bivens_ issue, could hardly have been clearer:

[I]t seems like at the core of your concerns and perhaps your colleagues' concerns is you don't have more information. And that might be the result of the fact that the district court did not rule on the state secrets issue, so all the classified declarations are not in the record, and if this court felt it could not address our Bivens special factors argument at this stage, and I think it can . . . then I respectfully suggest this court do a limited remand for the district court to review the state secrets issue. The government would have to update the declarations, because much time has passed, but allow the government to do that, have the district court rule on the state secrets issues and then this Court could have this declaration before it if it thought it needed to do that.

Tr. 58-59 (Cohn). And:

Your Honor, if this Court is talking simply about a limited remand, to send this case back simply for the limited purpose of the district court examining the state secrets issue first [if the court won't address Bivens otherwise], I think there's a lot of sense to that, your Honor.

Id. at 62-63 (Cohn).

Recognizing that the government, like Arar and his counsel, would prefer a ruling on the merits, we nonetheless think we should be taking the government up on its alternate suggestion. Doing so would likely allow us to avoid giving sweeping answers to difficult questions of law that we are not required to ask. And it would, by well-established procedure, address what the majority cites as additional "special factors

-63-

counseling hesitation" in recognizing a <u>Bivens</u> right of action.

In particular, the majority notes these "factors":

- Judicial consideration of the issues relating to rendition involves particular "sensitivities" because of the need to discover much "classified material," <u>supra</u> at **[43]**, including those relating to "the national security apparatus of at least three foreign countries, as well as that of the United States," <u>supra</u> at **[44]**.

- "Cases in the context of extraordinary rendition are very likely to present serious questions relating to private diplomatic assurances from foreign countries . . . , and this feature of such claims opens the door to graymail." <u>Supra</u> at **[48]**; <u>see also</u> <u>supra</u> at **[51]** ("The risk of graymail is itself a special factor which counsels hesitation in creating a <u>Bivens</u> remedy.").

These are "factors" that the state-secrets privilege was designed to address.[32]

We are not without precedent here -- similar both factually and procedurally. In <u>El-Masri v. United States</u>, 479 F.3d 296 (4th Cir.), <u>cert. denied</u>, 128 S. Ct. 373 (2007), the issue was an alleged "special rendition" by U.S. agents of a German citizen from Macedonia to a U.S.-controlled prison in

---

[32] Our discussion is limited to the government's invocation of the state-secrets privilege in the context of civil litigation. The protection of state secrets in the course of a criminal prosecution would likely raise many different and difficult issues in light of, among other things, the defendant's rights under the Fifth and Sixth Amendments.

-64-

Afghanistan for the purpose of abusive interrogation.  The plaintiff had brought suit, *inter alia*, pursuant to *Bivens*, for violation of his due process rights against former CIA director George Tenet, among others.  The Fourth Circuit explained:

> The United States intervened as a defendant in the district court, asserting that El-Masri's civil action could not proceed because it posed an unreasonable risk that privileged state secrets would be disclosed.  By its Order of May 12, 2006, the district court agreed with the position of the United States and dismissed El-Masri's Complaint.

*Id.* at 299-300.  The district court, in summarizing its order, had said, "It is important to emphasize that the result reached here is required by settled, controlling law."[33]  *El-Masri v.*

---

[33]  The district court's full statement bears repeating:

It is important to emphasize that the result reached here is required by settled, controlling law. It is in no way an adjudication of, or comment on, the merit or lack of merit of El-Masri's complaint.  Nor does this ruling comment or rule in any way on the truth or falsity of his factual allegations; they may be true or false, in whole or in part.  Further, it is also important that nothing in this ruling should be taken as a sign of judicial approval or disapproval of rendition programs; it is not intended to do either. In times of war, our country, chiefly through the Executive Branch, must often take exceptional steps to thwart the enemy.  Of course, reasonable and patriotic Americans are still free to disagree about the propriety and efficacy of those exceptional steps.  But what this decision holds is that these steps are not proper grist for the judicial mill where, as here, state secrets are at the center of the suit and the privilege is validly invoked.

*Tenet*, 437 F. Supp. 2d at 540-41.

*Tenet*, 437 F. Supp. 2d 530, 540 (E.D. Va. 2006). The Fourth Circuit agreed and affirmed. *El-Masri*, 479 F.3d at 300.[34]

The majority cites the possibility of "graymail" as a "special factor counseling hesitation." But as another decision of the Fourth Circuit points out, the state-secrets privilege protects this interest too, by "provid[ing] a necessary safeguard against litigants presenting the government with a Hobson's choice between settling for inflated sums or jeopardizing national security." *Sterling v. Tenet*, 416 F.3d 338, 344 (4th Cir. 2005).[35]

In Arar's case, the government followed essentially the same procedure as it had in *El-Masri*. The district court here (prior to the district court and court of appeals decisions in *El-Masri*) decided the case on *Bivens* grounds instead. We think that to have been mistaken.

B. Shortcomings of a State-Secrets Resolution

---

[34] We cite *El-Masri* not to endorse its conclusions, but as evidence that the procedures to be applied here are not in any sense novel.

[35] Cf. *Bivens*, 403 U.S. at 410 (Harlan, J., concurring) ("I simply cannot agree with my Brother BLACK that the possibility of 'frivolous' claims -- if defined simply as claims with no legal merit -- warrants closing the courthouse doors to people in Bivens' situation. There are other ways, short of that, of coping with frivolous lawsuits.").

We discussed the state secrets doctrine in some detail in Doe, 576 F.3d at 101-05 (describing, inter alia, the emergence of the doctrine in and after United States v. Reynolds, 345 U.S. 1 (1953)). We are not oblivious to the criticism to which it has been subject. There has been considerable debate about it, see, e.g., Robert M. Chesney, Enemy Combatants After Hamdan v. Rumsfeld: State Secrets and the Limits of National Security Litigation, 75 Geo. Wash. L. Rev. 1249, 1263-1308 (2007) ("Enemy Combatants"); Carrie Johnson, "Handling of 'State Secrets' At Issue," Washington Post, Mar. 25, 2009, at A1, which has been stoked by the recent surfacing of the now-declassified Air Force accident report that was the subject of Reynolds, see Barry Siegel, Claim of Privilege 205-10 (2008).[36]

But this controversy has centered on the extent of the judiciary's role in making the determination of the legitimacy of

---

[36] There have been assertions that the state-secrets invocation in Reynolds, in which the modern form of doctrine was first set forth, was a cover-up of government misfeasance, not an attempt to protect legitimate state secrets. See, e.g., Barry Siegel, Claim of Privilege at 205-10; Herring v. United States, No. A 03 Civ. 5500 (LDD), 2004 WL 2040272, at *2, 2004 U.S. Dist. LEXIS 18545, at *6-*7 (E.D. Pa. Sept. 10, 2004); but see Herring v. United States, 424 F.3d 384, 386 (3d Cir. 2005) (deciding, after review of the report, that the government's "assertion of military secrets privilege for [the] accident report [in Reynolds] . . . was [not a] fraud upon the court"), cert. denied, 547 U.S. 1123 (2006).

the claim of privilege and the consequences of the government's refusal to produce subpoenaed material necessary to the prosecution of the plaintiff's claim.  See, e.g., Enemy Combatants, 75 Geo. Wash. L. Rev. at 1288.[37]  No one can seriously doubt the need for a mechanism by which the government can effectively protect its legitimate military and diplomatic secrets.  The question is whether those procedures now in place

_____

[37]  Questions that have been raised include:  Did the Reynolds dissenters, and the Third Circuit and Eastern District of Pennsylvania before them, see Reynolds v. United States, 192 F.2d 987, 990 (3d Cir. 1951), have the better of the argument when concluding that the judicial role is not fully exercised in any case without an in-chambers, ex parte review of the allegedly privileged material?  Cf. State Secret Protection Act of 2009, H.R. 984, 111th Cong. § 5(a) ("Once the Government has asserted the privilege . . . the court shall undertake a preliminary review of the information the Government asserts is protected by the privilege . . . ."); State Secrets Protection Act, S. 417, 111th Cong. § 2 (2009) (providing that, absent certain exceptions "the United States shall make all evidence the United States claims is subject to the state secrets privilege available for the court to review, consistent with [specified requirements], before any hearing conducted under this section").  Should the monetary loss occasioned as the result of the invocation of the privilege fall invariably and exclusively on plaintiffs?  See Enemy Combatants, 75 Geo. Wash. L. Rev. at 1312-13.  How finely grained a showing should be required before an action is dismissed in light of a successful state-secrets invocation?  See Editorial, The State-Secrets Privilege, Tamed, N.Y. Times, Apr. 30, 2009, at A26 (opining on what it characterized as "the affront to civil liberties and the constitutional separation of powers in the Justice Department's argument that the executive branch is entitled to have lawsuits shut down whenever an official makes a blanket claim of national security"); see also msnbc.com, "Full transcript of President Barack Obama's news conference, Apr. 29, 2009," http://www.msnbc.msn.com/id/ 30488052// (The President:  "I actually think that the state secret doctrine should be modified.  I think right now it's overbroad.").

best balance the need for secrecy with competing values and interests. The critics do not, we think, seek to avoid at all cost and in all circumstances the ability of the government to protect state-secrets in civil litigation or the possibility that some such litigation will ultimately be resolved as a result.

C.   The Majority's Objections

The majority has two objections to a state-secrets resolution.

First, it hints that we have an "unflagging" obligation to address the Bivens issue before turning to the question of state secrets. See supra at **[39]** ("True, courts can -- with difficulty and resourcefulness -- consider state secrets and even reexamine judgments made in the foreign affairs context when we must, that is, when there is an unflagging duty to exercise our jurisdiction." (emphasis in original)). We highly doubt the jurisprudential necessity of addressing a broader, more difficult Bivens question when this case might be resolved on its facts by application of well-established state-secrets procedures. As the panel majority pointed out, non-merits dispositions do not require a predicate decision on subject-matter jurisdiction:

> The Supreme Court has, on several occasions,
> recognized that a federal court has leeway to
> choose among threshold grounds for denying
> audience to a case on the merits. . . .  [A]

-69-

federal court that dismisses on non-merits grounds before finding subject-matter jurisdiction makes no assumption of law-declaring power that violates separation of powers principles.

See Arar, 532 F.3d at 172 (internal quotation marks, citations, and ellipses omitted).  The Supreme Court acted similarly in Iqbal, assuming the viability of a Bivens action in order to decide the case on the basis of pleading and supervisory liability.  See Iqbal, 129 S. Ct. at 1948.

Second, the majority professes concern about the "[t]he court's reliance on information that cannot be introduced into the public record," which the Court says "is likely to be a common feature of any Bivens actions arising in the context of alleged extraordinary rendition."  Supra at **[42]**.  The majority thinks that this concern "should provoke hesitation, given the strong preference in the Anglo-American legal tradition for open court proceedings."  Supra at **[42-43]**.

"'A trial is a public event.  What transpires in the court room is public property.'"  Richmond Newspapers v. Virginia, 448 U.S. 555, 574 n.9 (1980) (plurality opinion) (quoting Craig v. Harney, 331 U.S. 367, 374 (1947)).  We applaud the majority's recognition of the fundamental importance of the principle that the courts are presumed to be open.  See supra at **[44]**; and see, e.g., Globe Newspaper Co. v. Superior Court, 457

-70-

U.S. 596, 604 (1982).  It respects this Circuit's history of meticulously guarding constitutional protection for "access to the courts" in the sense of the ability of a citizen to see and hear, and in that way to participate in, the workings of the justice system.[38]  See, e.g., Huminski v. Corsones, 396 F.3d 56 (2d Cir. 2005); Hartford Courant Co. v. Pellegrino, 380 F.3d 83 (2d Cir. 2004); ABC, Inc. v. Stewart, 360 F.3d 90 (2d Cir. 2004); United States v. Graham, 257 F.3d 143 (2d Cir. 2001); Westmoreland v. Columbia Broad. Sys., Inc., 752 F.2d 16 (2d Cir. 1984), cert. denied, 472 U.S. 1017 (1985); Joy v. North, 692 F.2d 880 (2d Cir. 1982).  But it follows not at all, we think, from the presumption of openness however gauged that the open nature of the federal courts is properly weighed as a factor in the Bivens analysis.

The presumption of openness is just that, a presumption.  In can be, and routinely is, overcome.  We regularly hear, on the basis of partially or totally sealed records, not only cases implicating national security or

---

[38]  This is "access to courts" in a sense quite different from the "access to courts" argument made by Arar referring to the frustration of his ability to seek relief from the judiciary. Cf. Huminski v. Corsones, 386 F.3d 116, 145 n.30 (2d Cir. 2004) (distinguishing between a litigant's due process right of access and the press and public's right of access under the First Amendment).

diplomatic concerns, see, e.g., Doe, 576 F.3d 95; In re Terrorist Bombings of U.S. Embassies in E. Afr. v. Odeh, 552 F.3d 93 (2d Cir. 2008), cert. denied, 129 S. Ct. 2778 (2009), but those involving criminal defendants' cooperation with prosecutors, see, e.g., United States v. Doe, 314 F. App'x 350 (2d Cir. 2008) (summary order), other criminal matters, see, e.g., U.S. v. Silleg, 311 F.3d 557, 560 (2d Cir. 2002), probation department reports, upon which federal criminal sentences are to a significant extent typically based, see, e.g., United States v. Parnell, 524 F.3d 166, 168 n.1 (2d Cir. 2008) (per curiam); United States v. Molina, 356 F.3d 269, 275 (2d Cir. 2004), child welfare, see, e.g., Sealed v. Sealed, 332 F.3d 51 (2d Cir. 2003), trade secrets, see, e.g., In re Orion Pictures Corp., 21 F.3d 24 (2d Cir. 1994), and any manner of other criminal and civil matters. Hardly a week goes by, in our collective experience, in which some document or fact is not considered by a panel of this Court out of the public eye.

We accommodate the public interest in proceedings before federal courts by rigorously adhering to the presumption of openness, but the presumption is often overcome. The majority's notion that because the presumption is likely to be overcome in a particular species of case we should therefore

-72-

foreclose a remedy or otherwise limit our jurisdiction in order to accommodate the public suspicion of secrecy, is misconceived. Denying relief to an entire class of persons with presumably legitimate claims in part because some of their number may lose in proceedings that are held in secret or because secrets may cause some such claims to fail, makes little sense to us. It could work endless mischief were courts to turn their backs on such cases, their litigants, and the litigants' asserted rights. We are not aware of any other area of our jurisprudence where the ability to overcome the presumption of openness has been relied upon to deny a remedy to a litigant. We do not think it should be here.

## CONCLUSION

For the foregoing reasons and to the extent indicated, we respectfully dissent.

BARRINGTON D. PARKER, Circuit Judge, joined by Judges CALABRESI, POOLER, and SACK, dissenting:

I join Judge Sack's, Judge Pooler's, and Judge Calabresi's opinions in full. My point of departure from the majority is the text of the Convention Against Torture, which provides that "[n]o exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Art. 2, cl. 2, December 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 ("Convention Against Torture"). Because the majority has neglected this basic commitment and a good deal more, I respectfully dissent.

Maher Arar credibly alleges that United States officials conspired to ship him from American soil, where the Constitution and our laws apply, to Syria, where they do not, so that Syrian agents could torture him at federal officials' direction and behest. He also credibly alleges that, to accomplish this unlawful objective, agents of our government actively obstructed his access to this very Court and the protections established by Congress. *See* 8 U.S.C. § 1252(a)(2)(D) (providing for judicial review of constitutional claims or questions of law raised by an order of removal).

While I broadly concur with my colleagues who dissent, I write separately to underscore the miscarriage of justice that leaves Arar without a remedy in our courts. The majority would immunize official misconduct by invoking the separation of powers and the executive's responsibility for foreign affairs and national security. Its approach distorts the system of checks

and balances essential to the rule of law, and it trivializes the judiciary's role in these arenas. To my mind, the most depressing aspect of the majority's opinion is its sincerity.

A primary theme of the majority's approach is deference to executive authority, especially in a time of national unrest, turmoil, or danger. The conduct of foreign policy and the maintenance of national security are surely executive and legislative powers. Yet those powers are not limitless. The bounds in both wartime and peacetime are fixed by the same Constitution. *See Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120-21 (1866). Where appropriate, deference to the coordinate branches is an essential element of our work. But there is, in my view, an enormous difference between being deferential and being supine in the face of governmental misconduct. The former is often necessary, the latter never is. At the end of the day, it is not the role of the judiciary to serve as a help-mate to the executive branch, and it is not its role to avoid difficult decisions for fear of complicating life for federal officials. Always mindful of the fact that in times of national stress and turmoil the rule of law is everything, our role is to defend the Constitution. We do this by affording redress when government officials violate the law, even when national security is invoked as the justification. *See* U.S. Const., Art. I, § 9, cl. 2; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

Notably, the majority opinion does not appear to dispute the notion that Arar has stated an injury under the Fifth Amendment of the Constitution. That is heartening, because, by any measure, the notion that federal officials conspired to send a man to Syria to be tortured "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). What is profoundly disturbing, however, is the Court's pronouncement that it can offer Arar no opportunity to prove his case and no possibility of relief. This conclusion is at odds with the Court's responsibility to enforce the

-2-

Constitution's protections and cannot, in my view, be reconciled with *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc.*, 403 U.S. 388 (1971), which remains good law to this day. *See also Davis v. Passman*, 442 U.S. 228, 243 (1979) (declaring *Bivens* remedy for alleged Fifth Amendment violations). The majority is at odds, too, with our own State Department, which has repeatedly taken the position before the world community that this exact remedy is available to torture victims like Arar.[1] If the Constitution ever implied a damages remedy, this is such a case – where executive officials allegedly blocked access to the remedies chosen by Congress in order to deliver a man to known torturers.

The Court's hesitation today immunizes official conduct directly at odds with the express will of Congress and the most basic guarantees of liberty contained in the Constitution. By doing so, the majority risks a government that can interpret the law to suits its own ends, without scrutiny. *See* Memorandum from John Yoo, Deputy Assistant Att'y Gen., & Robert J. Delahunty, Special Counsel, to William J. Haynes II, Gen. Counsel, Dep't of Defense, Jan. 9, 2002, in The Torture Papers: The Road to Abu Ghraib 38 (Karen J. Greenberg & Joshua L. Dratel eds., 2005); *The Federalist No. 48*, at 313 (James Madison) (Clinton Rossiter ed., 1961) (warning against the "tyrannical concentration of all the powers of government in the same hands"). Contrary to the majority, I believe that the Constitution affords Arar a remedy should he prove his sobering allegations, and that his case should be permitted to proceed.

**I**

---

[1] *See* United States Written Response to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (bullet-point 5) (Apr. 28, 2006), *available at* http://www.state.gov/g/drl/rls/68554.htm; United States Report to the United Nations Committee Against Torture, ¶¶ 51 (bullet-point 5), 274, U.N. Doc. CAT/C/28/Add.5 (Feb. 9, 2000), *available at* http://www.state.gov/documents/organization/100296.pdf.

The majority discovers myriad reasons to "hesitate" in the face of Arar's complaint that federal officials conspired to send him to Syria to be tortured. Its principal reason, however, is that permitting such an action "would have the natural tendency to affect diplomacy, foreign policy and the security of the nation." **Maj. Op. at 38**. This view of the separation of powers, which confines the courts to the sidelines, is, in my view, deeply mistaken; it diminishes and distorts the role of the judiciary especially during times of turmoil.

When presented with an appropriate case or controversy, courts are entitled – indeed obliged – to act, even in instances where government officials seek to shield their conduct behind invocations of "national security" and "foreign policy." *See, e.g., Hamdan v. Rumsfeld*, 548 U.S. 557 (2006); *Reid v. Covert*, 354 U.S. 1, 23-30 (1957); *Youngstown*, 343 U.S. 579. *Compare Ex parte Quirin*, 317 U.S. 1, 19 (1942) (observing the "duty which rests on the courts, in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty"), *with* **Maj. Op. at 42** (suggesting that Arar's allegations do not trigger the Court's "unflagging duty to exercise [its] jurisdiction"). This authority derives directly from the Constitution and goes hand in hand with the responsibility of the courts to adjudicate all manner of cases put before them.

The active management of foreign policy and national security is entrusted to the executive and legislative branches. *See* U.S. Const., Art. I, § 8; Art. II, § 2. But this does not mean that executive and legislative officials are left to adhere to constitutional boundaries of their own accord, without external restraint. That is the job of the courts. As Madison declared when he introduced the Bill of Rights to Congress:

> If [these amendments] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights.

1 *Annals of Cong.* 439 (Joseph Gales ed., 1834). The Constitution established three co-equal branches of government, each operating as a check upon the others. In this way, the separation of powers was designed as a limiting principle of government – not to silence any one branch, as the majority implies here, but to enlist each as "a sentinel over the public rights." *The Federalist No. 51*, at 323-24 (James Madison) (G.P. Putnam's Sons ed., 1908).

The majority treats the separation of powers as a reason for the Court to abstain in this case – in reality, it is precisely the opposite. The executive's core responsibility for foreign policy does not negate the judiciary's duty to interpret and enforce constitutional limits. "[E]ven the war power does not remove constitutional limitations safeguarding essential liberties." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934); *Boumediene v. Bush*, 128 S. Ct. 2229, 2246 (2008). One branch impermissibly intrudes upon another not when it fulfills its prescribed role but when it seeks to exercise authority assigned to its coordinate branches. *See Youngstown*, 343 U.S. at 587-89 (holding that the President had exceeded his executive powers when he assumed the "law making power" entrusted to "Congress alone in both good and bad times"); *Bowsher v. Synar*, 478 U.S. 714, 726 (1986) (holding that Congress may not remove executive officers except by impeachment); *The Federalist No. 47*, at 325-326 (James Madison) (J. Cooke ed. 1961) ("[W]here the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution,

are subverted."). The defendants before us could, of course, be fully exonerated in the end, but it is the Court's role to determine the legality of their actions for itself.

In this case, Arar does not ask the Court to assume any executive functions – to dispatch diplomatic representatives, negotiate treaties, or oversee battlefield decisions. Likewise, the suit does not implicate his release or rescue from Syrian custody. Rather, Arar asks the Court to perform a core judicial function: To interpret the laws and Constitution as they apply to detailed allegations of official misconduct on American soil. And he petitions for a familiar judicial remedy: money damages. *See Bivens*, 403 U.S. at 395. Such a suit does not represent judicial interference in executive functions, as the majority would have it, but rather an effort to keep executive power within constitutional limits. *See Buckley v. Valeo*, 424 U.S. 1, 121 (1976) (recognizing that each branch necessarily participates in the affairs of the others); *Mistretta v. United States*, 488 U.S. 361, 380-81 (1989). Respectfully, I believe the majority's deference dissolves the very protections and liberties that the separation of powers was intended to guarantee.

**II**

The Supreme Court has repeatedly made clear that the separation of powers does not prevent the judiciary from ruling on matters affecting national security, and that the courts are competent to undertake this task. *See, e.g., Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004) ("[W]e necessarily reject the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts" in establishing procedures for designating enemy combatants); *New York Times Co. v. United States*, 403 U.S. 713 (1971) (holding that asserted

military interests could not justify prior restraint of the press); *Youngstown*, 343 U.S. 579; *Ex parte Quirin*, 317 U.S. at 19.[2]

Courts routinely handle classified materials and exercise judgment about both the credibility and legal significance of the security interests asserted by the government. *See* Foreign Intelligence Surveillance Act of 1978 (FISA), 50 U.S.C. §§ 1801-1811, 1821-29, 1841-46, 1861-62 (2006); Freedom of Information Act (FOIA), 5 U.S.C. § 552(a)(4)(B) & (b)(1) (2002); Classified Information Procedures Act (CIPA), 18 U.S.C. App. III §§ 1-16; *Boumediene v. Bush*, 128 S. Ct. 2229, 2261 (2008) ("The Government presents no credible arguments that the military mission at Guantanamo would be compromised if habeas corpus courts had jurisdiction to hear the detainees' claims."); *United States v. United States District Court (Keith)*, 407 U.S. 297, 320 (1972) ("We cannot accept the Government's argument that internal security matters are too subtle and complex for judicial evaluation."). These cases belie the majority's notion that the courts lack authority or competency to assess Arar's claims. "What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions." *Sterling v. Constantin*, 287 U.S. 378, 401 (1932)).

---

[2]     In *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 179 (1804), for example, the Supreme Court found a naval captain "answerable in damages" for his unlawful seizure of a Danish trading ship, even where a Presidential order appeared to authorize the seizure. The Court did not hesitate, as here, to address the legality of the President's order or the seizure itself. "A commander of a ship of war of the United States, in obeying his instructions from the President of the United States, acts at his peril. If those instructions are not strictly warranted by law he is answerable in damages to any person injured by their execution." *Id.* at 170; *see also Talbot v. Seeman*, 5 U.S. (1 Cranch) 1 (1801) (determining the legality of the navy's capture of foreign merchant vessel during undeclared conflict with France); *The Prize Cases*, 67 U.S. (2 Black) 635 (1862). *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866), rejected the government's claim that civil war authorized the executive branch to act as "supreme legislator, supreme judge, and supreme executive." William H. Rehnquist, All the Laws But One: Civil Liberties in Wartime 121 (1998) (quoting the government's brief in *Milligan*). "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex parte Milligan*, 71 U.S. at 120-21.

The courts have a duty to scrutinize unilateral assertions of security and secrecy because the government's account has, in many of these cases, been overblown. Recent disclosures suggest that the military secrets so fiercely guarded in *United States v. Reynolds*, 345 U.S. 1 (1953) – the Supreme Court's seminal state secrets case – may well have posed no threat to national security. *See Herring v. United States*, 2004 WL 2040272, at *5 (E.D. Pa. Sept. 10, 2004), *aff'd*, 424 F.3d 384 (3d Cir. 2004) (finding no deliberate fraud upon the court, but noting "the apparent dearth of sensitive information in the accident investigation report and witness statements"); Louis Fisher, In the Name of National Security: Unchecked Presidential Power and the *Reynolds* Case 166-69 (2006).

A similar truth has emerged from the Pentagon Papers case, *New York Times Co. v. United States*, 403 U.S. 713 (1971). Although the government argued to the Supreme Court that publication posed a "grave and immediate danger to the security of the United States," former Solicitor General Griswold has since acknowledged that the executive's primary concern was "not with national security, but rather with governmental embarrassment." Erwin N. Griswold, Secrets Not Worth Keeping, Wash. Post, Feb. 15, 1989, at A25; *cf.* Office of the Attorney General, Mem. on Policies and Procedures Governing Invocation of the State Secrets Privilege 2 (Sept. 23, 2009) (issuing revised guidelines and clarifying that the Department of Justice "will not defend an invocation of the [state secrets] privilege in order to . . . prevent embarrassment to a person, organization, or agency of the United States government"). The appropriate tools for evaluating national security concerns are already firmly established in our law – namely, the state secrets privilege and CIPA. They do not require wholesale abstention by the courts.

Indeed, a number of cases in which courts have acceded in this way, relying on bald appeals to national security, have proven deeply troubling in retrospect. The Supreme Court's decisions upholding convictions under the Sedition Act of 1918 are regarded as indefensible today. *See Schenck v. United States*, 249 U.S. 47, 52 (1919); *Debs v. United States*, 249 U.S. 211 (1919); *Abrams v. United States*, 250 U.S. 616 (1919); *Morse v. Frederick*, 551 U.S. 393, 442 (2007) (Stevens, J., dissenting) (observing that Justice Holmes' dissent in *Abrams* has "emphatically carried the day"). More recently, the dire warnings issued to justify the indefinite detention of enemy combatants and forestall further court review have also drawn stern rebuke. In *Padilla v. Hanft*, 432 F.3d 582, 584-587 (4th Cir. 2005), the Fourth Circuit observed that the government had "steadfastly maintain[ed] that it was imperative in the interest of national security" to hold Padilla in military custody for three and a half years. Yet officials abruptly changed course on the doorstep of Supreme Court review, seeking to move Padilla into criminal custody, at a "substantial cost to the government's credibility before the courts." *Id.* at 584. *See also* Brief for Respondents, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (No. 03-6696) (arguing that military necessity required Hamdi's indefinite detention, yet releasing him to Saudi Arabia seven months later).

Finally, contrary to the majority's suggestion, the courts require no invitation from Congress before considering claims that touch upon foreign policy or national security. *See* **Maj. Op. at 10-11, 42-43, 57**. In fact, the Supreme Court has demonstrated its willingness to enter this arena against the express wishes of Congress. In *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), the Supreme Court rebuffed legislative efforts to strip the courts of jurisdiction over detainees held at Guantanamo Bay. It held that the writ of habeas corpus extended to the naval

base, and that neither Congress nor the executive branch could displace the courts without formally suspending the writ. Importantly, it did so despite the fact that this exercise of judicial power plainly affected the executive's detention of hundreds of enemy combatants and a centerpiece of the war on terror. The Court recognized that habeas proceedings "may divert the attention of military personnel from other pressing tasks" but refused to find these concerns "dispositive." *Id.* at 2261. Scores of decisions have since followed this lead. *See, e.g.*, *Al Rabiah v. United States*, 2009 WL 3048434 (D.D.C. Sept. 17, 2009); *Ahmed v. Obama*, 613 F. Supp. 2d 51 (D.D.C. 2009). Courts cannot blithely accept every assertion of national security at face-value, and they are entitled to enforce constitutional limits by scrutinizing such claims.

### III

Although Arar credibly alleges mistreatment in both the United States and Syria, the circumstances of his detention on American soil are summarily excluded from the majority's *Bivens* analysis. Instead, the Court concludes that Arar has not pleaded these allegations with the factual detail required by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *See* **Maj. Op. at 23-24**. Consequently, it dismisses Claim Four and proceeds as though the challenged conduct is strictly extraterritorial.[3] This conclusion goes far beyond any pleading rule we are bound to

---

[3] The majority identifies extraordinary rendition as the context for Arar's *Bivens* claims, a label that reduces the complaint to the fact of his transfer to Syria. *See* **Maj. Op. at 8, 32-33**. In doing so, the majority largely disregards the events both before and after Arar's transfer that are part and parcel of his claim for relief. Arar does not merely allege that he was rendered to Syria without process, but that he was first detained in the United States for twelve days, during which time he was held in harsh and punitive conditions, coercively interrogated, and deliberately denied access to counsel, his consulate, and the courts by American officials. *See* Compl. ¶¶ 2, 4, 32-49, 91-93. Moreover, the purpose and culmination of this mistreatment was not simply Arar's removal from the United States. Rather, American officials allegedly set out to render him to Syria either intending or knowing that Arar would be tortured there, and aided this abuse by providing information to his captors. *See id.* ¶¶ 55-57. One hopes that all extraordinary rendition is not for the purpose of torture; certainly, this abuse is not one of the attributes that the majority attaches to that label. *See* **Maj. Op. at 9-10 n.1**. All told, extraordinary rendition is the method by which Arar was transferred to Syria, but it hardly captures the constitutional

-10-

apply, and it is inconsistent with both Rule 8 of the Federal Rules of Civil Procedure and recent Supreme Court decisions.

Even after *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), which dismissed discrimination claims against policymakers on account of inadequate pleading, Claim Four readily exceeds any measure of "plausibility." Claim Four seeks to hold Defendants John Ashcroft, Larry Thompson, Robert Mueller, James Ziglar, J. Scott Blackman, Edward McElroy, and John Does 1-10 responsible for the extreme conditions under which Arar was held in the United States.[4] While the majority finds that Arar failed to allege the requisite "meeting of the minds" necessary to support a conspiracy, *see* **Maj. Op. 24**, it ignores the fact that Arar pleaded multiple theories of liability. Formal conspiracies aside, he also alleges that the defendants commonly aided and abetted his detention and removal – that is, that the defendants were personally involved in his mistreatment both in the United States and abroad. *See Hayut v. State Univ. of New York*, 352 F.3d 733, 753 (2d Cir. 2003) (A supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or (4) deliberate indifference to the rights of others); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001).

---

injuries described in his complaint.

[4] At the time of Arar's detention, Defendant Ashcroft was Attorney General of the United States; Defendant Thompson was Deputy United States Attorney General; Defendant Robert Mueller was the Director of the Federal Bureau of Investigation (FBI); Defendant Ziglar was Commissioner of the Immigration and Naturalization Service (INS); Defendant Blackman was Regional Director of the INS for the Eastern District; Defendant McElroy was District Director for the INS for the New York City District; and John Does 1-10 were federal law enforcement agents employed by the FBI or INS. *See* Compl. ¶¶ 14-22.

In support of his claim for mistreatment and due process violations while in American custody, Arar includes factual allegations that are anything but conclusory. Indeed, he provides as much factual support as a man held incommunicado could reasonably be expected to offer a court at this stage. The complaint alleges that Defendant McElroy was personally involved in Arar's failure to receive the assistance of counsel. *See* Compl. ¶ 43. It alleges that Defendants Blackman and Thompson personally approved Arar's expedited transfer from the United States to Syria, implicating these officials in his inability to access the courts. *Id.* ¶¶ 15, 47-48. And it recounts statements by Arar's American interrogators that they were discussing his situation with "Washington D.C." *Id.* ¶ 45; *see also* Dep't of Homeland Security, Office of the Inspector General, The Removal of a Canadian Citizen to Syria ("OIG Report") at 11 (reporting that DOJ and INS officials in Washington, D.C. learned of Arar's apprehension on the evening of Thursday, September 26, 2002, 12 days before he was rendered to Syria via Jordan). More broadly, Arar details the harsh conditions under which he was held, including shackling, strip searches, administrative segregation, prolonged interrogation, and a near communications blackout. *See id.* ¶¶ 29-47. Notably, these are not "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949. They easily satisfy the requirements of both *Iqbal* and also Rule 8, whose "short and plain statement" remains the baseline for notice-pleading. *See* Fed. R. Civ. P. 8(a)(1).

Moreover, as *Iqbal* made clear, plausibility is "context-specific," requiring the reviewing court "to draw on its experience and common sense." *Iqbal*, 129 S. Ct. at 1950. There, the Supreme Court rejected Iqbal's discrimination claims against high-ranking federal officials because his complaint lacked sufficient factual allegations supporting the inference of

discriminatory intent. *Id.* at 1952. Central to the majority's decision was the fact that these officials faced a devastating terrorist attack "perpetrated by 19 Arab Muslim hijackers." *Id.* at 1951. Against this backdrop, the majority found Iqbal's claim overwhelmed by the "obvious alternative explanation" – that his arrest stemmed from a "nondiscriminatory intent to detain aliens . . . who had potential connections to those who committed terrorist acts." *Id.* at 1951 (quoting *Twombly*, 550 U.S. at 567). Apparently having their own views about the defendants' state of mind, the majority simply found Iqbal's discrimination claim incredible.

Plausibility, in this analysis, is a relative measure. Allegations are deemed "conclusory" where they recite only the elements of the claim. They become implausible when the court's commonsense credits far more likely inferences from the available facts. *See Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009). Plausibility thus depends on a host of considerations: The full factual picture presented by the complaint, the particular cause of action and its elements, and the available alternative explanations. *See Iqbal*, 129 S. Ct. at 1947-52. As Rule 8 implies, a claim should only be dismissed at the pleading stage where the allegations are so general, and the alternative explanations so compelling, that the claim no longer appears plausible. *See* Fed. R. Civ. P. 8(a); *Twombly*, 550 U.S. at 556 (requiring simply "enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the claims).

Arar's claim readily survives this test, particularly in light of the Court's obligation to "draw[] all reasonable inferences in the plaintiff's favor" on a motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). The notion that high-ranking government officials like Defendants Ashcroft and Mueller were personally involved in setting or approving the conditions under which suspected terrorists would be held on American soil – and

-13-

even oversaw Arar's detention and removal – is hardly far-fetched. Arar's arrival at JFK airport was a significant event in September 2002, triggering all manner of security responses. *See, e.g.*, Compl. ¶ 45; OIG Report at 11, 15 (citing "high-level interest in Arar in Washington, DC"); *id.* at 30 n.31 (describing the four-vehicle convoy in which Arar was transported, including nine INS officers equipped with their service weapons, Remington 870 shotguns, M-4 rifles, helmets, and ballistic vests). The fact that Arar was covertly transferred to Syria, by itself, indicates involvement at the highest levels of government.

In contrast to *Iqbal*, it is the alternative here that is difficult to fathom. To think that low-level agents had complete discretion in setting the conditions for holding a suspected member of al Qaeda defies commonsense. It requires the Court to believe that, while high-level officials were involved in arranging Arar's removal to Syria – a premise the majority does not question[5] – they were oblivious to the particulars of his detention. The majority was, of course, bound to credit all reasonable inferences from the allegations in the complaint, understanding that their factual basis would be thoroughly tested in discovery. *See Twombly*, 550 U.S. at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"). The inference that, in 2002, high-level officials had a role in the detention of a suspected member of al Qaeda requires little imagination.

Further, unlike *Iqbal*, Arar's due process claims do not ask the Court to speculate about the mental state of government officials. Rather, Claim Four rests on objective factors – the

---

[5] Likewise, the majority finds these very same allegations sufficient for purposes of personal jurisdiction, as did the panel. *See* **Maj. Op. at 19**; *Arar v. Ashcroft*, 532 F.3d 157, 173-75 (2d Cir. 2008) (panel op.) (applying identical personal involvement standard in considering personal jurisdiction and finding it met).

-14-

conditions of confinement and his access to the courts – that are independent of motive. *Compare Iqbal*, 129 S. Ct. at 1948 (claim of invidious discrimination requires the plaintiff to "plead and prove that the defendant acted with discriminatory purpose"), *with Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir.1995) (government conduct that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense" violates substantive due process). The complaint contains more than sufficient factual allegations detailing these deprivations. *See* Compl. ¶¶ 27-49.

Finally, it should not be lost on us that the Department of Homeland Security's Office of Inspector General has itself confirmed the broad contours of Arar's mistreatment, producing a lengthy report on the conditions of his detention in American custody. *See* OIG Report. This report provides a powerful indication of the reliability of Arar's factual allegations at this stage.[6] Plainly, the majority has read the OIG report, even citing it for limited purposes in its opinion. *See* **Maj. Op. at 48**. It is difficult, then, to comprehend how the majority can ignore the report's findings and conclusions in assessing the basic plausibility of Arar's fourth claim.

Ultimately, it is unclear what type of allegations to overcome a motion to dismiss by high-level officials could ever satisfy the majority. In refusing to credit Arar's allegations, the majority cites the complaint's use of the "passive voice" in describing some of the underlying events. *See* **Maj. Op. at 25**. This criticism is odd because the occasional use of the passive voice has not previously rendered pleadings defective, particularly where the defendants' roles can be easily ascertained from the overall complaint. *See* Compl. ¶¶ 14-22; *Yoder v.*

_____

[6] In *Iqbal*, the Supreme Court looked beyond the complaint to a wider factual context in assessing plausibility. *See* 129 S. Ct. at 1951-52.

*Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 561 (2d Cir. 1985) ("It is elementary that, on a motion to dismiss, a complaint must be read as a whole, drawing all inferences favorable to the pleader.") (citations omitted). Specifically, the majority faults Arar for not pinpointing the individuals responsible for each event set out in the complaint and for failing to particularize more fully when and with whom they conspired. The irony involved in imposing on a plaintiff – who was held in solitary confinement and then imprisoned for ten months in an underground cell – a standard so self-evidently impossible to meet appears to have been lost on the majority.

The flaws in the majority's approach are not unique to Arar, but endanger a broad swath of civil rights plaintiffs. Rarely, if ever, will a plaintiff be in the room when officials formulate an unconstitutional policy later implemented by their subordinates. Yet these closeted decisions represent precisely the type of misconduct that civil rights claims are designed to address and deter. *See Carlson v. Green*, 446 U.S. 14, 21 (1980). Indeed, it is this kind of executive overreaching that the Bill of Rights sought to guard against, not simply the frolic and detour of a few "bad apples." The proper way to protect executive officials from unwarranted second-guessing is not an impossible pleading standard inconsistent with Rule 8, but the familiar doctrine of qualified immunity.

Even if the majority finds that Arar's factual allegations fall short of establishing the personal involvement of Defendants Ashcroft and Mueller, they plainly state a claim against defendants such as Thompson, Blackman, McElroy, and John Doe FBI and ICE agents. *See* Compl. ¶¶ 43, 47-48, 55. The direct involvement of these defendants is barely contested by the appellees and barely mentioned by the majority. For this reason alone, there is no legal justification for the majority to dismiss Claim Four outright.

**IV**

When the full range of alleged mistreatment is considered, Arar's injuries hardly constitute a "new" context for *Bivens* claims, and I agree with both Judge Sack's and Judge Pooler's careful analyses. This Court has repeatedly assumed that *Bivens* extends to substantive due process claims and provides a damages remedy to other detainees illegally injured by executive officials or their agents. *See Carlson v. Green*, 446 U.S. 14 (1980); *Thomas v. Ashcroft*, 470 F.3d 491, 497 (2d Cir. 2006); *Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir. 2000). Our State Department is of the same view, having assured the United Nations' Committee Against Torture that a *Bivens* remedy is available to torture victims. *See* United States Written Response to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (bullet-point 5) (Apr. 28, 2006), *available at* http://www.state.gov/g/drl/rls/68554.htm.[7]

Even if Arar's case were viewed as a new context, the "special factors" cited by the majority do not justify denying him relief because they are not "special." They largely duplicate concerns – like state secrets, sovereign immunity, and qualified immunity – amply addressed by other doctrines at the Court's disposal. *See Davis v. Passman*, 442 U.S. 228, 246 (1979) (refusing to hesitate where special factors were "coextensive with the protections afforded by the Speech or Debate Clause"). My colleagues make these arguments in greater detail, cataloging the flaws in the majority's *Bivens* analysis. I write to emphasize the heightened need for a *Bivens* remedy in cases such as this where executive officials have deliberately thwarted the remedies

---

[7] Responding to the Committee's question, "What guarantees and controls does [the United States] have to ensure the monitoring of the activities of law enforcement officials in prisons and other detention centres . . . under its jurisdiction or de facto control," the State Department acknowledged among other remedies: "Suing federal officials for damages under provisions of the U.S. Constitution for 'constitutional torts,' *see Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and *Davis v. Passman*, 442 U.S. 228 (1979)."

provided by Congress and obstructed access to the courts. Arar's claims in this regard supply an exceptionally compelling justification for affording a *Bivens* remedy, going well beyond the allegations that gave rise to *Bivens* in the first place.

The judicial role recognized in *Bivens* reflects an important institutional balance – one closely aligned with separation of powers. *Bivens* offers Congress the first opportunity to fashion a remedy for invasions of individual rights protected by the Constitution. However, when a legislative judgment is lacking, *Bivens* permits the courts to use their common-law powers to fill crucial gaps and provide redress in appropriate instances. This line of cases thus instructs the courts to tread lightly where Congress has spoken, presuming that in those instances constitutional interests have been adequately addressed by the legislative branch. *See Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988) ("When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.").

On the other hand, where no legislative remedy exists, *Bivens* reaffirms the courts' power to ensure that individuals can obtain relief for constitutional injuries. The courts, within this framework, provide a forum of last resort; through *Bivens*, they stand behind constitutional guarantees neglected by the political branches. *Compare Bivens*, 403 U.S. at 410 (Harlan, J., concurring) (implying a remedy where constitutional injury would otherwise go unredressed), *with Bush v. Lucas*, 462 U.S. 367, 388 (1983) (denying *Bivens* remedy in light of the "elaborate remedial system" established by Congress).

Even so, this remedy is constrained by "special factors" that counsel hesitation even in the "absence of affirmative action by Congress." *Bivens*, 403 U.S. at 396. The Supreme Court has never provided an exhaustive definition of these special factors, and existing precedent offers only a few data-points.[8] But it has nonetheless indicated that this analysis should "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done." *Wilkie v. Robbins*, 551 U.S. 537, 554 (2007). In *Wilkie*, for example, the factor that ultimately counseled hesitation was the difficulty of distinguishing unconstitutional conduct from lawful government activity. *Id.* at 555-61. In earlier cases, involving claims by military personnel, the Supreme Court cited Congress' plenary authority "To make Rules for the Government and Regulation of the land and naval Forces," and its adoption of the Uniform Code of Military Justice. *See Chappell v. Wallace*, 462 U.S. 296, 302-03 (1983) (citing U.S. Const., Art. I, § 8, cl. 12-14; 10 U.S.C. § 938); *see also United States v. Stanley*, 483 U.S. 669, 683-84 (1987). Where Congress, pursuant to this authority, had established a parallel system of military discipline, the Court declined to interfere in the relationship between enlisted personnel and their commanding officers. *See Chappell*, 462 U.S. at 304. "Special factors," then, must be regarded as a prudential limitation: One that considers the suitability of money damages for the particular constitutional injuries alleged, together with the availability of other relief.[9] *See Davis*, 442 U.S.

---

[8] While the majority pointedly notes that the Supreme Court has only agreed to extend a Bivens remedy three times since 1971, it has only rejected such claims based on special factors on three occasions over that same period. *See Wilkie v. Robbins*, 551 U.S. 537, 554 (2007); *United States v. Stanley*, 483 U.S. 669 (1987); *Chappell v. Wallace*, 462 U.S. 296 (1983). In every other case, the Court has determined that the remedial scheme established by Congress displaces a judicial remedy – a finding that the majority does not purport to make here. Moreover, even in *Chappell*, the Supreme Court relied in part on the alternative remedial scheme provided in the Uniform Code of Military Justice.

[9] The special factors analysis considers the wisdom and effectiveness of one particular remedy – the recovery of money damages from individual federal officers. This determination is separate and distinct from (1) a court's capacity to assess the right in question; and (2) its power to afford

at 245 (finding "special concerns" overcome by impossibility of equitable relief and appropriateness of damages remedy).

So limited, *Bivens* is an infrequent remedy, but it is a vitally necessary one. In laying out the *Bivens* remedy, the Supreme Court recognized that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws." *Butz v. Economou*, 438 U.S. 478, 485 (1978) (quoting *Bivens*, 403 U.S. at 395, 397); *see also Davis*, 442 U.S. at 241 ("[T]he judiciary is clearly discernible as the primary means through which these rights may be enforced."). It was this principle, in the face of "the most flagrant abuses of official power," that prompted the Court to afford a damages remedy. *Bivens*, 403 U.S. at 410 (Harlan, J., concurring). *Bivens* thus reflects the courts' role as an independent source of protection, applying the damages remedy as a form of individual relief and official accountability.

This prerogative is consistent with the constitutional plan. With its built-in limitations, *Bivens* has never represented a formidable expansion of judicial power. The doctrine, it must be remembered, does not create any new rights; it provides a mechanism for enforcing existing constitutional rights when no other avenue exists. "[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any

_____

relief of any kind. In particular, if a court would be entitled to provide injunctive or habeas relief for the same or similar claims, it cannot treat the special factors analysis as a proxy for justiciability, the political question doctrine, or the separation of powers. Indeed, if other forms of relief would be available, these potential obstacles to the court's jurisdiction have already been dispatched and they may not be smuggled in a second time through the back door. Yet the majority does precisely this, relying on a host of "special factors" that simply repeat concerns accounted for elsewhere in our law. *See* **Maj. Op. at 38-50** (treating as special factors separation of powers, sovereign immunity, state secrets and classified information, and diplomatic assurances). In reality, it is a much more modest inquiry. The special factors analysis must focus on why money damages – as opposed to other forms of available relief – might be inappropriate or undesirable.

available remedy to make good the wrong done." *Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also Bivens*, 403 U.S. at 395 ("Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty.").

Against this backdrop, the majority sets out to narrow *Bivens* to the point of vanishing. The majority's test would not just eliminate a *Bivens* remedy in Arar's case, but in almost all cases. According to the majority, "'[h]esitation' is 'counseled' whenever thoughtful discretion would pause even to consider," and "no account is taken of countervailing factors." *See* **Maj. Op. at 37**. But because "thoughtful" people, by definition, always "pause to consider," this approach would foreclose a damages remedy on account of the most fleeting and superficial of concerns. And it would permit courts to ignore completely, as the majority opinion itself does, the gravity of the constitutional injuries alleged. As the Court admits, this dramatic recasting of *Bivens* is unnecessary to support its holding. *Id.* **at 38** (expressing the view that Arar's action "would have the natural tendency to affect diplomacy, foreign policy and the security of the nation," and therefore the Court's holding "need be no broader"). The standard described by the majority misstates the law and, for the reasons surveyed here, significantly weakens the courts' ability to redress constitutional injuries.

## V

Arar's claims, in fact, go beyond the usual imperatives for a *Bivens* remedy. His complaint offers an exceptionally compelling basis for relief, one that the majority repeatedly sidesteps: The charge that government officials actively obstructed Arar's access to the courts, violating core procedural due process rights. *See Tellier v. Fields*, 280 F.3d 69 (2d Cir. 2000) (assuming that a *Bivens* action exists for procedural due process claim by detainee). Any court

-21-

should be deeply disturbed by such allegations, especially those backed by the factual detail presented here. *Cf. Valverde v. Stinson*, 224 F.3d 129, 133-34 (2d Cir. 2000) (finding AEDPA statute of limitations equitably tolled where prison officials intentionally obstructed habeas petitioner's ability to file his petition by confiscating his legal papers). Yet the majority's wholesale dismissal of claims relating to Arar's detention in the United States – for insufficient pleading, as described above – allows it to avoid any meaningful engagement with these allegations.

Normally, as we have seen, when Congress legislates in a particular area, a *Bivens* action is not appropriate. In particular, the division of labor outlined in *Bivens* contemplated two scenarios: (1) Where Congress has selected a remedy for constitutional injuries, the courts should defer to its legislative wisdom; (2) Where Congress has not considered a remedy, however, a court must use its "judgment about the best way to implement a constitutional guarantee." *Wilkie*, 551 U.S. at 550; *see Bivens*, 403 U.S. at 496. However, Arar's case fits neither situation. Instead, the allegations are that any remedy provided by Congress and the Constitution was purposefully foreclosed by executive officials.

When it comes to torture, Congress has spoken loudly and clearly. Title 18, Section 2441 makes it a felony punishable by life imprisonment to commit, or conspire to commit, "an act specifically intended to inflict severe physical or mental pain or suffering . . . upon another person within his custody or physical control for the purpose of obtaining information or a confession." *See also* 18 U.S.C. § 2340A. Arar's transfer to Syria was allegedly designed to skirt the congressional prohibition on torture by outsourcing this form of interrogation. Moreover, in order to seamlessly accomplish this transfer, officials had to ignore or evade a

-22-

number of other congressional dictates: An immigration policy that bars the removal of any person to a country where he will likely be tortured, and the INA's judicial review provision. *See* Convention Against Torture, December 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85, *implemented by* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G., Tit. XXII, § 2242, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231); 8 U.S.C. § 1252(a)(2)(D); *see also Tun v. INS*, 445 F.3d 554, 566 (2d Cir. 2006). Finally, officials' actions also foreclosed Arar's opportunity to seek habeas relief under 28 U.S.C. § 2241 and the Constitution, a remedy that the government itself concedes should have been available to Arar.

In bare terms, the complaint alleges that executive officials set out to circumvent and undercut the powers of both the legislative and judicial branches. Under these circumstances, the usual justifications for hesitation in applying *Bivens* are simply not present. When, as here, the executive branch takes measures incompatible with the express or implied will of Congress, its "power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (1952) (Jackson, J., concurring). Factors that might otherwise counsel hesitation disappear where executive officials have sought to nullify the remedies chosen by Congress. In these cases, courts owe the executive branch little deference. Instead, the courts' provision of a substitute remedy is an undertaking not simply "appropriate for a common-law tribunal" but essential for the rule of law. *Bush v. Lucas*, 462 U.S. 367, 378 (1983). Since the majority fails in these responsibilities, I repectfully dissent.

POOLER, Circuit Judge, joined by Judges Calabresi, Sack, and Parker, dissenting.

I agree with the well-reasoned dissents of my colleagues and join their opinions in full. I write separately to note that the majority's opinion in this troubling and unusual case should not be misread as adopting a new framework for determining whether to recognize a Bivens claim, and to explain why I do not agree that Arar's TVPA claim should be dismissed.

## I.    Bivens

At first glance, it might seem that the majority's reasoning with respect to Arar's Bivens claim proceeds in two simple steps: (1) Arar's claim presents a new context for a Bivens action,[1] and (2) special factors counsel hesitation before recognizing a Bivens remedy. But a closer reading of the majority opinion reveals far more than a mere hesitation to extend Bivens to a new context in light of special factors. Because the majority's holdings bear no relation to its new statements of Bivens principles, those remarks are dicta. Moreover, any such simplistic framework would be contrary to the Supreme Court's Bivens decisions, which require that courts consider reasons both for and against recognizing the remedy.

The Supreme Court has held that we must engage in the following analysis in considering whether to recognize Bivens action:

> In the first place, there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages. But even in the absence of an alternative, a Bivens remedy is a subject of judgment: "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation."

---

[1]  I do not agree with the majority's conclusion that Arar's case presents a new context for a Bivens action for the reasons stated in Judge Sack's dissent.

1

Wilkie v. Robbins, 551 U.S. 537, 550 (2007) (quoting Bush v. Lucas, 462 U.S. 367, 378 (1983)). After sidestepping the question of existing remedies, Maj. Op. at **33-36**, the majority states that the remainder of inquiry can be reduced to the question of whether there any special factors to consider. Id. at **35-36**

The majority begins by observing that the Supreme Court has extended Bivens twice but refused to extend Bivens seven times, as if this empirical disfavor could save courts the trouble of engaging in "the kind of remedial determination that is appropriate for a common-law tribunal." Wilkie, 551 U.S. at 550.[2] Notwithstanding the Supreme Court's reluctance to extend Bivens in recent years, it has not overruled Bivens, nor has it overruled the decisions extending Bivens to new contexts in Davis v. Passman, 442 U.S. 228 (1979) and Carlson v. Green, 446 U.S. 14 (1980), nor has it ever held that "Bivens and its progeny should be limited to the precise circumstances that they involved." Wilkie, 551 U.S. at 568 (Thomas, J., concurring) (quotation marks omitted). Thus, the majority must distinguish Bivens, Davis, and Green's cases from Arar's.

To do so, the majority points to "special factors" that counsel hesitation. The majority observes, in dicta, two "principles" emerging from the case law on Bivens. First, where special factors counseling hesitation exist, "no account is taken of countervailing factors." Maj. Op. at **37.** Notwithstanding this new principle, the majority concludes that it "cannot ignore that, as the panel dissent put it, 'there is a long history of judicial review of Executive and Legislative decisions related to the conduct of foreign relations and national security.'" Id. at **56-57** (quoting

---

[2] Recently, in dicta, the Supreme Court explained that its "reluctan[ce]" to extend Bivens stems from the fact that "implied causes of action are disfavored." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009).

Arar v. Ashcroft, 532 F.3d 157, 213 (2d Cir. 2008) (Sack, J., dissenting in part)). And the majority recognizes that prudential considerations play into the Bivens analysis, considering, for example, whether a Bivens action in Arar's context would have a deterrent effect. Id. at **52**. Ultimately, therefore, the majority has not adopted any new principle of disregarding countervailing factors.

Second, the majority proclaims that the threshold for determining whether a factor "'counsels hesitation' is remarkably low.'" Maj. Op. at **37**. The majority explains that "'[h]esitation' is 'counseled' whenever thoughtful discretion would pause even to consider." Id. I find this statement somewhat inscrutable, but I do not take the majority to mean that Bivens should not be extended anytime a special factor deserves any degree of consideration. Insofar as the majority intends to lower the bar for special factors, its remarks are dicta. These remarks bear no relation to the majority's holding that extension of Bivens to Arar's context is not "advisable," id. at **32**, because separation of powers, institutional competence, and other factors "sternly" counsel hesitation. Id. at **36**. Indeed, the majority's opinion devotes twenty pages to its stern assessment of special factors, id. at **36-56**, including the fear that "actual terrorists" could win damages awards, placing courts in the position of funding terrorism, id. at **53 n.12**; that the government will be "graymail[ed]" into settling cases to prevent disclosure of classified information, id. at **51-54**; and that other countries will be "less willing to cooperate with the United States in sharing intelligence resources to counter terrorism," id. at **43**.

Apart from being dicta, these remarks represent a misreading of Supreme Court precedent. Wilkie exhorts that we pay heed to special factors counseling hesitation while exercising the type of remedial judgment appropriate for a common law tribunal – "weighing

3

reasons for and against the creation of a new cause of action, the way common law judges have always done." 551 U.S. at 554 (citing Bush, 462 U.S. at 378). In the exercise of remedial judgment, we should not consider only those factors that militate in favor of one side of the argument. We must be mindful of a wide range of prudential concerns. See, e.g, id. at 550 (holding that "any freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee"); Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 70 (2001) (considering whether extension of Bivens would "deter individual federal officers . . . from committing constitutional violations"). The majority cannot overrule Wilkie's holding that we must make "the kind of remedial determination that is appropriate for a common-law tribunal," 551 U.S. at 550, by replacing that phrase with ellipses when quoting the case, see Maj. Op. at **35**.

Were the majority's dicta the rule, there would be no explanation for the Supreme Court's decision in Bivens in the first place. Surely there were special factors that would have counseled hesitation – the drain on the public fisc, the strain on judicial resources, the hindrance to law enforcement personnel whose efforts had to be diverted to defending lawsuits for damages. Without pausing to consider these factors, the Bivens Court held that a damages remedy was necessary to enforce the Fourth Amendment. Bivens v. Six Unknown Named Agents, 403 U.S. 388, 397-98 (1971). Moreover, were the majority's dicta correct, it would be impossible to make heads or tails of Davis v. Passman, supra. In that case, the Court extended Bivens to a claim for employment discrimination in violation of the equal protection component of the Fifth Amendment's Due Process Clause against a member of Congress. The Court recognized a Bivens remedy despite pausing to give thoughtful consideration to the argument that Passman's

4

status as a member of Congress, "counsel[ed] hesitation." 442 U.S. at 246. The Court also noted the risk of "deluging federal courts with claims" and the scarcity of judicial resources, but did not find these special factors sufficiently persuasive to overwhelm Davis's need for a remedial mechanism. Id. at 248 (quotation marks omitted).

The absence of other remedies for a constitutional violation may be a reason for creating a new cause of action. Wilkie, 551 U.S. at 554 (considering, at the second step of the analysis, the inadequacy of existing remedies). Thus, the Supreme Court has recognized a Bivens remedy where, for the plaintiff, it was "damages or nothing." Davis, 442 U.S. at 245 (quoting Bivens, 402 U.S. at 410 (Harlan, J., concurring in judgment)). "'The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.'" Bivens, 403 U.S. at 397 (quoting Marbury v. Madison, 1 Cranch (5 U.S.) 137 (1803)). "[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." Id. at 392 (quoting Bell v. Hood, 327 U.S. 678, 684 (1946)). In Davis, the Court held, "unless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights." 442 U.S. at 242.

The majority "avoids any categorical ruling on alternative remedies," in favor of its "dominant holding" on special factors. Maj. Op. at **8**.[3] I have searched the majority's opinion for

_____

[3] By abandoning the panel majority's holding that the INA is an alternative existing remedy that precludes Bivens relief, the majority has avoided any implication that well-established Bivens actions for immigrants alleging Fourth and Eighth amendment violations

5

a subordinate and non-categorical ruling on alternative remedies, and I have found none. This is for good reason. The majority recognizes that "Arar has alleged that he was actively prevented from seeking any meaningful review and relief through the INA processes." Id. at **35**. This makes Arar's case unlike those in which the Court refused to imply a Bivens remedy upon concluding that Congress had already established a remedial scheme covering the field. See, e.g., Schweiker v. Chilicky, 487 U.S. 412 (1988); Bush v. Lucas, 462 U.S. 367 (1983). Where defendants blocked a plaintiff's access to the remedies established by Congress, foreclosing a Bivens remedy eliminates any judicial review. See Rauccio v. Frank, 750 F. Supp. 566, 571 (D. Conn. 1990); Grichenko v. U.S. Postal Serv., 524 F. Supp. 672, 676-77 (E.D.N.Y. 1981). This result thwarts Congress's will and abdicates the judicial role. The majority errs in failing to take account of this consideration in its assessment of special factors.

In cases in which the Court declined to extend Bivens, it did not resolve the issue simply by observing that it had to pause to consider special factors. Rather, the Court declined to extend Bivens because factors related to institutional competence and separation of powers strongly counseled hesitation. For example, in Chappell v. Wallace, 462 U.S. 296 (1983), the Court declined to create a damages remedy for alleged racial discrimination by military officers because "[t]he need for . . . a special and exclusive system of military justice[] is too obvious to require extensive discussion; no military organization can function without strict discipline and regulation that would be unacceptable in a civilian setting," id. at 300, and the creation of a Bivens remedy by the federal courts "would be plainly inconsistent with Congress' authority in

___

are without basis. And, by abandoning the holding that it could not take as true Arar's "unverified" allegations of official obstruction of his right to challenge the CAT determination, the opinion avoids the implication that Bivens claimants face a heightened pleading standard.

this field" under Article 1of the Constitution, id. at 304.

Ultimately, the majority concludes that the Constitution provides Arar no remedy for this wrong, that the judiciary must stay its hand in enforcing the Constitution because untested national security concerns have been asserted by the Executive branch. For the reasons stated herein and in Judge Sack's dissenting opinion, I would hold the Arar should have a Bivens remedy – to reinforce our system of checks and balances, to provide a deterrent, and to redress conduct that shocks the conscience. I understand the majority's opinion today to be a result of its hyperbolic and speculative assessment of the national security implications of recognizing Arar's Bivens action, its underestimation of the institutional competence of the judiciary, and its implicit failure to accept as true Arar's allegations that defendants blocked his access to judicial processes so that they could render him to Syria to be tortured, conduct that shocks the conscience and disfigures fundamental constitutional principles. This is a hard case with unique circumstances. The majority's disappointing opinion should not be interpreted to change Bivens law.

## II. TVPA

I cannot join the Court in concluding that the facts of Arar's complaint are insufficient to state a claim under the TVPA. Section 2(a) of the TVPA provides that a defendant is liable only if he acted under "actual or apparent authority, or color of law, of any foreign nation . . ." 28 U.S.C. 1350 (note). In construing this requirement, we look "to principles of agency law and to jurisprudence under 42 U.S.C. § 1983." Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir. 1995). Under Section 1983, "[t]he traditional definition of acting under color of state law requires that the defendant . . . have exercised power possessed by virtue of state law and made possible only

7

because the wrongdoer is clothed with the authority of state law."  West v. Atkins, 487 U.S. 42, 49 (1988) (quotation marks omitted).

I agree with the majority that there is no litmus test for determining whether a Section 1983 defendant is acting under color of state law.  Maj. Op. at **21** ("The determination as to whether a non-state party acts under color of state law requires an intensely fact-specific judgment unaided by rigid criteria as to whether particular conduct may be fairly attributed to the state." (citing Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 295 (2001)).  This is a wise departure from the test set forth by the panel opinion, which interpreted Section 1983 case law to require that when the defendant is a federal official, he must be under the "control or influence" of the state actor to act under color of state law.  Arar, 532 F.3d at 175-76.  Our Circuit has consistently recognized several bases for liability under Section 1983, "control or influence" being just one:

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

Sybalski v. Indep. Group Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008) (per curiam) (quoting Brentwood Acad., 531 U.S. at 296).  As the majority now recognizes, "[a] federal officer who conspires with a state officer may act under color of state law."  Maj. Op. at **21** (citing Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 154 (2d Cir. 2006)).

The majority concludes that Arar's pleading was deficient because he alleged only that

8

"United States officials encouraged and facilitated the exercise of power by Syrians in Syria," not that defendants possessed power under Syrian law which they used to remove him to Syria to be tortured. Maj. Op. at **21-22**. I disagree. In the Section 1983 context, the Supreme Court has held that private individuals may be liable for joint activities with state actors even where those private individuals had no official power under state law. <u>Dennis v. Sparks</u>, 449 U.S. 24, 27-28 (1980). In <u>Sparks</u>, the private individuals conspired with a state judge to enjoin the plaintiff's mining operation. The Court held:

> [T]o act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions.

<u>Id.</u>; <u>see also</u> <u>Khulumani v. Barclay Nat. Bank Ltd.</u>, 504 F.3d 254, 315 (2d Cir. 2007) (Korman, J., concurring in part). Arar alleges that U.S. officials, recognizing that Syrian law was more permissive of torture that U.S. law, contacted an agent in Syria to arrange to have Arar tortured under the authority of Syrian law. Specifically, Arar alleges that U.S. officials sent the Syrians a dossier containing questions, identical to those questions he was asked while detained in the U.S., including one about his relationship with a particular individual wanted for terrorism. He also alleges the Syrian officials supplied U.S. officials with information they extracted from him, citing a public statement by a Syrian official. Assuming the truth of these allegations, defendants' wrongdoing was only possible due to the latitude permitted under Syrian law and their joint action with Syrian authorities. The torture may fairly be attributed to Syria.

Because the majority's holding in this case is not required by controlling law from the

9

Section 1983 context,[4] the decision must turn on the unique features of this case – brought under

the TVPA alleging joint action by federal agents with Syrian officials.  The majority cites

Harbury v. Hayden, 444 F. Supp. 2d 19, 42-43 (D.D.C. 2006), aff'd on other grounds, 522 F.3d

413 (D.C. Cir. 2008).  In that case, as well as one other, district judges concluded that U.S.

officials pursuing federal policy under federal statutes act under color of U.S., not foreign, law.

Id. (holding that CIA officers cooperating with the Guatemalan military acted under color of U.S.

law because they were "within the scope of their employment serving the United States" and

"carrying out the policies and directives of the CIA"); Schneider v. Kissinger, 310 F. Supp. 2d

251, 267 (D.D.C. 2004) ("Dr. Kissinger was most assuredly acting pursuant to U.S. law . . .

despite the fact that his alleged foreign co-conspirators may have been acting under color of

Chilean law."), aff'd on other grounds, 412 F.3d 190 (D.C. Cir. 2005).  But the majority does not

adopt this questionable reasoning – that a federal official can act under color of only one

sovereign's authority at a time.  The majority simply observes that because "federal officials

typically act under color of federal law, they are rarely deemed to have acted under color of state

law."  Maj. Op. at **21** (quotation marks omitted).

Rather, where the alleged torture was carried out by foreigners in a foreign land, the

majority draws a line between the actual exercise of power under foreign law and the

encouragement, facilitation, or solicitation of that exercise of power.  Id. at **21-22**.  This

distinction is unprincipled.  Under agency law, "when two persons engage jointly in a partnership

for some criminal objective, the law deems them agents for one another.  Each is deemed to have

---

[4] Because the majority's holding turns on the unique aspects of Arar's claim under the TVPA, it does not limit the range of conduct for which non-state actors can be held liable under Section 1983.

10

authorized the acts and declarations of the other undertaken to carry out their joint objective."

United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002). It is of no matter that only one member

of the conspiracy carried out the torture. If we carry the majority's logic to its extreme, federal

agents "could never be responsible for torture inflicted under color of foreign law, even if they

were in the room with the foreign torturers orchestrating the techniques." Arar Reply Br. at 36.[5]

Under Section 1983, non-state actors who willfully participate in joint action with state

officials, acting under state law, themselves act under color of state law. By analogy, under the

TVPA, non-Syrian actors who willfully participate in joint action with Syrian officials, acting

under Syrian law, themselves act under color of Syrian law. In Aldana v. Del Monte Fresh

Produce, 416 F.3d 1242, 1249, 1265 (11th Cir. 2005), the Eleventh Circuit sustained a TVPA

claim where plaintiffs alleged that a U.S. corporation "hir[ed] and direct[ed] its employees and/or

agents," including a Guatemalan mayor, "to torture the Plaintiffs and threaten them with death."

416 F.3d at 1265. The allegation that the corporation participated in joint action with the

Guatemalan official was sufficient.[6] I see no principled reason to apply different rules to the

TVPA context than the Section 1983 context, to federal agent defendants than corporate

---

[5] The majority's perplexing statement that if a federal official were found to be acting under color of foreign law, it "would render a U.S. official an official of a foreign government," Maj. Op. at **22-23 n.3**, is simply incorrect. A private actor is not transformed into a state official merely because he acted under color of state law, see Dennis, 449 U.S. at 27-28 (1980), and there is no reason that this would be the case in the analogous TVPA context.

[6] Although the question in Aldana was whether violence by a private security force involved "state action," and not whether the U.S. corporation was acting in Guatemala under color of U.S. or Guatemalan law, in the Section 1983 context, the two inquiries are interchangeable. See, e.g., Lugar v. Edmondson Oil Co., 457 U.S. 922, 929 (1982); see also Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1264 (11th Cir. 2009).

11

defendants, or to actors in the United States than actors on foreign soil.[7]  Arar alleges that

defendants, acting in concert with Syrian officials, interrogated him through torture under color

of Syrian law, which they could not have accomplished under color of U.S. law alone.

Thus, I cannot agree that the panel correctly determined the TVPA question on the "color

of law" question.

I must therefore respectfully dissent.

---

[7]  Because plaintiffs must meet a plausibility standard for claims against federal officials under Ashcroft v. Iqbal, supra, I am not concerned that subjecting federal officials to liability under the TVPA would open the floodgates to a wave of meritless litigation.  But see Hayden, 444 F. Supp. 2d at 41.

CALABRESI, <u>Circuit Judge</u>, joined by Judges Pooler, Sack, and Parker, dissenting.

I respectfully dissent. I join Judge Sack's, Judge Parker's, and Judge Pooler's dissenting opinions in full. But, because I believe that when the history of this distinguished court is written, today's majority decision will be viewed with dismay, I add a few words of my own, ". . . more in sorrow than in anger." *Hamlet*, act 1, sc. 2.

My colleagues have already provided ample reason to regret the path the majority has chosen. In its utter subservience to the executive branch, its distortion of *Bivens* doctrine, its unrealistic pleading standards, its misunderstanding of the TVPA and of § 1983, as well as in its persistent choice of broad dicta where narrow analysis would have sufficed, the majority opinion goes seriously astray. It does so, moreover, with the result that a person—whom we must assume (a) was totally innocent and (b) was made to suffer excruciatingly (c) through the misguided deeds of individuals acting under color of federal law—is effectively left without a U.S. remedy. *See especially* dissenting opinion of Judge Parker.

All this, as the other dissenters have powerfully demonstrated, is surely bad enough. I write to discuss one last failing, an unsoundness that, although it may not be the most significant to Maher Arar himself, is of signal importance to us as federal judges: the majority's unwavering willfulness. It has engaged in what properly can be described as extraordinary judicial activism.[1] It has violated long-standing canons of restraint that properly must guide courts when they face complex and searing questions that involve potentially fundamental constitutional rights. It has

---

[1] I use this much abused phrase "judicial activism," in its literal sense, to mean the unnecessary reaching out to decide issues that need not be resolved, the violation of what Chief Justice Roberts called "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs., Inc. v. U.S. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring).

reached out to decide an issue that should not have been resolved at this stage of Arar's case. Moreover, in doing this, the court has justified its holding with side comments (as to other fields of law such as torts) that are both sweeping and wrong. That the majority—made up of colleagues I greatly respect—has done all this with the best of intentions, and in the belief that its holding is necessary in a time of crisis, I do not doubt. But this does not alter my conviction that in calmer times, wise people will ask themselves: how could such able and worthy judges have done that?

**I**

I focus first on the willful reaching out to decide a hard constitutional question. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944). The Supreme Court long ago made clear that it would not—and that we should not—"pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *see also, e.g.*, *Alexander v. Louisiana*, 405 U.S. 625, 633 (1972) ("[W]e follow our usual custom of avoiding decision of constitutional issues unnecessary to the decision of the case before us."); *Burton v. United States*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case."). We ourselves have described this canon of constitutional avoidance as "axiomatic," *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149 (2d Cir. 2001), and have long allowed it to "dictate[]" our decisions in appropriate circumstances. *Fine v. City of New*

2

*York*, 529 F.2d 70, 76 (2d Cir. 1975).[2]

The question that today's majority elects to decide implicates this fundamental principle. This is because the existence *vel non* of a claim meriting a *Bivens* remedy, in the absence of any congressionally mandated relief, is a matter of constitutional interpretation. As early as *Bivens* itself, the Supreme Court made clear that the cause of action it recognized arose "under" the Constitution. *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971). As Justice Harlan said in his influential concurrence in *Bivens*, "the source of the legal interest" protected by any *Bivens* action is "the Federal Constitution itself"; "the Constitution is in the relevant sense a source of legal protection for the 'rights' enumerated therein." *Id.* at 402 n.3 (Harlan, J., concurring). And even the majority here describes *Bivens* as "a judicially-created remedy *stemming directly from the Constitution itself.*" Maj. Op. at **30**

---

[2] There is also a canon that courts should not lightly find legislation to be unconstitutional. *See, e.g.*, *Clark v. Suarez Martinez*, 543 U.S. 371, 381-82 (2005). That canon is of great importance, and is related to but separate from the canon to which I am referring. *See id.* at 381. It derives from the so-called "majoritarian difficulty," the fact that courts are, generally, not representative bodies. *See* Alexander M. Bickel, *The Least Dangerous Branch* 16-17 (2d ed. 1986) ("[W]hen the Supreme Court declares unconstitutional a legislative act or the action of an elected executive, it thwarts the will of representatives of the actual people . . . .") The canon at issue in this case is different, however, and demands, more broadly, that unnecessary constitutional decisions not be made, *whichever way they would come out.* It is expressed in a large variety of rules, a few of which are listed in one Supreme Court decision:

> constitutional issues affecting legislation will not be determined in friendly, nonadversary proceedings; *in advance of the necessity of deciding them*; in broader terms than are required by the precise facts to which the ruling is to be applied; *if the record presents some other ground upon which the case may be disposed of*; at the instance of one who fails to show that he is injured by the statute's operation, or who has availed himself of its benefits; or if a construction of the statute is fairly possible by which the question may be avoided.

*Rescue Army v. Mun. Court of Los Angeles*, 331 U.S. 549, 569 (1947) (emphasis added).

3

(emphasis added).[3]

I recognize that this question—the constitutional status of *Bivens* actions—is one that has vexed some in academia. But as is often the case, what can be layered with mystery in the pages of a law review is, in practice, fairly simple. When a court concludes that a *Bivens* action is appropriate, it is holding that, on the then-present state of the law, the Constitution requires the court to create a remedy. As even the staunchest critics of *Bivens* recognize, a holding that a particular constitutional right implies a remedy "can presumably not even be repudiated by Congress." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring). While Congress can vitiate the need for a judicially created *Bivens* remedy by providing an "alternative . . . process for protecting the [constitutional] interest," *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007),[4] it cannot overturn a holding that *some* remedy is necessary.[5] This is the

---

[3] *Cf. Fine*, 529 F.2d at 71, 76 (2d Cir. 1975) (declining to decide the "difficult and troublesome constitutional questions" in a *Bivens*-like claim against a municipality "founded directly upon the Fourteenth Amendment"); *Brault v. Town of Milton*, 527 F.2d 730, 738 (2d Cir. 1975) (en banc) (assuming, without deciding, that a claim against a municipality "can be founded directly on the Fourteenth Amendment," but finding "discussion of other possible barriers on [the plaintiff's] road to relief . . . superfluous" because the allegations in the complaint were insufficient).

[4] For this reason, were there a majority finding that Arar could bring a TVPA action, as Judge Pooler, in her dissenting opinion, powerfully argues he should be able to do, then of course there might well be an "alternative, existing process," *Wilkie*, 551 U.S. at 550, in which case a *Bivens* action might not lie under the well-established rule that such a remedial scheme may obviate the need for a *Bivens* action. Because of the majority's holding that the TVPA does not apply, however, I need not reach this question. A more complicated issue, which I also don't need to reach, is whether compensation by a *foreign* government can constitute an alternative redress, because of which, on the very particular facts of this case, a *Bivens* action might not lie. But no one has discussed or argued that in any way, and since it is not an easy issue, I see no need to delve into it further.

[5] The first step of the two-part analysis laid out in *Wilkie* is itself an instance of constitutional avoidance. Where a congressionally created process adequately protects a

4

essence of a constitutional holding, and hence one directly subject to the avoidance canon.[6]

That avoiding difficult constitutional questions like those before us is the proper course was made clear by the Supreme Court in *Christopher v. Harbury*, 536 U.S. 403 (2002). In that case, the only issue before the Supreme Court was whether Harbury's *Bivens* action for denial of access to courts could proceed. *Id.* at 412. Justice Souter (for eight members of the Court) wrote

_____

constitutional right, there is no need to determine whether the Constitution requires a remedy. *See Bush v. Lucas*, 462 U.S. 367, 378 n.14 (1983) ("We need not reach the question whether the Constitution itself requires a judicially fashioned damages remedy in the absence of any other remedy to vindicate the underlying right, unless there is an express textual command to the contrary. The existing civil service remedies for a demotion in retaliation for protected speech are clearly constitutionally adequate." (citation omitted)).

By contrast, the Supreme Court, acting prudentially, has denied *Bivens* claims due to "special factors" only in quite particular circumstances implicating substantial constitutional questions. First, it has done so in response to an exclusive textual commitment of authority to another branch. *See United States v. Stanley*, 483 U.S. 669, 681-82 (1987) (holding that no *Bivens* action lay because of "explicit constitutional authorization for *Congress* 'to make Rules for the Government and Regulation of the land and naval Forces'" and "the insistence . . . with which the Constitution confers authority over the Army, Navy, and militia upon the political branches" (quoting U.S. Const. Art. I, § 8, cl. 14)); *Chappell v. Wallace*, 462 U.S. 296, 300-02 (1983) (same); *cf. Davis v. Passman*, 442 U.S. 228, 246 (1979) ("[A]lthough a suit against a Congressman for putatively unconstitutional actions taken in the course of his official conduct does raise special concerns counseling hesitation, we hold that these concerns are coextensive with the protections afforded by the Speech or Debate Clause."). Second, it has done so where the Constitution did not provide a workable standard for distinguishing constitutional conduct from unconstitutional conduct. *See Wilkie*, 551 U.S. at 555-61.

[6] While the methodology that courts apply in determining whether or not a constitutional right presupposes some implied remedy is that of "a common-law tribunal," *Bush*, 462 U.S. at 378, that fact in no way diminishes the status of the ultimate holding, up or down, as a constitutional interpretation.

And while there are, of course, situations in which a court must or should put aside the practice of avoiding constitutional questions, as when its jurisdiction under Article III is in doubt, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998), none of them apply here. The existence *vel non* of a *Bivens* action is not a jurisdictional prerequisite that must be resolved first. If this was ever in doubt, it has been resolved by *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009), which makes clear that a court can "assume, without deciding, that [a] claim is actionable under *Bivens*" and then dismiss a case on non-jurisdictional grounds.

that whether this *Bivens* action lies would require an inquiry that raises

concerns for the separation of powers in trenching on matters committed to the other branches. *Since the need to resolve such constitutional issues ought to be avoided where possible, the [courts] should . . . as soon as possible in the litigation [determine] whether a potential constitutional ruling may be obviated because the allegations of denied access fail to state a claim on which relief could be granted.*

*Id.* at 417 (emphasis added). The Court, in other words, said we must first decide if there are non-*Bivens* grounds for resolving the dispute, and only then address the constitutional issues raised by *Bivens* actions.[7] This practice, the Court stated, comports with "the obligation of the Judicial Branch to avoid deciding constitutional issues needlessly." *Id.* The Court then proceeded to examine closely the cause of action that Harbury claimed to have lost through the defendants' behavior, determined that it was insufficient to justify relief, and, on that non-constitutional basis, dismissed Harbury's claim. *Id.* at 418.

The implications for Arar's case could hardly be more manifest. The national security concerns that the majority relies upon in its special factors analysis are precisely those that the Supreme Court said must be avoided in *Harbury*. And in such circumstances, it is our job to put

---

[7] To be sure, the Supreme Court noted that the defendants in *Harbury* "did not challenge below the existence of a cause of action under *Bivens,*" and accordingly it did not express an opinion on the question or use the "special factors" terminology. *Harbury*, 536 U.S. at 412 n.6. But the constitutional question before us, of the balancing of two constitutional interests, one an individual right and one a matter of national security and separation of powers, is the same one as was avoided in *Harbury*.

6

"the trial court . . . in a position as soon as possible in the litigation to know whether a potential constitutional ruling may be obviated." *Id.* at 417. For reasons that will be clear soon enough, it may well be that, on remand, this case would, for non-constitutional reasons, "fail to state a claim on which relief could be granted." *Id.* at 417. That being so, the Supreme Court has told us, we must avoid constitutional pronouncements.

For this Court to go out of its way to decide on *Bivens* grounds when it is not necessary is, therefore, a reaching out of a particularly dangerous sort, regardless of what conclusion the Court comes to on the *Bivens* question.[8] If—as I would if I had to face the question—we were to decide that *Bivens* applies, then some remedy would be necessary regardless of Congress's preference. If, as the majority chooses to do, we rule that *Bivens* does not apply, we have said that, in a wide variety of cases, the Constitution fails to give protection. Both positions require a parsing of the Great Charter. When such a decision cannot be avoided, so be it: we do our job. But where it can be avoided, it should be.

## II

So, how might the *Bivens* issue have been avoided? As Judge Sack explains in his

---

[8] At footnote 7, the majority disputes Judge Pooler's statement that the propositions in the accompanying text are dicta. *See* Maj. Op. at **37**. The majority then seeks to characterize those propositions as holdings. But whether something is holding or dicta is an objective fact and does not depend on how it is characterized either by a majority or by a dissent. It is what it is regardless of what one calls it. To paraphrase my professor Fleming James, "You can call it Thucydides or you can call it mustard plaster, but it is [dicta or holding] just the same."

The fact that the majority *wishes* to call the propositions holding is instructive, however. If the propositions are *holding* then they would eliminate virtually all *Bivens* actions in this circuit. And they would do so despite the assertions, elsewhere in the majority opinion, that recognizing a *Bivens* action in this extraordinary case would be uniquely dangerous. The majority's desire to make a "holding" of such breadth, as to a question entailing constitutional interpretation, in a case which, as I argue, could likely be resolved on other grounds, displays a truly extraordinary degree of willfulness and activism.

7

eloquent dissent, this might be done through first examining the significance of the state secrets privilege to this case.[9] That privilege has long required dismissal in those rare cases where national security interests so drastically limit the evidence that can be introduced as to deprive either a plaintiff or a defendant of an opportunity to make its case. *See, e.g.*, *Zuckerbraun v. Gen. Dynamics Corp.*, 932 F.2d 544, 547 (2d Cir. 1991); *see also United States v. Reynolds*, 345 U.S. 1 (1953); *El-Masri v. United States*, 479 F.3d 296, 308 (4th Cir. 2007) ("[A] proceeding in which the state secrets privilege is successfully interposed must be dismissed if the circumstances make clear that privileged information will be so central to the litigation that any attempt to proceed will threaten that information's disclosure."). In a case such as this, where the Government asserts that the plaintiff's claim implicates vital national secrets, we must, before we move to the merits, examine the consequences of our duty to guard against any potentially harmful disclosures.

The majority obviously shares our concerns about the protection of state secrets, as virtually every "special factor" identified in the majority opinion concerns classified material. But, as Judge Sack says, this amounts to double-counting of the Government's interest in preserving state secrets. *See* dissenting opinion of Judge Sack at **52**. We *already* possess a well-

---

[9] At footnote 14, the majority states that the state secrets privilege, despite its common law origin, is not devoid of constitutional implications. *See* Maj. Op. at **58-59**. That may well be. But that fact in no way means that decisions as to the applicability of a particular claim of the privilege entail constitutional interpretations. The existing common law privilege more than covers whatever the Constitution requires. The proper analogy is quite simple. If Congress were to pass a statute, akin to § 1983, giving broad cause of action to those injured by federal officials, decisions under that statute would not normally involve constitutional interpretations. And this would be so even though, in the absence of such a statute, a *Bivens*, constitutional claim, might lie. The same is so with respect to applications of the common law state secrets privilege. As an excuse for the majority's violation of the canon of constitutional avoidance this argument does not make it to first base.

8

established method for protecting secrets, one that is more than adequate to meet the majority's concern.[10] Denying a *Bivens* remedy because state secrets might be revealed is a bit like denying a criminal trial for fear that a juror might be intimidated: it allows a risk, that the law is already at great pains to eliminate, to negate entirely substantial rights and procedures.

Even more mystifying is the majority's insistence that it is respecting "[t]he preference for open rather than clandestine court proceedings." Maj. Op. at **47**. How, exactly, does the majority promote openness by shaping a constitutional decision around the fact that state secrets might be involved in a claim? The state secrets doctrine is undoubtedly in tension with the public right of access to the courts, but the majority's approach is more opaque than any state secrets resolution. When a court properly applies the state secrets doctrine, the case at bar will proceed only if the alleged state secrets are not vital to a claim or defense, so there should be little fear that a substantive holding will ultimately turn on secret material. By contrast, consider the harm done to the openness of the court system by what the majority does here. It bars any action in the face of what we are required to assume are outrageous constitutional violations, and it does so simply because state secrets *might possibly* be involved, without having a court look into that very question. As a result, even if the Government's claimed need for secrecy turned out to be wholly illusory, there would be no recourse! Indeed, even if the Government declassified every document relating to this case, even if all four countries involved announced that they had nothing to hide and that Arar's claim should proceed so that they could be

---

[10] Indeed, if anything, existing doctrine may be *too* solicitous of the need for secrecy, if the many critics of the *Reynolds* line are correct. *See infra* Part IV. But while there is widespread concern that the doctrine may be overused, it is hard to find any commentators who think that state secrets are inadequately protected under current law.

exonerated, there would be no open judicial testing of Arar's allegations. Which approach should give us more cause to hesitate?

The majority further errs in its use and abuse of other fields of law. In trying to find "special factors" that could justify barring a *Bivens* claim (but do not depend on "state secrets") the majority points to two issues that arise in *every* tort suit against a government official. If they are valid here they would appear to counsel "hesitation" in (and, under the majority's reasoning, seemingly preclude) every *Bivens* action. First, the majority warns that "[t]he risk of graymail . . . counsels hesitation in creating a *Bivens* remedy." Maj. Op. at **51**. Because the risk of unwarranted and dangerous disclosure is so high, the Government will be pressured into settling meritless cases. Second, as a consequence of such graymail, the Government, rather than individual defendants, would wind up paying off claims. *See* Maj. Op. at **52**. Because these possibilities are "an endemic risk in cases (however few) which involve a claim like Arar's," the majority concludes, they make *Bivens* actions particularly inappropriate. Maj. Op. at **51**.

But both of these issues—the risk of graymail and the disjunction between individual defendants and an indemnifying government—are present in *every* tort suit against a government agent, not just the relatively "few" cases involving extraordinary rendition for the purposes of torture.[11] Taking the latter point first, both state and federal officers are almost universally indemnified by the State if they lose tort suits. In *Bivens* cases, the federal government "indemnifies its employees against constitutional tort judgments or settlements (in the rare instances in which a *Bivens* claim results in a monetary liability) and takes responsibility for

---

[11] That is, except to the extent "state secrets" are involved. And to the extent they are, as already discussed, the state secrets privilege is more than sufficient to preclude graymail.

10

litigating such suits." Cornelia T.L. Pillard, *Taking Fiction Seriously: The Strange Results of Public Officials' Individual Liability Under Bivens*, 88 Geo. L.J. 65, 76 (1999). Indeed, "[a]s a practical matter . . . indemnification is a virtual certainty." *Id.* at 77. Similarly, as is widely understood, "a suit against a state officer is functionally a suit against the state, for the state defends the action and pays any adverse judgment. So far as can be assessed, this is true not occasionally and haphazardly but pervasively and dependably." John C. Jeffries, Jr., *In Praise of the Eleventh Amendment and Section 1983*, 84 Va. L. Rev. 47, 50 (1998) (citation omitted). So the majority's point proves far too much: if a *Bivens* action is inappropriate where the individual defendants' pocketbooks are not ultimately at risk, then *Bivens* actions are *always* inappropriate. And while the majority could be right that, as a policy matter, tort suits against financially indifferent defendants are unwise, who are we as federal appellate judges to say that *what is standard tort law in every state in the nation*, and what has been repeatedly approved by the Supreme Court and every federal circuit, *is fatally unacceptable?*

As to graymail, defendants in civil suits are always subject to pressures to settle, yet this has never been considered a reason to bar categorically a type of suit against government officials. Is the desire to avoid the revelation of state secrets (a desire that is already fully accommodated by the state secrets doctrine) so different from the desire to avoid, for example, devastating reputational injury, which will often drive a state or federal entity's response to a suit? How is the hassle attendant on a claim like Arar's—the "enmesh[ing of] government lawyers" and the "elicit[ing of] government funds for settlement," Maj. Op. at **39**—so much worse here than it is in the types of suits that every state has chosen to permit and that all three branches of the federal Government have accepted since *Bivens* was issued almost 40 years

11

ago?[12]

These, then, are the majority's determinative "special factors": a mix of risks that are amply addressed by the state secrets doctrine and policy concerns that inhere in all *Bivens* actions and in innumerable every-day tort actions as well.[13] This maladaptation of a *Bivens* analysis, as far as I can tell, is motivated by a belief that the majority's holding is necessary to protect our nation's security. But, as I have already said, that worthy concern both can be and should be protected by already existing ordinary law and not by reaching out and potentially warping the

[12] On the subject of graymail, something must be said in response to the majority's remarkable insinuation that Canada has been the victim of graymail at Arar's hands. Maj. Op. at **53-54**. ("It is not for nothing that Canada (the government, not an individual officer of it) paid Arar $10 million dollars."). The Canadian government decided on its own accord to initiate an inquiry into its role in Arar's treatment, an investigation that operated independently of Arar's suits. That inquiry was "specifically precluded from making any findings (or even assessments) as to whether the Government of Canada would be civilly liable to Mr. Arar." *Report of the Events Relating to Maher Arar: Analysis & Recommendations*, Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar 362 (Sept. 18, 2006). It had no power to recommend payment, but instead just expressed the facts surrounding Arar's treatment, spelling out Canada's conduct vis-à-vis Arar in hundreds of pages of detail. The Canadian government considered that report and decided to compensate and apologize to Arar. In other words, Canada voluntarily established a commission the entire purpose of which was to determine and discuss publicly what the Canadian government did to Arar; it then assessed those facts and concluded that it should negotiate a settlement with him and formally apologize for the role of Canadian officials. Many lessons could be drawn from this process for the American response to allegations like Arar's, but one thing quite clearly cannot be said: that what happened in Canada is tantamount to graymail.

[13] My fellow dissenters have said all that needs to be said about the majority's insistence that Arar's action is "a constitutional challenge to policies promulgated by the executive" and that *Bivens* actions cannot proceed where they "affect diplomacy, foreign policy and the security of the nation." Maj. Op. at **38**. And as to the ominous-sounding warning that "[s]uch a suit unavoidably influences government policy" and "invades government interests," Maj. Op. at **39**, I would not think that an unconstitutional course of government action is shielded from scrutiny merely because it can be described as a "policy" or "interest." If the DEA had a "policy" of conducting warrantless home searches, would we hesitate to influence it? *See Bivens*, 403 U.S. at 389-90. If corrections officials acted on an "interest" in denying their inmates medical care, would we hesitate to invade it? *See Carlson v. Green*, 446 U.S. 14, 16 (1980).

Constitution.

## III

The state secrets doctrine has recently come in for significant criticism, much of it warranted. In particular, many commentators—not to mention the Obama administration and a Ninth Circuit panel—have suggested that outright dismissal of a case on state secrets grounds should be disfavored. *See, e.g.*, *Mohamed v. Jeppesen Dataplan, Inc.*, 563 F.3d 992, 1006 (9th Cir. 2009), *amended at* 579 F.3d 942, *reh'g en banc granted by* No. 08-15693, 2009 U.S. App. LEXIS 23595; *Policies and Procedures Governing Invocation of the State Secrets Privilege*, Memorandum from the Attorney Gen. to Heads of Exec. Dep'ts and Agencies (Sept. 23, 2009), *available at* http://www.usdoj.gov/opa/documents/state-secret-priviliges.pdf. There is much to these concerns. But I would note three reasons that a threshold dismissal for want of evidence due to the existence of state secrets (if that were eventually determined necessary) would be preferable to the constitutional holding made today. And this would be so, I suggest, quite apart from the importance of adhering to the canon of constitutional avoidance.

First, a dismissal because a party simply cannot (for reasons of state secrets) proffer necessary evidence says nothing about the merits of the underlying claim.[14] While this may be deeply unfair to a party who has been grievously injured (as we must assume Arar was), it, at least, does no damage to the legal standards by which other parties' claims are judged.

Second, a routine practice of first considering state secrets avoids the risk of a certain type

---

[14] The fact that a claim involves an open and plausible constitutional question should be no bar to a state secrets ruling. As in *Iqbal*, a court can simply "assume, without deciding, that [plaintiff's *Bivens*] claim is actionable" and determine whether a case must be dismissed even on the legal theory most favorable to the plaintiff. *Iqbal*, 129 S. Ct. at 1948.

13

of Government gamesmanship. If the Government has the option of seeking a state secrets dismissal both before *and* after a decision on some open question, then it has the ability to moot unfavorable rulings. Consider the strategy in this case. The Government's initial filing before the District Court sought a state secrets dismissal. In its brief for this *en banc* hearing, however, *after* it had won a favorable substantive ruling from the District Court and the panel, the Government did not mention any interest in a remand for a state secrets dismissal.[15] It seems more than likely that, had the District Court or the panel found *against* the Government on the *Bivens* question, the Government would be arguing to us that the opinion below should be vacated pending a state secrets determination. To be sure, a party has no obligation to fire all of its guns at once when a single argument can shoot a claim down. And I do not mean to imply any devious motive on the part of the Government in this case in particular. But there is no reason to structure our law to facilitate such conduct.

Third, and most important, a holding that Arar, *even if all of his allegations are true*, has suffered no remediable constitutional harm *legitimates* the Government's actions in a way that a state secrets dismissal would not. The conduct that Arar alleges is repugnant, but the majority signals—whether it intends to or not—that it is not *constitutionally* repugnant. Indeed, the majority expressly states that the legal significance of the conduct Arar alleges is a matter that should be left entirely to congressional whim. *See* Maj. Op. at **56-57**. While a state secrets dismissal would similarly move the locus of redress to the political branches, it would do so not by holding that the harm done to Arar is of no concern to the judiciary or to the Constitution. It

---

[15] At oral argument, however, the Government did indicate that it could accept such a remand.

14

would do so, instead, by acknowledging an institutional limitation—due to the presence of state secrets—that is independent of the merits of Arar's claim and would, thereby, invite other branches to look into those possible merits.

This leads to my final point. Whether extraordinary rendition is constitutionally permissible is a question that seems to divide our country. It seems to me obvious, however, that regardless of the propriety of such renditions, an issue on which I won't hide my strong feelings, mistakes *will* be made in its operation. And *more* obvious still is that a civilized polity, when it errs, admits it and seeks to give redress. In some countries, this occurs through a royal commission. In the United States, for better or worse, courts are, almost universally, involved. This being so, and regardless of whether the Constitution itself requires that there be such redress, the object must be to create and use judicial structures that *facilitate* the giving of compensation, at least to innocent victims, while protecting from disclosure those facts that cannot be revealed without endangering national security. That might well occur here through the application of a sophisticated state secrets doctrine.[16] It does not occur when, at the outset,

---

[16] Consider the closing remarks of Judge Ellis in his state secrets dismissal of Khaled El-Masri's similar allegations:

> It is important to emphasize that the result reached here is required by settled, controlling law. It is in no way an adjudication of, or comment on, the merit or lack of merit of El-Masri's complaint. . . . [P]utting aside all the legal issues, if El-Masri's allegations are true or essentially true, then all fair-minded people, including those who believe that state secrets must be protected, that this lawsuit cannot proceed, and that renditions are a necessary step to take in this war, must also agree that El-Masri has suffered injuries as a result of our country's mistake and deserves a remedy. Yet, it is also clear from the result reached here that the only sources of that remedy must be the Executive Branch or the Legislative Branch, not the Judicial Branch.

*El-Masri v. Tenet*, 437 F. Supp. 2d 530, 540-41 (E.D. Va. 2006).

Arar's claims—though assumed true and constitutionally significant—are treated as lacking any remedy. And this is just what today's unfortunate holding does. It hampers an admission of error, if error occurred; it decides constitutional questions that should be avoided; it is, I submit, on all counts, utterly wrong. I therefore must regretfully, but emphatically, dissent.